1

**POMERANTZ LLP**

2
Brian Calandra (*pro hac vice*)

Jeremy Lieberman (*pro hac vice*)
3
600 3rd Avenue, 20th Floor

New York, NY 10016
4
bcalandra@pomlaw.com

5
jalieberman@pomlaw.com

6

Jennifer Pafiti (SBN 282790)
7
1100 Glendon Avenue, 15th Floor

Los Angeles, California 90024
8
Telephone: (310) 405-7190

9
jpafiti@pomlaw.com

10
*Attorneys for Plaintiff*

11

[additional counsel on signature page]
12

13
UNITED STATES DISTRICT COURT

14
CENTRAL DISTRICT OF CALIFORNIA

15

| | |
|---|---|
| 16 ERIC TAN, Individually and on Behalf of All Others Similarly Situated, | Case No.: 8:23-cv-01685-JWH-ADS |
| 17 | |
| 18 Plaintiff, | CLASS ACTION |
| 19 v. | AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| 20 PACWEST BANCORP N/K/A BANC OF CALIFORNIA, INC., MATTHEW P. WAGNER, PAUL W. TAYLOR, BART R. OLSON, WILLIAM J. BLACK, and KEVIN LEWIS THOMPSON, | |
| 21 | DEMAND FOR JURY TRIAL |
| 22 | |
| 23 | |
| 24 | |
| 25 Defendants. | |
| 26 | |

27

28

---

Lead Plaintiffs Aleen Hosdaghian and Onurcan Atak ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, for their amended complaint against Defendants (defined below), allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, *inter alia*, the investigation conducted by Plaintiffs' counsel.

This investigation included, among other things, a review and analysis of: (i) PacWest Bancorp, n/k/a Banc of California, Inc.'s[1] public filings with the Securities and Exchange Commission ("SEC"); (ii) research reports prepared by securities and financial analysts concerning PacWest; (iii) transcripts of PacWest investor conference calls; (iv) PacWest investor presentations; (v) reports by the financial press concerning PacWest; (vi) PacWest securities pricing data; (vii) interviews of former PacWest employees; (viii) consultations with experts; and (ix) other material and data identified herein. Lead Counsel's investigation into the factual allegations is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control.

## NATURE OF THE ACTION

1.     This is a class action on behalf of persons and entities that purchased or otherwise acquired PacWest securities between February 28, 2022 and May 10,

---

[1] Effective as of November 30, 2023, PacWest Bancorp merged with and into Banc of California, Inc., with the surviving entity operating as Banc of California, Inc. (the "Merger"). References to "PacWest" or the "Bank" in this amended complaint are to the pre-Merger PacWest Bancorp. References to "Banc of California" in this amended complaint are to the pre-Merger Banc of California, Inc. References to "BOC" are to the post-Merger Banc of California, Inc.

2023, inclusive ("Class Period"). Plaintiffs pursue claims against Defendants under the Securities Exchange Act of 1934 ("Exchange Act").

2.      Defendants repeatedly misled investors about PacWest's financial condition and the effect consistent, sharp interest rate hikes would have on PacWest's liquidity. As market and financial conditions worsened for the Bank, Defendants instead stood reality on its head, stating that what was bad was actually good for PacWest. Even as similar-sized banks failed, Defendants assured investors that all was well with PacWest. Meanwhile, Defendants were selling stock, getting out before the inevitable stock price reckoning. When, finally, the truth slowly began to emerge and the risks concealed by Defendants' false and misleading statements materialized, PacWest's stock price plummeted, devastating investors.

3.      PacWest was a mid-sized regional California bank largely focused on commercial customers, particularly in the Los Angeles area. Business had boomed at PacWest from 2019 through the end of 2021, with its assets *growing 51%* and its deposits *rising 82%*. At the start of the Class Period, in February 2022, economic conditions were about to undergo a sea change as the U.S. Federal Reserve (the "Fed") prepared to raise interest rates at the fastest pace in four decades.[2]

4.      Throughout the Class Period, Defendants assured investors in SEC filings and press releases, as well as on earnings conference calls, that they were focused on the Bank's risk management. For example, PacWest's annual reports on Form 10-K for 2021 and 2022 (the "2021 10-K" and "2022 10-K," respectively),

---

[2] "Between March 2022 and July 2023, the Federal Open Market Committee raised the federal funds target rate by 525 basis points, making this tightening cycle, which now appears to be over, the fastest in four decades." Felix Richter, *The Most Aggressive Tightening Cycle in Decades*, Statista.com, Dec. 14, 2023, https://www.statista.com/chart/28437/interest-rate-hikes-in-past-tightening-cycles/#:~:text=Between%20March%202022%20and%20July,the%20fastest%20in%20four%20decades.

assured investors that the Bank had a "**comprehensive risk management process that measures, monitors, evaluates, and manages the risks we assume in conducting our activities**," and each of Defendants' quarterly SEC filings during the Class Period (the, "Q1 2022 10-Q," "Q2 2022 10-Q," "Q3 2022 10-Q" and "Q1 2023 10-Q," respectively) advised that PacWest's future performance depended upon "**the effectiveness of [its] risk management framework**." One risk central to the Bank's activities was liquidity, or PacWest's "capacity to meet its cash and collateral obligations without incurring unacceptable losses."[3] To that end, the 2021 and 2022 10-Ks highlighted that "**[e]ffective liquidity management is essential for the operation of our business**."

5.     During the Class Period, however, PacWest's risk management processes were inadequate, and Defendants recklessly failed to manage the Bank's liquidity. According to PacWest's Class Period SEC filings, the Bank managed the risk of covering the $33-35 billion in Class Period customer deposits through assets on hand, or the Bank's "primary liquidity." At the start of the Class Period, Defendants reported "primary liquidity" of over $14 billion for a "liquidity ratio" of primary liquidity to deposits of approximately 40%. The sources of this primary liquidity were largely a portfolio of "available for sale," or "AFS" securities (the "AFS Portfolio"). Over 90% of these securities had maturities of over 5 years and approximately 60% of those securities had maturities of over 10 years. This unbalanced reliance on longer-term securities exposed the AFS Portfolio to increases in interest rates, because when interest rates rise, the value of the securities

---

[3] Board of Governors of the Federal Reserve System, *Supervisory Policy and Guidelines Topics: Liquidity Risk Management*, FederalReserve.Gov https://www.federalreserve.gov/supervisionreg/topics/liquidity_risk.htm, last visited Feb. 19, 2024.

1   in the AFS portfolio falls.[4] Defendants never advised investors of the risks to the
2   AFS portfolio posed by increases in interest rates, nor did Defendants disclose that
3   the AFS portfolio *was entirely unhedged*.

4         6.     In the run-up to and throughout the Class Period, financial journalists
5   sounded alarms bells about the Fed's intent to not only raise interest rates, but also
6   raise those rates at a pace not seen in generations to combat inflation. Defendants
7   thus knew or were severely reckless in not knowing that the Fed would sharply and
8   repeatedly raise interest rates from 2022 into 2023. Indeed, Defendants did nothing
9   to mitigate the impact of raised interest rates on the Bank's AFS portfolio.
10  Accordingly, when the Fed raised rates, the AFS portfolio sustained hundreds of
11  millions of dollars in losses over the course of the Class Period and PacWest's
12  liquidity ratio plummeted from 40% to 20%. Rather than take action to try to
13  ameliorate the damage to the portfolio, Defendants instead simply ***stopped***
14  ***reporting the liquidity ratio altogether***, to hide the truth from investors.

15        7.     The material decline in the AFS portfolio's value and the attendant
16  material decline in the Bank's liquidity ratio meant that PacWest would be unable
17  to cover deposits if substantial customer deposits were withdrawn over a very short
18  time period.

19        8.     Rather than warn investors of the risks rising interest rates presented
20  to the Bank's stability, and the fact that the AFS portfolio was unhedged, however,
21  Defendants assured investors that PacWest would ***benefit*** from the rising rates, in
22  part because of increases in "net interest income" ("NII") which Defendants
23  emphasized was a "key indicator" of the Bank's health. As investors absorbed these

---

[4] *See* Nick Lioudis, *Inverse Relation Between Interest Rates and Bond Prices*,
Investopedia.com, Mar. 28, 2023, https://www.investopedia.com/ask/answers/why-interest-rates-have-inverse-relationship-bond-prices/.

false and misleading assurances, certain Defendants lined their own pockets by selling off hundreds of thousands or millions of dollars of PacWest shares.

9. The cracks in the Bank's misleading façade began to emerge in early March 2023, when several small- to mid-size U.S. banks failed in rapid succession, including Silicon Valley Bank ("SVB"), Signature Bank ("Signature"), and First Republic Bank ("First Republic"), triggering a sharp decline in global bank stock prices and widespread depositor concerns. These banks experienced severe liquidity crises that ultimately led to voluntary liquidation and/or regulatory takeover.

10. In response, on March 10, 2023, Defendants issued a press release reiterating the supposed strength of the Bank's financial position, and falsely asserting that PacWest had taken steps over the prior year to insure its stability, when in reality **the AFS portfolio was unhedged** and Defendants had stood by while the Bank's primary liquidity **eroded by $8 billion**.

11. When PacWest's customers began to withdraw their deposits toward the end of the Class Period, the public learned the relevant truth and material risks concealed by Defendants' misrepresentations and omissions, that Defendants had not properly managed the Bank's interest rate, liquidity, and other risks, and to survive it needed to be sold.

12. Specifically, on March 22, 2023, before markets opened, when Defendants issued a press release which disclosed the extent of the deposit outflows in response to SVB and Signature's failures and that the Bank had to turn to the Fed for a *de facto* bailout. The March 22 Release disclosed that PacWest's deposits had declined $6.8 billion, or 20%, from the end of 2022. Further, the release belatedly disclosed that the Bank had had to tap federal lending to stay afloat. On that news, the Bank's share price fell $2.09, or 17.1%.

13. The truth continued to emerge, and risks continue to materialize, on May 3, 2023, less than two months after PacWest reassured investors of its financial

6

strength, *Bloomberg* published an article entitled "Regional Banks Sink as PacWest Weighs Strategic Options." According to *Bloomberg*, "PacWest Bancorp led a renewed slide in regional banks after a report that it's **weighing strategic options including a sale** heightened concerns that the turmoil engulfing smaller lenders is far from over[,]" and "[t]he sector has been under pressure as rising interest rates lowered the value of their longer-term investments while increasing the cost of funding and spurring depositors to move cash into higher-yielding money market funds."

14.     The following day, *Forbes* published an article entitled "PacWest Stock Falls 39% After Federal Reserve's Latest Interest Rate Hike," which stated that "[h]igher interest rates intensify the spread of the latest bank failure virus that drives deposits out of vulnerable banks, tanks their stock prices, and ultimately prompts an FDIC-enabled rescue[,]" and "the big loss an acquirer would incur to mark down the value of some PacWest loans makes it unlikely a buyer will emerge for the entire bank."

15.     Following the publication of the *Bloomberg* and *Forbes* articles, PacWest's stock price fell from $6.42 on May 3, 2023, to $3.17 on May 4, 2023, or 51%.

16.     On May 11, 2023, PacWest filed its Q1 2023 10-Q, which disclosed that the Bank's deposits "**had declined approximately 9.5%, with a majority of that decline occurring on May 4th and May 5th after the news reports on the afternoon of May 3rd**." The 10-Q further disclosed that the only way PacWest was able to withstand this decline in deposits was by borrowing from the federal government, *i.e.*, obtaining a bail-out. In fact, while PacWest had over $25 billion in deposits, the Bank only had $15.0 billion in primary *and* secondary liquidity to cover those deposits. Defendants tried to obscure the Bank's precarious position by saying that its primary and secondary liquidity exceeded "**uninsured** deposits of

7

"$5.2 billion," but this was hardly the point. If a substantial portion of the bank's deposits were withdrawn, PacWest would surely fail. On this news, PacWest's stock price fell $1.38 per share, or 22.77%, to close at $4.68 per share on May 11, 2023.

17. While investors were damaged by the decline in PacWest's stock price, Defendants ultimately managed to save the Bank through the above-described *de facto* bailout by the federal government and a merger with another regional bank, the Banc of California.

18. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Bank's business, operations, and prospects, including that (i) PacWest's faulty liquidity management processes had caused the Bank to rely on interest-rate sensitive long-term securities for primary liquidity, which would collapse in value when interest rates rose, (ii) PacWest's AFS securities portfolio was unhedged, meaning that the Bank's primary liquidity was certain to deteriorate when interest rates rose, (iii) rising interest rates would benefit the Bank, when in reality interest rate increases were harming the Bank, and (iv) there was a material undisclosed risk that the Bank would not be able to continue operating as a standalone entity.

## **JURISDICTION AND VENUE**

19. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

21. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). PacWest is

headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

22.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## **PARTIES**

23.    Lead Plaintiff Aleen Hosdaghian purchased PacWest securities at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein. Her PSLRA certification has been previously filed with the Court and is incorporated by reference herein. *See* ECF No. 12-2.

24.    Plaintiff Onurcan Atak purchased PacWest securities at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein. His PSLRA certification has been previously filed with the Court and is incorporated by reference herein. *See* ECF No. 16-3.

25.    Defendant PacWest is a Delaware corporation with principal executive offices located at 9701 Wilshire Blvd., Suite 700, Beverly Hills, CA 90212. During the Class Period, PacWest's common stock traded in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "PACW."

26.    Defendant Matthew P. Wagner ("Wagner") served as PacWest's Chief Executive Officer ("CEO") from prior to the start of the Class Period until January 2023. Wagner was PacWest's primary spokesperson during the first ten months of the Class Period, and regularly spoke publicly about the Bank's purported controls

9

around risk management, interest rate risk, and liquidity. Wagner signed and certified each of the Bank's 2021 10-K and Q1 2022 10-Q, Q2 2022 10-Q, and Q3 2022 10-Q, including that they complied with GAAP and contained no material false statements or omissions. Between February 28, 2022 and May 10, 2023, Wagner sold 197,727 shares of PacWest stock worth approximately $5.8 million at artificially inflated prices for a substantial profit. These sales were disproportionate to Wagner's sales in each of the prior two years, when, from February 28, 2020 to February 27, 2021, he sold 22,118 shares for approximately $699,814, and February 28, 2021 to February 27, 2022, he sold 47,410 shares for approximately $2,034,854. In particular, Wagner made large share sales on November 25, 2022, December 9, 2022, within weeks of the issuance of the Q3 2022 10-Q, and when the Bank's share price was inflated by, among other things, misrepresentations as to the Bank's need to sell AFS securities at a loss and that NII would increase in late 2022 into 2023 and the omission of the Bank's declining liquidity ratio.

27.    Defendant Paul W. Taylor ("Taylor") has served as PacWest's CEO, President, and Director since January 2023. Taylor was PacWest's primary spokesperson during the final four months of the Class Period, and regularly spoke publicly about the Bank's purported controls around risk management, interest rate risk, and liquidity. Taylor signed and certified each of the Bank's 2022 10-K and Q1 2023 10-Q, including that they complied with GAAP and contained no material false statements or omissions.

28.    Defendant Bart R. Olson ("Olson") served as PacWest's Executive Vice President ("V.P.") and Chief Financial Officer ("CFO") from prior to the start of the Class Period until November 2022. Olson regularly spoke publicly about the Bank's purported controls around risk management, interest rate risk, and liquidity. Olson signed and certified each of the Bank's 2021 10-K and Q1 2022 10-Q, Q2

2022 10-Q, and Q3 2022 10-Q, including that they complied with GAAP and contained no material false statements or omissions.

29.    Defendant Kevin Lewis Thompson ("Thompson") has served as PacWest's Executive V.P. and CFO since November 2022. Thompson also regularly spoke publicly about the Bank's purported controls around risk management, interest rate risk, and liquidity, as well as the ability to hold the Bank's HTM securities to their maturity dates. Thompson signed and certified the Bank's 2022 10-K and Q1 2023 10-Q, including that they complied with GAAP and contained no material false statements or omissions.

30.    Defendant William J. Black ("Black") has served as PacWest's Executive V.P., Strategy and Corporate Development since July 1, 2020. Black regularly spoke publicly about the Bank's financial condition and performance, including on all earnings conference calls during the Class Period. Black sold 24,310 shares of PacWest during the Class Period at artificially inflated prices for nearly $683,150 in ill-gotten gains. His class period sales were completely inconsistent with his sales from July 1, 2020 to February 27, 2022, when he did not sell any PacWest shares at all. In particular, Black made large share sales on August 31, 2022, within weeks of the issuance of the Q2 2022 10-Q, and when the Bank's share price was inflated by, among other things, misrepresentations as to the Bank's need to sell AFS securities at a loss and that NII would increase in late 2022 into 2023.

31.    Defendants Wagner, Taylor, Olson, Thompson, and Black are collectively referred to herein as the "Individual Defendants."

32.    PacWest and the Individual Defendants are collectively referred to herein as "Defendants."

33.    Each of the Individual Defendants:

(a) directly participated in the management of the Bank;

11

(b) was directly involved in the day-to-day operations of the Bank at the highest levels;

(c) was privy to confidential proprietary information concerning the Bank and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Bank's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements and omissions concerning the Bank were being issued;

(g) approved or ratified these statements in violation of the federal securities laws;

(h) culpably participated in the misstatements and omissions as set forth herein; and/or

(i) because of their positions with the Bank, possessed the power and authority to control the contents of the Bank's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.

34.    Each of the Individual Defendants were provided with copies of the Bank's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were

then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### A.      Background of PacWest's Business

35.      PacWest was created by John Eggemeyer in 2000 as First Community Bancorp ("First Community"), a small regional bank with $318 million of assets. Eggemeyer named Wagner as First Community's CEO shortly after its founding. Led by Wagner, First Community began gobbling up smaller West Coast banks. First Community changed its name to PacWest in 2008, and by the end of 2014 had successfully completed 27 acquisitions and boasted over $16 billion in assets.

36.      During the Class Period, PacWest operated as a holding company for its wholly owned subsidiary, Pacific Western Bank ("PWB"), a regional bank based in Los Angeles, California. PWB had 69 bank branches in California, one branch in Durham, North Carolina, one branch in Denver, Colorado, and many loan production offices across the United States.

37.      Through PWB, PacWest offered community banking products, including lending, deposit, and treasury management services to small and medium-sized businesses. The Bank also offered national lending products including "asset-based, equipment, and real estate loans" and "treasury management services" to middle-market businesses, as well as venture banking products, *i.e.*, deposit banking, loans, and other financial services for start-up companies.

38.      PacWest's growth went into overdrive between 2019 and 2021, fueled by deposits in its venture business.[5] The Bank's total deposits grew ***over 82%*** from approximately $19.2 billion to approximately $35 billion during this period.

---

[5] Bank deposits consist of money placed into banking institutions for safekeeping. These deposits are made to deposit accounts such as savings accounts, checking accounts, and money market accounts. The account holder has the right to withdraw

13

39.     Confidential Witness 1 ("CW1")[6] worked as a vice president and senior loan consultant at PacWest from March 2016 to June 2022. CW1 was based on Oakland, California, and reported to the Managing Director of Multifamily Lending. CW1 and his team originated small-balance multifamily and mixed-use loans in California, Oregon, Washington, Utah, and Colorado.

40.     From December 2021 to June 2022, CW1 worked in PacWest's venture office. Leadership at PacWest frequently advised CW1 and his colleagues "about how much excess capital the bank had," which, according to CW1, he and his fellow loan originators "were supposed to go deploy" by lending it. CW1 said that the size of deposits available for lending that he heard his venture banker colleagues discussing were staggering. At one point during his time in the venture office, CW1 said he learned from his colleagues that PacWest had **$17 billion** in deposits that it needed to invest.

41.     This type of explosive growth, however, can be a red flag. As the U.S. Department of the Treasury's Office of the Comptroller Currency (the "OCC"), has observed, "rapid, or significant growth **can be a sign of risk management weaknesses** and can increase a bank's risk exposure, stretch the expertise of bank management, and strain the bank's resources, which, in turn, can lead to numerous and sometimes sudden bank failures as sectoral economic conditions change."[7] In other words, when a bank, like PacWest, sudden had massive amounts of deposits

---

deposited funds, as set forth in the terms and conditions governing the account agreement.

[6] All CWs are arbitrarily referred to in the masculine to preserve their anonymity.

[7] Office of the Comptroller of the Currency, Examination Process: Problem Bank Supervision Version 1.0 (September 2021), https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/problem-bank-supervision/pub-ch-problem-bank-supervision.pdf.

to deploy in a short period management might, among other things, not properly protect those deposits in a rush to try to derive income from those deposits. Having extensive deposits also presented a risk that if Defendants did not properly manage PacWest's liquidity, a large outflow of deposits could threaten the Bank's liquidity—prompting other customers to withdraw their funds and resulting in a classic "run on the bank."

    **B.**    <u>**Defendants Tout PacWest's Risk Management and Liquidity**</u>

    42.    To address such concerns, Defendants touted PacWest's risk management controls and, more specifically, its ability to protect the Bank and safeguard against changes in interest rates and liquidity needs. Defendants bolstered these representations with further assurances that PacWest's "available-for-sale" ("AFS") securities were sufficient to manage the Bank's liquidity risks and exposure to interest rate increases, as well as that the Bank had the ability to hold billions of dollars of securities—the majority of which consisted of securities with a maturity of 10 years or more away—without any need to sell them or recognize any market-based losses on any of them.

    43.    For example, Defendants emphasized in the 2021 and 2022 10-Ks that the Bank had a "***comprehensive risk management process that measures, monitors, evaluates, and manages the risks we assume in conducting our activities***." Likewise, each of the Q1 2022 10-Q, Q2 2022 10-Q, Q3 2022 10-Q and Q1 2023 10-Q advised that PacWest's future performance depended upon "***the effectiveness of [its] risk management framework***." One risk central to the Bank's activities was liquidity, or PacWest's "capacity to meet its cash and collateral obligations without incurring unacceptable losses,"[8] and thus the 2021 and 2022 10-

---

[8] *See* n.4 *supra*.

Ks highlighted that "*[e]ffective liquidity management is essential for the operation of our business*."

44.     The 2021 and 2022 10-Ks further assured investors that "[b]y leveraging our business model, service-driven focus, and presence in attractive markets, as well as maintaining a highly efficient operating model *and robust approach to risk management*, we have achieved significant and profitable growth, both organically and through disciplined acquisitions." This "robust approach to risk management," Defendants assured investors, was "*another core competency of our business*," and consisted of "a comprehensive risk management process that measures, monitors, evaluates, and manages the risks we assume in conducting our activities," which was "structured to guide decisions regarding the appropriate balance between risk and return considerations in our business," "supported by an enterprise risk management program . . . . that integrates all risk efforts under one common framework," and "include[d] risk policies, procedures, measured and reported limits and targets, and reporting."

45.     The 2021 and 2022 10-Ks further assured investors that Defendants had "implemented strategies to maintain sufficient and diverse sources of funding to accommodate planned, as well as unanticipated, changes in assets, liabilities, and off-balance sheet commitments under various economic conditions."

46.     Defendants further assured investors that PacWest had the necessary controls in place to protect the Bank from the risks associated with changes in interest rates. For example, the 2021 and 2022 10-Ks advised investors that the Bank's "operating results generally depend on [certain] key performance factors." Chief among those performance factors was net interest income ("NII") which the Bank defined as "the excess of interest earned on our interest-earning assets over the interest paid on our interest-bearing liabilities."

47.     Given the importance of NII to the Bank, the 2021 and 2022 10-Ks emphasized PacWest's "NII simulation model" that purportedly measured the estimated changes in NII that would result over the ensuing 12-month period "from immediate and sustained changes in interest rates."

### C.     Contrary to Defendants' Touts of PacWest's Ability to Manage Risk and Interest Rate Exposure, the Bank's Liquidity and NII Plummet.

48.     Defendants consistently assured investors that the Bank was stable and safe through its Bank's risk management approach, NII simulation model, and other liquidity and risk management processes, as set forth below.

49.     In truth, however, to the extent that any liquidity or risk management processes existed *at all*, they were inadequate as the over the course of the Class Period the Bank's liquidity deteriorated to the point that the PacWest could no longer operate as a stand-alone entity as a result of its inadequate liquidity. In addition, Defendants' assurances that the Bank's NII would *increase* during the Class Period proved false, as *NII plummeted* as Defendants struggled to respond to entirely avoidable problems created by rising interest rates.

#### 1.  Year End 2021

50.     At the start of the Class Period, PacWest's 2021 10-K, which was signed by Wagner and Olson and filed with the SEC on February 28, 2022, reported that as of December 31, 2021, the Bank had total assets of $40.4 billion and liabilities of $36.4 billion, $35 billion of which were customer deposits. The overwhelming majority (over 95%) of these deposits were payable on demand, meaning that customers could withdraw the full amount of their deposits at any time and without notice.

51.     Although PacWest's assets were greater than its liabilities at the end of 2021, if all of PacWest's customers decided to withdraw their deposits at once,

or in rapid succession, *i.e.*, a "bank run,"[9] it would be impossible for PacWest to give its deposit customers their money without becoming insolvent because PacWest had primary liquidity sufficient to cover only 40% of the Bank's deposits.

52. To cover these deposits, PacWest maintained "pools of liquid assets … consisting of cash and due from banks, interest-earning deposits in other financial institutions, and unpledged securities available-for-sale"—*i.e.*, its AFS securities portfolio—which Defendants referred as PacWest's "primary liquidity." PacWest also maintained "available borrowing capacity under secured credit lines with the FHLB [Federal Home Loan Bank of San Francisco] and the FRBSF [Federal Reserve Bank of San Francisco]," which it referred to as the Bank's "secondary liquidity." For the first seven months of the Class Period, Defendants kept investors apprised of the Bank's ability to cover deposit withdrawals by disclosing the bank's ratio of primary liquidity to total deposits ("Liquidity Ratio").

53. Table 1 below is an excerpt of the 2021 10-K summarizing the Bank's primary and secondary liquidity levels and Liquidity Ratio at the end of 2019, 2020, and 2021, respectively.[10]

---

[9] A "bank run" occurs when many depositors attempt to simultaneously withdraw their money from a bank. Common reasons for a bank run include a "fear for the bank's solvency and the safety of [customer] deposits." Christopher J. Neely et al., Interest Rate Risk, Bank Runs and Silicon Valley Bank, Federal Reserve Bank of St. Louis (May 11, 2023), https://www.stlouisfed.org/publications/regional-economist/2023/may/interest-rate-risk-bank-runs.

[10] "Pledged securities" are securities that PacWest posted as for funds borrowed from the FHLB and the FRBSF.

1

## TABLE 1

| Primary Liquidity - On-Balance Sheet | | December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2021 | | 2020 | | 2019 |
| | | *(Dollars in thousands)* | | | | |
| Cash and due from banks | $ | 112,548 | $ | 150,464 | $ | 172,585 |
| Interest-earning deposits in financial institutions | | 3,944,686 | | 3,010,197 | | 465,039 |
| Securities available-for-sale | | 10,694,458 | | 5,235,591 | | 3,797,187 |
| Less: pledged securities | | (532,418) | | (449,330) | | (486,200) |
| Total primary liquidity | $ | 14,219,274 | $ | 7,946,922 | $ | 3,948,611 |
| | | | | | | |
| Ratio of primary liquidity to total deposits | | 40.6 % | | 31.9 % | | 20.5 % |
| | | | | | | |
| Secondary Liquidity - Off-Balance Sheet | | December 31, | | | | |
| Available Secured Borrowing Capacity | | 2021 | | 2020 | | 2019 |
| | | *(In thousands)* | | | | |
| Total secured borrowing capacity with the FHLB | $ | 3,976,465 | $ | 3,330,715 | $ | 4,229,788 |
| Less: secured advances outstanding | | — | | (5,000) | | (1,318,000) |
| Available secured borrowing capacity with the FHLB | | 3,976,465 | | 3,325,715 | | 2,911,788 |
| Available secured borrowing capacity with the FRBSF | | 1,380,191 | | 1,409,452 | | 1,988,028 |
| Total secondary liquidity | $ | 5,356,656 | $ | 4,735,167 | $ | 4,899,816 |

54.     According to PacWest's SEC filings, the Bank's deposits grew from $24.9 billion at the end of 2019 to $36.4 billion at the end of 2021, or by 48%. As reflected in Table 1, between 2019 and 2021, PacWest's primary liquidity—the cash and securities it had on hand with which to provide funds to customers who drew on their deposits—grew from $4 billion at the end of 2019 to $14.2 billion at the end of 2021, or by 260%. This increase in primary liquidity was driven by a nearly $7 billion (or 181%) increase in the Bank's AFS securities portfolio, or from approximately $3.8 billion to approximately $10.7 billion.

55.     As a result of this increase in securities available for sale, the Bank's Liquidity Ratio—*i.e.*, the percentage of deposits it could cover quickly—went from 20.5% at the end of 2019 to 40.6% at the end of 2021. Defendants' Liquidity Ratio thus assured investors that the Bank's liquidity management had improved as it raked in that $12 billion (or 48%) increase in deposits between 2019 and 2021 because while the Bank only could have withstood a withdrawal of 20.5% of customer deposits at the end of 2019, it had the ability to withstand a withdrawal of

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

40.6% of its customer deposits at the end of 2021. PacWest's Liquidity Ratio was thus essential for investors to determine the extent of the Bank's liquidity risk.

56.     There was a catch, however. As shown in Table 1 above, available for sale securities made up the majority of the Bank's primary liquidity. In fact, at the start of the Class Period, *all* of the Bank's debt investments were classified as available for sale securities at December 31, 2021. Throughout the Class Period, over 90% of PacWest's AFS securities portfolio were in various *long-term* securities that were scheduled to mature in over five years, and nearly 60% of those securities were scheduled to mature in over ten years.

57.     For example, as set forth in Table 2 below, at December 31, 2021, *over 90%* of the Bank's AFS portfolio was scheduled to mature after five years.

### TABLE 2

| December 31, 2021 | Due Within One Year | | Due After One Year Through Five Years | | Due After Five Years Through Ten Years | | Due After Ten Years | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Fair Value | Rate[1] | Fair Value | Rate[1] | Fair Value | Rate[1] | Fair Value | Rate[1] | Fair Value | Rate[1] |
| | *(Dollars in thousands)* | | | | | | | | | |
| Agency residential MBS | $ 31 | 4.85% | $ 8,335 | 3.77% | $ 6,909 | 3.93% | $ 2,882,935 | 2.70% | $ 2,898,210 | 2.71% |
| Municipal securities | 28,542 | 4.23% | 120,882 | 3.80% | 720,580 | 2.29% | 1,445,964 | 3.15% | 2,315,968 | 2.93% |
| Agency commercial MBS | 8,823 | 3.66% | 463,242 | 2.66% | 1,052,581 | 1.97% | 164,321 | 2.38% | 1,688,967 | 2.21% |
| Agency residential CMOs | — | 0.00% | 1,906 | 3.18% | 220,885 | 2.54% | 815,343 | 2.30% | 1,038,134 | 2.35% |
| U.S. Treasury securities | — | 0.00% | 5,146 | 2.67% | 961,751 | 1.17% | — | 0.00% | 966,897 | 1.18% |
| Corporate debt securities | — | 0.00% | 28,513 | 4.60% | 410,030 | 4.29% | 88,551 | 4.49% | 527,094 | 4.34% |
| Private label Commercial MBS | 4,961 | 4.05% | 8,676 | 3.43% | 41,510 | 2.63% | 395,070 | 2.48% | 450,217 | 2.53% |
| Collateralized loan obligations | — | 0.00% | — | 0.00% | 121,093 | 2.00% | 264,269 | 1.85% | 385,362 | 1.89% |
| Private label residential CMOs | — | 0.00% | — | 0.00% | — | 0.00% | 264,417 | 2.68% | 264,417 | 2.68% |
| Asset-backed securities | 10,464 | 0.79% | 25,248 | 1.52% | 1,736 | 0.79% | 92,099 | 1.11% | 129,547 | 1.16% |
| SBA securities | 1,864 | 4.07% | 429 | 3.24% | 7,612 | 2.76% | 19,740 | 2.87% | 29,645 | 2.93% |
| Total securities available-for-sale | $ 54,685 | 3.46% | $ 662,377 | 2.93% | $ 3,544,687 | 2.14% | $ 6,432,709 | 2.69% | $ 10,694,458 | 2.53% |

(1)   Rates presented are weighted average rates. Rates on tax-exempt securities are contractual rates and are not presented on a tax-equivalent basis.

58.     As set forth above, throughout the Class Period Defendants assured investors that the goals of PacWest's liquidity management were "to ensure the ability of the Bank to meet its financial commitments when contractually due and to respond to other demands for funds such as the ability to meet the cash flow

requirements of customers who may be either depositors wanting to withdraw funds or borrowers who have unfunded commitments." In other words, PacWest used liquidity management to ensure that if a large number of depositors withdrew funds at the same time, the bank's solvency would not be threatened.

59.    As of December 31, 2021, however, over 50% of PacWest's AFS securities had declined and thus experienced "unrealized losses."[11] By contrast, at the end of 2020, only 10.5% of the AFS portfolio had experienced unrealized losses.

60.    In addition, unbeknownst to investors, the AFS securities portfolio was "unhedged."[12] As alleged further below, in October 2023, after the Merger had been announced, Defendants filed a proxy statement with the SEC for investors to use in voting on the merger ("Merger Proxy"). The Merger Proxy described a variety of transactions that would be conducted if the merger closed, including a sale of $2.6 billion of PacWest's AFS securities. The Merger Proxy further disclosed that those securities were *entirely unhedged*. In fact, while Defendants spoke of hedging in contexts other than their own securities, they never stated that any portion of their own securities were *ever* hedged. The failure to hedge an AFS portfolio when that portfolio is a source of primary liquidity was a direct cause of the failure of Silicon

---

[11] Unrealized losses are the difference between the price paid for securities in a portfolio and the current market price of those securities. Max Phillips, *Banks Unrealized Losses Grew in the Third Quarter*, Axios, Nov. 30, 2023, https://www.axios.com/2023/11/30/banks-unrealized-losses-grow-q3-2023.

[12] Per Investopedia, a "hedge" is "a trade that is made with the purpose of reducing the risk of adverse price movements in another asset." *Hedge Definition: What It Is and How It Works in Investing*, Investopedia, Oct. 31, 2023, https://www.investopedia.com/terms/h/hedge.asp. An asset, like the AFS portfolio, is thus "unhedged" if there is no protection against its adverse movements, *i.e.*, declines.

Valley Bank.[13] Indeed, the AFS portfolio "is where most self-respecting banks lugging around a big portfolio of bonds will hedge their interest rate risk."[14]

### 2. Q1 2022

61.     PacWest's liquidity situation substantially worsened in Q1 2022. The Q1 2022 10-Q stated that PacWest's customer deposits had declined from $35 billion at the end of 2021 to $33.2 billion at the at March 31, 2022. Even though deposits had declined, the Bank's available liquidity to cover those deposits had declined even further: as reflected in the table below, by the end of Q1 2022, the Bank's ratio of primary equity to total deposits had declined from 40.6% to 34.6%, in part because the amount of securities in PacWest's AFS portfolio had declined by 6.7%, or approximately $700 million, to approximately $10 billion.

---

[13] Eliot Brown, Silicon Valley Bank Dropped a Hedge Against Rising Rates in 2022, Wall St. J., Mar. 13, 2023, https://www.wsj.com/livecoverage/stock-market-news-today-03-13-2023/card/silicon-valley-bank-dropped-a-hedge-against-rising-rates-in-2022-6MiD9ZLVY9CF8zbIM7ze.

[14]  Robin Wigglesworth, *How Crazy Was Silicon Valley Bank's Zero-Hedge Strategy?*, Mar. 17, 2023, https://www.ft.com/content/f9a3adce-1559-4f66-b172-cd45a9fa09d6 ("The most popular example of the fecklessness of Silicon Valley Bank is that *it stupidly amassed a $124bn bond portfolio and then — even more madly — didn't hedge against the swelling interest rate exposure*").

**TABLE 3**

| Primary Liquidity - On-Balance Sheet | | March 31, 2022 | | December 31, 2021 |
|---|---|---|---|---|
| | | (Dollars in thousands) | | |
| Cash and due from banks | $ | 205,446 | $ | 112,548 |
| Interest-earning deposits in financial institutions | | 1,865,235 | | 3,944,686 |
| Securities available-for-sale | | 9,975,109 | | 10,694,458 |
| Less: pledged securities | | (558,004) | | (532,418) |
| Total primary liquidity | $ | 11,487,786 | $ | 14,219,274 |
| | | | | |
| Ratio of primary liquidity to total deposits | | 34.6 % | | 40.6 % |

| Secondary Liquidity - Off-Balance Sheet Available Secured Borrowing Capacity: | | March 31, 2022 | | December 31, 2021 |
|---|---|---|---|---|
| | | (In thousands) | | |
| Secured borrowing capacity with the FHLB | $ | 3,573,555 | $ | 3,976,465 |
| Less: secured advances outstanding | | (629,000) | | — |
| Available secured borrowing capacity with the FHLB | | 2,944,555 | | 3,976,465 |
| Available secured borrowing capacity with the FRBSF | | 2,410,630 | | 1,380,191 |
| Total secondary liquidity | $ | 5,355,185 | $ | 5,356,656 |

62.    But the outlook for PacWest's liquidity was much worse than this data suggested. On March 16, 2022, the Fed approved its first interest rate increase since 2018, raising the federal funds rate, the target interest rate range set by the Federal Open Market Committee ("FOMC"), by 25 basis points,[15] or from 0.25% to 0.50%. Debt securities like those in PacWest's AFS portfolio have an inverse relationship to interest rates, which means that when interest rates rise, the value of the securities falls.[16] In fact, the longer-term securities that made up over 90% of PacWest's primary liquidity securities are the most sensitive to interest rate changes, *i.e.*, their value will decline more quickly and steeply than shorter term debt securities.

---

[15] A basis point is 1/100th of 1%, or 0.01%. Jason Fernando, *Basis Point (BPS) Explained for Interest Rates and Investments*, Investopedia.com, https://www.investopedia.com/terms/b/basispoint.asp (last visited Feb. 19, 2024). As such, a 0.01% increase in interest rates is an increase of 1 basis point, and a 1% increase in interest rates is an increase of 100 basis points. *Id.*

[16] *See* Nick Lioudis, *Inverse Relation Between Interest Rates and Bond Prices*, Investopedia.com, Mar. 28, 2023, https://www.investopedia.com/ask/answers/why-interest-rates-have-inverse-relationship-bond-prices/.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

63.     The interest rate increase in Q1 2022 was expected to be the first in a long series of rate increases. CNBC.com, for example, the website associated with the prominent business news channel, reported that the FOMC "penciled in increases at *each of the six remaining meetings*" in 2022, as well as "three more hikes in 2023."[17]

64.     Two weeks later, on March 30, 2022, the Boston Globe reported that "Federal Reserve officials, rattled by persistent inflation and criticism that they're behind the curve, have pivoted toward an even more aggressive plan of interest-rate hikes than they signaled earlier this month" and quoted the president of the Philadelphia Federal Reserve Bank as stating that he "expects a series of 'deliberate, methodical' increases in the benchmark federal funds rate this year, but said he is open to a half-point move in May if near-term data shows more inflation."

65.     Defendants were well aware of the Fed's intention to raise interest rates. Indeed, in the Bank's March 2022 proxy statement ("March 2022" proxy), founder John Eggemeyer and Wagner emphasized that the Bank was prepared for interest rate increases and had and had been working to "diversify" its "funding base":

> *[W]e have been anticipating an eventual rise in interest rates* following the pandemic-induced rate cuts in 2020 and the expected rebound in the economy and inflation. Rising inflation has become a reality and has the attention of the Federal Reserve, which has indicated its intention to raise rates. While our business is naturally asset sensitive, our increase in low-cost core deposits during 2021 from organic and strategic growth *has helped us further diversify our funding base and prepare for a higher rate environment*. We will continue to build our business with a strong commitment to core

---

[17] *See* Jeff Cox, *Federal Reserve Approves First Interest Rate Hike In More Than Three Years, Sees Six More Ahead*, CNBC.com, Mar. 16, 2023, https://www.cnbc.com/2022/03/16/federal-reserve-meeting.html.

deposits and a willingness to think long-term from a funding perspective.

66.     Despite Defendants' much-touted risk management processes, PacWest's balance sheet was entirely unprepared for these rate increases. Indeed, the Bank's reliance on longer term securities, which would decline when interest rates rose and thus reduce funds available to protect against deposit withdrawals, **had intensified** during Q1 2022. The average maturity of the securities in the Bank's AFS portfolio had increased from 4.8 years at the end of 2021 to 5.7 years at the end of 2022. In all, **93% of the Bank's AFS securities had maturities of over five years**. Defendants would do **nothing** throughout the entire Class Period to remedy this imbalance.

67.     It is thus no surprise that in Q1 2022 PacWest's AFS securities started to suffer serious losses. At the end of 2021, the Bank reported a net unrealized gain for its AFS portfolio of $91 million. By the end of Q1 2022, however, the Bank reported a net unrealized loss of $519 million, and that 80.7% of the Bank's AFS securities had experienced losses by the end of Q1 2022.

68.     Rather than admit that rising interest rates presented an existential threat to PacWest's balance sheet, Defendants assured investors that "Although we periodically sell securities for portfolio management purposes, **we do not foresee having to sell any impaired securities strictly for liquidity needs and believe that it is more likely than not we would not be required to sell any impaired securities before recovery of their amortized cost**."

*3.  Q2 2022*

69.     In Q2 2022 the Fed raised interest rates by a total of 125 basis points, or from 0.50% to 1.75%. As it had in Q1 2022, the news media covered these increases as the tip of the spear of an historic series of increases, not a blip. For example, on May 11, 2022, after the Fed had announced a 50-basis point rate

increase, the Associated Press reported that "The unexpected persistence of high inflation has caused the Fed to embark **on what may become its fastest series of interest rate increases in 33 years**." The article continued, "the Fed raised its benchmark short-term rate by a half-point, its steepest increase in two decades . . . [and] **signaled that more such sharp rate hikes are coming**."[18]

70.    Similarly, a month later, on June 13, 2022, the New York Times reported that "[t]he Fed raised rates by half a percentage point in May and officials had suggested for weeks that a similar increase would be warranted at their meetings in June and July if data evolved as expected," and disclosed that the Fed was considering the largest interest rate increase since 1994.[19] Three days later, on June 16, 2022, the Fed announced an additional 75 basis point increase.

71.    These increases contributed to a $1.7 billion decline in PacWest's overall investment portfolio, and the AFS portfolio declined even more substantially. In a July 20, 2022 press release announcing the Bank's financial results for Q2 2022, Defendants disclosed that PacWest's AFS portfolio had decreased from $10.0 billion to $6.8 billion, or by 32%. Defendants knew, but did not disclose, however, that the portfolio was unhedged.

72.    Instead of reducing the amount of long-term securities in the AFS portfolio, Defendants engaged in an accounting sleight-of-hand. On June 1, 2022, Defendants transferred $2.3 billion of securities from the Bank's AFS securities portfolio to its "hold-to-maturity" or "HTM securities" portfolio. Defendants

---

[18] Associated Press, *U.S. inflation hit 8.3% last month but slows from 40-year high*, Politico.com, May 11, 2022, https://www.politico.com/news/2022/05/11/inflation-april-price-increase-peak-00031696.

[19] Jeanna Smialek, The Fed May Discuss the Biggest Interest Rate Increase Since 1994, NYTimes.com, June 13, 2022, https://www.nytimes.com/2022/06/13/business/fed-interest-rate-increase.html?searchResultPosition=28.

admitted that they had moved the securities from AFS to HTM solely as an accounting maneuver to avoid having to recognize a $37 million loss in "accumulated other comprehensive income" ("AOCI")—a "crucial financial analysis metric" used and tracked by analysts in evaluating a bank's earnings and profitability.[20]

73.     In a July 21, 2022 call with investors to report the Bank's Q2 2022 performance ("Q2 2022 Call"), Defendants freely admitted that their sole purpose for moving the $2.3 billion in AFS securities to HTM securities was to avoid affecting AOCI. On that call, Olson acknowledged to investors that "On June 1, [PacWest] moved $2.3 billion of available for sale securities held-to-maturity ***to mitigate the impact on accumulated other comprehensive income for future increases in interest rates***."

74.     The AFS portfolio had also shrunk because Defendants had sold $393.4 million in AFS securities at a loss of $1.2 million, even though Defendants had assured investors in the Q1 2022 10-Q that they "***believe[d] that it is more likely than not we would not be required to sell any impaired securities before recovery of their amortized cost***." Remarkably, even though Defendants had just sold AFS securities at a loss, which they said they would not do, they reiterated in the Q2 2022 10-Q that "we do not foresee having to sell any impaired securities strictly for liquidity needs and believe that it is more likely than not we would not be required to sell any impaired securities before recovery of their amortized cost."

75.     The rise in interest rates also materially lowered PacWest's Liquidity Ratio, which plummeted from 34.6% in Q1 2022 to 25.3% in Q2 2022. This was

---

[20]   Corporate     Finance     Institution,     *Other     Comprehensive     Income*, https://corporatefinanceinstitute.com/resources/accounting/other-comprehensive-income/.

largely because while deposits had increased from $33.2 billion in Q1 to $34.0 billion in Q2 2022, the Bank's primary liquidity had declined over 25% from $11.5 billion in Q1 to $8.6 billion in Q2 2023 because of a "$1.8 billion decrease in interest-earning deposits in financial institutions, a $1.7 billion decrease in securities, and a $2.3 billion increase in pledged securities." This translated to a **40% decline in the Bank's primary liquidity and 15.3% decline in the Bank's Liquidity Ratio in only six months**, as reflected in Table 4 below.

### TABLE 4

| Primary Liquidity - On-Balance Sheet | June 30, 2022 | December 31, 2021 |
|---|---|---|
| | (Dollars in thousands) | |
| Cash and due from banks | $ 197,027 | $ 112,548 |
| Interest-earning deposits in financial institutions | 2,192,877 | 3,944,686 |
| Securities available-for-sale, at fair value | 6,780,648 | 10,694,458 |
| Securities held-to-maturity, at fair value | 2,209,759 | — |
| Less: pledged securities, available-for-sale, at fair value | (2,164,676) | (532,418) |
| Less: pledged securities, held-to-maturity, at fair value | (619,449) | — |
| Total primary liquidity | $ 8,596,186 | $ 14,219,274 |
| | | |
| Ratio of primary liquidity to total deposits | 25.3 % | 40.6 % |

76.     The rise in interest rates was also a major contributor to the decline in primary liquidity. As a result of the rise in interest rates PacWest's AFS portfolio had experienced **$596 million in unrecognized losses**, an **increase of 728%** from the end of 2021. Defendants nevertheless did not decrease the Bank's reliance on long-term securities as the predominant source of its primary liquidity. In fact, the average maturity of the securities in the Bank's overall investment portfolio **increased** from 5.7 years at the end of Q1 2022 to 6.2 years at the end of Q2 2022. In addition, 93% of the securities in the Bank's investment portfolio had maturities of over five years, and over 59% of those securities had maturities of over 10 years.

        *4.  Q3 2022*

77.     In Q3 2022 the Fed again raised interest rates by 75 basis points on July 27, 2022 and by another 75 basis points on September 21, 2022. In all, interest rates increased in Q3 by total of 150 basis points, or from 1.75% to 3.25%, and the

news media continued to report that these increases would continue for the foreseeable future. On July 29, 2022, for example, Al Jazeera reported that "[t]he Federal Reserve raised interest rates by 75 basis points on Wednesday. The US central bank has increased its efforts to combat the greatest inflation in more than 40 years and stated that more 'unusually large increase could be appropriate' at its September meeting." The article further observed that "[s]ince March, the Fed has increased rates by 225 basis points."[21] Similarly, after the interest rate increase in January, the New York Times reported that the Fed had made "another big interest rate hike and sharply increased its outlook for how high it expects to raise rates in coming months." Defendants, however, continued to do nothing to balance the AFS portfolio or improve the Bank's liquidity.

78.     Although the Bank's deposits had ticked up slightly from $34.0 billion to $34.2 billion, PacWest's primary liquidity had fallen 10.5% from $8.6 billion at the end of Q2 to only $7.7 billion at the end of Q3 2022. This meant that the Bank's primary liquidity had fallen from ***$14.2 billion to $7.7 billion, or 45.8%,*** in only nine months. The Bank's liquid investment portfolio, *i.e.*, the securities that actually could be sold to cover deposit withdrawals because they had not been pledged as collateral for loans from the U.S. government or other financial institutions, had fallen to $5.4 billion, or $4.2 billion in AFS securities and $1.2 billion in HTM securities.

---

[21] Radmilla Suleymanova, Top economic takeaways as US wrangles with recession fears, AlJazeera.com, July 29, 2022. https://www.aljazeera.com/economy/2022/7/29/top-economic-takeaways-as-us-wrangles-with-recession-fears#:~:text=Back%2Dto%2Dback%20GDP%20slowdown,highlights%20from%20a%20busy%20week.

79.    In fact, the Banks' Liquidity Ratio had declined so precipitously that *Defendants stopped disclosing it*. Neither the Q3 2022 10-Q, nor the accompanying October 19, 2022 earnings press release ("Q3 2022 Release") or October 20, 2022 earnings call with investors ("Q3 2022 Call") mentioned the Liquidity Ratio at all.

80.    Rising interest rates also continued to erode the Bank's AFS portfolio, which had further declined by $800 million, or $13.1%, from $6.7 billion to $5.9 billion, all of which was *unhedged*. The average duration of the bank's investment portfolio remained long-term, with an average duration of 6.1 years to maturity. In addition, 93% of the securities in the Bank's investment portfolio had maturities of over five years, and 59% of those securities had maturities over 10 years.

81.    Finally, at the end of Q3 2022, almost the entire AFS portfolio (99.7% of the securities) had experienced losses, and the total amount of these unrealized losses was $590.4 million. In other words, if the Bank was required to sell any securities to meet its liquidity needs, it was almost certain to sell those securities at a loss. Nevertheless, as a result of this virtual certainty, Defendants continued to insist that "Although we periodically sell securities for portfolio management purposes, *we do not foresee having to sell any impaired securities strictly for liquidity needs and believe that it is more likely than not we would not be required to sell any impaired securities before recovery of their amortized cost*."

5.    *Q4 2022*

82.    The Fed continued to raise interest rates through the end of 2022, the Bank's liquidity position continued to degrade, and Defendants continued to take no steps to balance the AFS portfolio. Specifically, on November 2, 2022, the Fed again raised interest rates by 75 basis points and by another 50 basis points on December 14, 2022. In all, interest rates increased by total of 125 basis points in Q4 2022, or from 3.25% to 4.50%.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

83.    Although Defendants had continued to assure investors that the Bank would not sell securities from its AFS portfolio to increase its liquidity, PacWest's earnings press release for Q4 2022 ("Q4 2022 Release") informed investors that the Bank had sold $1 billion of AFS securities at a loss of $49 million in part to "*improve the capital and liquidity position of the Bank*." Further, although Defendants had repeatedly emphasized that interest rate increases would benefit the Bank's NII, the Q4 2022 Release revealed that PacWest's NII had *decreased* during Q4 by $12.2 million, or by 3.67%.

84.    In addition, not only had the Bank's deposits declined slightly from $34.2 billion to $33.9 billion, but PacWest's primary liquidity had fallen an addition 19.5% from $7.7 billion at the end of Q3 to only $6.2 billion at the end of Q3 2022. This meant that the Bank's primary liquidity had plummeted *$8 billion* from $14.2 billion to $6.2 billion, or 56.3%, in only a year. The Bank's liquid investment portfolio, *i.e.*, the securities that actually could be sold to cover deposit withdrawals because they had not been pledged as collateral for loans from the U.S. government or other financial institutions, had fallen to only $4.1 billion, or $3.7 billion in AFS securities and $416 million in HTM securities. The Bank's primary liquidity was declining in substantial part because of rising interest rates and the Defendant's continued reliance on long-term securities. Indeed, the AFS portfolio suffered net unrealized losses of *$902.1 million* in 2022 because of increases in interest rates.

85.    The Bank's Liquidity Ratio had fallen to approximately 18.6% in Q4 2022—from 40.4% at the end of 2021, a decline of over 50% in just a year. Defendants, however, did not disclose the ratio in any SEC filings or public statements in connection with the Bank's financial position at the end of 2022.

86.    Rising interest rates also continued to negatively affect the Bank's AFS portfolio, which had further declined by $1.05 billion, or $17.8%, from $5.9 billion to $4.85 billion, all of which was *unhedged*. The bank's investment portfolio

31

remained overwhelmingly long-term, with an average duration for AFS securities of 5.9 years to maturity and an average duration for AFS securities of 8.2 years. In addition, 97% of the securities in the Bank's investment portfolio had maturities of over five years, and 59% of those securities had maturities of over 10 years.

87.    At the end of 2022, almost the entire AFS portfolio (99.8% of the securities) had experienced losses, and the total amount of these unrealized losses was $811.1 million. In other words, if the Bank was required to sell any securities to meet its liquidity needs, it was almost certain to sell those securities at a loss.

88.    In short, at the end of 2022, PacWest was on a knife's edge, with billions in customer deposits and scant liquidity to cover those deposits should a large group customers begin to withdraw their deposits.

**D.    Bank Failures in March 2023 Push PacWest to the Brink of Insolvency**

89.    In January 2023, as Defendants were disclosing the Bank's financial condition for Year End 2022, they announced a new "strategic plan" for PacWest that they claimed would "maximize stockholder value and improve its liquidity position and capital ratios by strengthening its community bank business, exiting non-core products and services, improving capital and liquidity, and enhancing operational efficiency."

90.    Specifically, Defendants wound down PacWest's operations in its "premium finance and multi-family lending groups in the fourth quarter of 2022," "began planning for a restructuring of its Civic subsidiary in January 2023," and sold the above-mentioned "$1.0 billion of available-for-sale securities at a loss in the fourth quarter of 2022." Defendants also announced that PacWest was slowing loan growth to preserve capital and strengthen the Bank's balance sheet.

91.    In early March 2023, SVB, a regional bank in California that largely served tech startups, learned that credit rating agency Moody's was going to announce a downgrade of the bank's credit rating. This prompted SVB's customers

to withdraw $42 billion of deposits in a single day. Like PacWest, SVB's primary liquidity consisted of long-term securities whose values had plummeted in response to rising interest rates, and thus the bank lacked the capital to honor all the withdrawals. SVB declared insolvency on March 10, 2023 and was acquired by First Citizens Bank two weeks later.

92.    In the wake of SVB's failure, and recognizing that PacWest's balance sheet, like SVB's, used interest rate sensitive securities for primary liquidity in the event of customer withdrawals, Defendants promptly issued a press release designed to discourage customers from withdrawing their deposits (the "March 10 Release").

93.    Defendants stated that they were issuing the March 10 Release "in light of recent industry events." Among other things, Defendants assured investors that while PacWest's deposits had declined $700 million since the end of 2022, from $33.9 billion to $33.2 billion, they had "taken numerous strategic steps over the past four quarters to improve the balance sheet" and the Bank's asset quality "remains excellent" and had "experienced no significant changes since year-end, including classified assets, non-performing assets, and charge-offs."

94.    These statements were patently untrue, however, as over the prior four quarters Defendants had (i) permitted the Bank's primary liquidity to decline by over $8 billion and Liquidity Ratio to fall by over 50%, or to the point that Defendants stopped reporting it to avoid alarming investors; (ii) done nothing to mitigate PacWest's exposure to interest rate-sensitive long-term securities; and (iii) let the value of PacWest's AFS portfolio deteriorate to the point that the Bank was massively exposed to a run.

95.    Two days later, on March 12, 2023, the FDIC placed Signature, a New York bank that specialized in private real estate, private equity, and cryptocurrency services, into receivership.

96.     Industry observers immediately reported that whatever problems had led to SVB and Signature's respective demises could spread to PacWest, and the Bank's stock price plummeted 53% on March 13, a drop so severe that trading was halted multiple times because of volatility.[22]

97.     There was no question that Defendants understood that PacWest was in danger of financial calamity at this time. For example, CW2, a senior vice president at the Bank from March 2018 until he retired in May 2023, said that "all hell broke loose" at PacWest in March 2023, in response to negative news stories about the Bank. As a senior vice president, CW2 was a lending officer at a Carlsbad, California, PacWest branch.

98.     CW3 was a vice president and product manager in Denver, Colorado, for PacWest from May 2022 to August 2023. He reported to PacWest's EVP and Head of Treasury Sales & Products. CW3 focused on delivering the Bank's real-time payments product; owned product strategy, roadmap, and execution for new and core cash management solutions in payments; managed product launches, enhancements, and upgrades; ensured business readiness and regulatory compliance; and collaborated with sales, product teams, and business leaders. He also identified customer needs and emerging payment methods to address those needs, worked closely with the Digital Banking team, and performed user research.

99.     CW3 confirmed that negative reporting in the wake of SVB and Signature Bank's failures led customers to panic and to withdraw money. CW3 said that he and his colleagues worked 17-hour days to calm customers over the phone to stop deposit outflows.

---

[22] *See, e.g.*, ET NowDigital, *SVB Collapse Fallout: Trading in Dozens of Regional American Banks Halted After Shares Slump*, TimesNowNews.com (Mar. 13. 2023).

100.    As Bank employees were pleading with customers not to withdraw deposits, Defendants issued another press release on March 17, 2023 ("March 17 Release") that sought to calm investors and stave off a bank run. The March 17 Release assured investors that the Bank "continues to have solid liquidity, with over $10.8 billion in available cash as of March 17, 2023," and that the "available" cash exceeded the amount of the Bank's deposits that were not insured. Defendants admitted that PacWest had "experienced elevated net deposits outflows, concentrated primarily in our Venture Banking business" since the failures of SVB and Signature, but insisted that "deposit balance fluctuations had substantially stabilized" since March 13, 2023. Defendants reiterated in the March 17 Release that the Bank's "asset quality remains excellent" and that the Defendants had taken "numerous steps, including leveraging available collateral, over the past week to enhance and fortify our liquidity during this time."

101.    Like the March 10 Release, the March 17 Release misled investors, presenting a materially different situation from the facts on the ground at the Bank. While Defendants touted PacWest's liquidity, they elided the fact that the "available cash" was not on hand, but rather emergency borrowing capabilities from the FHLB and FRBSF. In addition, Defendants continued to assert that their assets were "excellent," even though the value of its AFS securities had plummeted in response to rising interest rates. In short, while Defendants were assuring investors that all was well, they knew or recklessly disregarded that they could not save PacWest by selling the AFS portfolio at fire sale prices, so Defendants had turned to U.S. government entities for a *de facto* bailout.

102.    On March 22, 2023, before markets opened, Defendants disclosed in a press release (the "March 22 Release") the extent of the deposit outflows in response to SVB and Signature's failures. The March 22 Release disclosed that PacWest had only $27.1 billion in deposits, a decline of $6.8 billion, or 20%, from

35

the end of 2022. Further, the release belatedly disclosed that the Bank had had to tap federal lending, *i.e.*, on a *de facto* bailout, to stay afloat. On that news, the Bank's share price fell $2.09, or 17.1%.

103.   On April 25, 2023, PacWest issued a press release disclosing its results for Q1 2023 ("Q1 2023 Release"). The Q1 2023 Release disclosed, contrary to Defendants' assurances earlier in the Class Period that increases in interest rates would benefit NII in early 2023, that the Bank's NII had plummeted 13.5%, or $43.7 million, from $322.9 million at the end of 2022 to $279.3 million at the end of Q1 2023.

104.   The Q1 2023 Release further disclosed that while deposits had ticked back up since the March 22 Release, they had nevertheless fallen 16.8% overall from $33.9 billion at the end of 2022 to $28.2 billion at the end of Q1 2023.

105.   In addition, the Q1 2023 Release disclosed that since PacWest did not have securities to sell to improve its liquidity, given that the securities' value had plummeted in the face of rising interest rates, Defendants had resorted to selling profitable loans to obtain cash. The Q1 2023 Release stated that "in light of the recent events"—*i.e.*, the failures of SVB and Signature—"management took immediate steps to maximize liquidity, including the exploration of strategic asset sales, which ***has led to the transfer of our $2.7 billion Lender Finance loan portfolio to held for sale***."

106.   Only three days later, on April 28, 2023, First Republic, a San Francisco-based bank that provided wealth management services and banking services to the tech industry, was seized by the FDIC and later sold to JPMorgan Chase.

### E.   PacWest is Sold to Banc of California

107.   On May 3, 2023, after markets had closed, *Bloomberg* published an article entitled "Regional Banks Sink as PacWest Weighs Strategic Options" ("May

3 Article"). The article revealed that the Bank's share price had plummeted 60% upon reports that PacWest was "**weighing strategic options including a sale**." The May 3 Article was a materialization of the concealed risk that the Bank would not be able to continue operating as a stand-alone concern because of (i) the failure of Defendants' liquidity management processes to ameliorate the Bank's reliance on interest-rate sensitive long-term securities for primary liquidity, (ii) the weakness of the PacWest's Liquidity Ratio, (iii) the $8.0 billion decline in the Bank's primary liquidity, and (iv) the decline in PacWest's NII.

108.   Later that evening, Defendants confirmed in a statement that the May 3 Article was accurate, and that PacWest had been "approached by several potential partners and investors" and "discussions are ongoing."

109.   On October 23, 2023, Defendants filed a proxy statement with the SEC that described the events leading up to the Merger in November 2023 that formed BOC ("Merger Proxy"). The Merger Proxy disclosed that on May 2, 2023, the day before the May 3 Article, a potential acquirer delivered a proposal for a cash acquisition of PacWest to "PacWest management," *i.e.*, at a minimum, Taylor and Thompson.

110.   According to the Merger Proxy, the next day (*i.e.*, May 3), PacWest's Board of Directors, which included Wagner, met with Taylor, Thompson and others and instructed Taylor and Thompson to "approach and initiate discussions with a larger number of prospective strategic partners," *i.e.*, obtain additional bids for PacWest.

111.   PacWest representatives immediately began contacting "potential acquirers and business combination partners" and PacWest "entered into confidentiality agreements" **with ten potential acquirers and/or partners**, including Banc of California, who began conducting "preliminary due diligence" **the very next day**, *i.e.*, May 4, 2023.

112.    Also on May 4, *Forbes* published an article entitled "PacWest Stock Falls 39% After Federal Reserve's Latest Interest Rate Hike." The article stated that PacWest's shares had fallen 60% in after-hours trading following the May 3 article. The article advised investors to "consider whether PacWest — which said it added deposits since SVB failed and has not suffered 'out-of-the-ordinary' deposit outflows since the First Republic rescue — will be able to find a buyer willing to shoulder its losses." The article further disclosed that PacWest's shares had lost 28% of their value on May 2, the day after JPMorgan had taken over First Republic, and observed that an analyst had suggested on CNBC that "the stock price is the market's way of signaling which bank is the next one to require a government-assisted rescue."

113.    PacWest's stock price had closed at $6.42 on May 3, before the May 3 Article appeared. Following the publication of the May 3 and May 4 articles, however, PacWest's stock price fell $3.25 per share, or 51%, to close at $3.17 per share on May 4, 2023.

114.    According to the Merger Proxy, Defendants were so desperate for an entity to acquire PacWest that on May 5, 2023, only two days after the May 3 Article, Defendants stopped negotiating with Banc of California because the Bank's "discussions with other parties were in more advanced stages."

115.    Then, on May 11, 2023, PacWest filed the Q1 2023 10-Q. The Q1 2023 10-Q disclosed that in the wake of the May 3 and May 4 articles, the Bank's deposits "***had declined approximately 9.5%, with a majority of that decline occurring on May 4th and May 5th after the news reports on the afternoon of May 3rd***." The 10-Q further disclosed that PacWest had funded this decline in deposits by borrowing from the federal government. According to the Q1 2023 10-Q, although PacWest had over $25 billion in deposits, the Bank only had $15.0 billion in primary *and* secondary liquidity.

116.   On this news, PacWest's stock price fell $1.38 per share, or 22.77%, to close at $4.68 per share on May 11, 2023.

117.   Given PacWest's desperate liquidity situation, Defendants had no choice but to find a buyer for the Bank. On July 25, 2023, it was announced that PacWest had entered into an agreement to be purchased by Banc of California.

118.   Now that the danger of a bank run on PacWest had passed, Defendants resumed disclosing the Liquidity Ratio in the Bank's 10-Q for the second quarter of 2023, which it filed on August 9, 2023 ("Q2 2023 10-Q"). That 10-Q disclosed, for the first time, that the Bank's Liquidity Ratio had declined to *18.6%* at the end of 2022.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

119.   Plaintiffs allege that the statements highlighted in bold and italics within this section were knowingly or recklessly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, such statements artificially inflated or maintained the price of PacWest's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

120.   Throughout the Class Period, Defendants made a series of misrepresentations concerning PacWest's financial health and the effect that rising interest rates would have on the Bank's balance sheet. Specifically, Defendants made material misstatements and omissions that misled investors about the fact that: (i) PacWest's faulty liquidity management processes had caused the Bank to rely on interest-rate sensitive long-term securities for primary liquidity, which would collapse in value when interest rates rose, (ii) PacWest's AFS securities portfolio was unhedged, (iii) rising interest rates would harm the Bank, and (iv)

39

there was a material undisclosed risk that the Bank would not be able to continue operating as a standalone entity.

**A.** **<u>False and Misleading Statements Regarding PacWest's Financial Health</u>**

121.   The 2021 10-K, which was signed by Wagner and Olson, touted that:

> Our business strategy is to operate a client-focused, ***well-capitalized and profitable nationwide bank*** dedicated to providing personal service to our business and individual customers. We believe that stable, long-term growth and profitability are the result of building strong customer relationships while maintaining disciplined credit underwriting standards. We continue to focus on originating high-quality loans and leases and growing our low-cost deposit base through our relationship-based business lending. ***These principles enable us to maintain operational efficiency, increase profitability, increase core deposits, and grow loans and leases in a sound manner***.

122.   Defendants' statements in paragraph 120 above were materially false and/or misleading because they knowingly or recklessly assured investors that the Bank was in good financial condition, when Defendants knew, but did not disclose that (i) PacWest's faulty liquidity management processes had caused the Bank to rely on interest-rate sensitive long-term securities for primary liquidity that would collapse in value when interest rates rose, (ii) PacWest's AFS securities portfolio was unhedged, and thus (iii) there was a material undisclosed risk that the Bank would not be able to continue operating as a standalone entity.

123.   The 2022 10-K, which was signed by Taylor and Thompson, touted that:

> Our business strategy is to operate a client-focused, ***well-capitalized and profitable nationwide bank*** dedicated to providing personal service to our business and individual customers. We believe that stable, long-term growth and profitability are the result of building strong customer relationships while maintaining disciplined credit underwriting standards. We continue to focus on originating high-quality loans and leases and growing our low-cost deposit base through

40

our relationship-based business lending. ***These principles enable us to maintain operational efficiency, increase profitability, increase core deposits, and grow loans and leases in a sound manner***.

124.   Defendants' statements in paragraph 122 above were materially false and/or misleading because they knowingly or recklessly assured investors that the Bank was in good financial condition when (i) PacWest's faulty liquidity management processes had caused the Bank to rely on interest-rate sensitive long-term securities for primary liquidity that had collapsed in value when interest rates rose; (ii) PacWest's AFS securities portfolio was unhedged; (iii) Defendants had permitted the Bank's primary liquidity to decline by over $8 billion and Liquidity Ratio to fall by over 50%, or to the point that Defendants stopped reporting it to avoid alarming investors; (iv) Defendants had done nothing to mitigate PacWest's exposure to interest rate-sensitive long-term securities; and thus (v) there was a material undisclosed risk that the Bank would not be able to continue operating as a standalone entity.

125.   The 2021 10-K further assured investors that:

***We have a comprehensive risk management process*** that measures, monitors, evaluates, and manages the risks we assume in conducting our activities.

***

***Our risk framework is structured to guide decisions regarding the appropriate balance between risk and return considerations in our business***. Our risk framework is based upon our business strategy, risk appetite, and financial plans approved by our Board.

126.   Defendants' statements in paragraph 124 above were materially false and/or misleading because they knowingly or recklessly assured investors that the Bank had a "comprehensive risk management process" and "risk framework," and thus at a minimum was preparing for rises in interest rates, when Defendants knew

or recklessly disregarded that (i) PacWest's faulty liquidity management processes had caused the Bank to rely on interest-rate sensitive long-term securities for primary liquidity, which would collapse in value when interest rates rose, (ii) PacWest's AFS securities portfolio was unhedged, and thus (iii) there was a material undisclosed risk that the Bank would not be able to continue operating as a standalone entity.

127.   The 2022 10-K further assured investors that:

*We have a comprehensive risk management process* that measures, monitors, evaluates, and manages the risks we assume in conducting our activities.

\*\*\*

*Our risk framework is structured to guide decisions regarding the appropriate balance between risk and return considerations in our business.* Our risk framework is based upon our business strategy, risk appetite, and financial plans approved by our Board.

128.   Defendants' statements in paragraph 126 above were materially false and/or misleading because they knowingly or recklessly assured investors that the Bank had a "comprehensive risk management process" and "risk framework," when Defendants knew or recklessly disregarded that (i) PacWest's faulty liquidity management processes had caused the Bank to rely on interest-rate sensitive long-term securities for primary liquidity that had collapsed in value when interest rates rose, (ii) PacWest's AFS securities portfolio was unhedged, (iii) Defendants had permitted the Bank's primary liquidity to decline by over $8 billion and Liquidity Ratio to fall by over 50%, or to the point that Defendants stopped reporting it to avoid alarming investors; (iv) Defendants had done nothing to mitigate PacWest's exposure to interest rate-sensitive long-term securities; and thus (v) there was a

material undisclosed risk that the Bank would not be able to continue operating as a standalone entity.

129.  On January 27, 2023, PacWest hosted an earnings call with investors and analysts to discuss the Bank's Q4 and full year 2022 results (the "Q4 2022 Earnings Call"). During the scripted portion of the Q4 2022 Earnings Call, Taylor stated, in relevant part, "[t]here are real challenges ahead with rising interest rates and a slowing economy, but there is [. . .] a ***significant opportunity*** for PacWest to ***improve our performance*** and return to shareholders, given our strong team, a great customer base and a plan to unlock additional value for our shareholders and employees*."*

130.  Defendants' statements in paragraph 128 above were materially false and/or misleading because they knowingly or recklessly assured investors that the Bank had a "significant opportunity" "to "improve performance" when (i) PacWest's faulty liquidity management processes had caused the Bank to rely on interest-rate sensitive long-term securities for primary liquidity that had collapsed in value when interest rates rose, (ii) PacWest's AFS securities portfolio was unhedged, (iii) Defendants had permitted the Bank's primary liquidity to decline by over $8 billion and Liquidity Ratio to fall by over 50%, or to the point that Defendants stopped reporting it to avoid alarming investors; (iv) Defendants had done nothing to mitigate PacWest's exposure to interest rate-sensitive long-term securities; and thus (v) there was a material undisclosed risk that the Bank would not be able to continue operating as a standalone entity.

131.  The 2021 10-K also included a section entitled "Risk Factors," which stated that:

> The value of our securities in our investment portfolio ***may*** decline in the future.

The fair market value of our investment securities **may be adversely affected** by general economic and market conditions, including changes in interest rates, credit spreads, and the occurrence of any events adversely affecting the issuer of particular securities in our investments portfolio or any given market segment or industry in which we are invested. We analyze our securities, all of which are classified as available-for-sale, on a quarterly basis to measure currently expected credit losses. The process for determining currently expected credit losses usually requires complex, subjective judgments about the future financial performance of the issuer in order to assess the probability of receiving principal and interest payments sufficient to recover our amortized cost of the security. Because of changing economic and market conditions affecting issuers, we may be required to recognize credit losses in future periods, which could have a material adverse effect on our business, financial condition, or results of operations.

132.   This risk factor was materially false and/or misleading because Defendants knowingly or recklessly stated that the Bank's "securities in [its] investment portfolio" may "decline" or be "adversely affected" by changes in interest rates when Defendants knew that interest rates were going to increase in the immediate future and that (i) PacWest's faulty liquidity management processes had caused the Bank to rely on interest-rate sensitive long-term securities for primary liquidity that would collapse in value when interest rates rose, (ii) PacWest's AFS securities portfolio was unhedged, and thus (iii) there was a material undisclosed risk that the Bank would not be able to continue operating as a standalone entity.

133.   The 2022 10-K also included a section entitled "Risk Factors," which stated that:

The value of our securities in our investment portfolio **may** decline in the future.

The fair market value of our investment securities **may be adversely affected** by general economic and market conditions, including changes in interest rates, credit spreads, and the occurrence of any events adversely affecting the issuer of particular securities in our investments

44

portfolio or any given market segment or industry in which we are invested. We analyze our securities, all of which are classified as available-for-sale, on a quarterly basis to measure currently expected credit losses. The process for determining currently expected credit losses usually requires complex, subjective judgments about the future financial performance of the issuer in order to assess the probability of receiving principal and interest payments sufficient to recover our amortized cost of the security. Because of changing economic and market conditions affecting issuers, we may be required to recognize credit losses in future periods, which could have a material adverse effect on our business, financial condition, or results of operations.

134. This risk factor was materially false and/or misleading because Defendants knowingly or recklessly stated that the Bank's "securities in [its] investment portfolio" may "decline" or be "adversely affected" by changes in interest rates when these events had come to pass and were worsening given that (i) PacWest's faulty liquidity management processes had caused the Bank to rely on interest-rate sensitive long-term securities for primary liquidity that had collapsed in value when interest rates rose, (ii) PacWest's AFS securities portfolio was unhedged, (iii) Defendants had permitted the Bank's primary liquidity to decline by over $8 billion and Liquidity Ratio to fall by over 50%, or to the point that Defendants stopped reporting it to avoid alarming investors; (iv) Defendants had done nothing to mitigate PacWest's exposure to interest rate-sensitive long-term securities; and thus (v) there was a material undisclosed risk that the Bank would not be able to continue operating as a standalone entity.

135. Defendants continued to make false statements about the Bank's financial health in response to the well-publicized failures of SVB and Signature. Defendants' March 10 Release assured investors they had "*taken numerous strategic steps over the past four quarters to improve the balance sheet*" and PacWest's asset quality "*remains excellent*" and had "*experienced no significant changes since year-end, including classified assets, non-performing assets, and*

45

*charge-offs*." Similarly, the March 17 Release touted that the Bank's "**asset quality remains excellent**."

136.    Defendants' statements in the foregoing paragraph were materially false and misleading because, over the prior four quarters (i) PacWest's faulty liquidity management processes had caused the Bank to rely on interest-rate sensitive long-term securities for primary liquidity that had collapsed in value when interest rates rose, (ii) PacWest's AFS securities portfolio was unhedged, (iii) Defendants had permitted the Bank's primary liquidity to decline by over $8 billion and Liquidity Ratio to fall by over 50%, or to the point that Defendants stopped reporting it to avoid alarming investors; (iv) Defendants had done nothing to mitigate PacWest's exposure to interest rate-sensitive long-term securities; and thus (v) there was a material undisclosed risk that the Bank would not be able to continue operating as a standalone entity.

**B.    False and Misleading Statements Regarding the Effect of Rising Interest Rates on PacWest**

137.    During the Class Period Defendants misrepresented to investors that PacWest would *benefit* from increases in interest rates. These statements were false and misleading, however, because Defendants knew, but did not disclose, that rising interest rates would harm the Bank's performance by damaging PacWest's primary liquidity, reducing its NII, and thereby creating a material undisclosed risk that the Bank would not be able to continue operating as a standalone entity.

138.    PacWest's 2021 10-K, for example, emphasized to investors that the Bank's operating results "generally depended" on NII as a "key performance indicator." The 2021 10-K further advised investors that the Bank used an NII simulation model to "measure the estimated changes in NII that would result over the next 12 months from immediate and sustained changes in interest rates." Defendants boasted to investors that, according to the model, the Bank's "balance

sheet is asset-sensitive" and "[a]n asset-sensitive profile would suggest that *a sudden sustained increase in rates would result in an increase in our estimated NII*."

139.   Similarly, the 2022 10-K stated, in relevant part:

We evaluated the *results* of our NII simulation model and MVE model prepared as of December 31, 2022, the results of which are presented below. Our NII simulation and MVE model indicate that our balance sheet is substantially neutral. A neutral IRR profile would suggest that *a sudden sustained rate increase or decrease would not result in a material change in our estimated NII and MVE*.

140.   By emphasizing that NII was a key performance indicator and asserting that a "sudden sustained increase in [interest] rates would either "increase" NII or "not result in a material change in [PacWest's] estimated NII," Defendants communicated to investors that the Bank would benefit from an increase in interest rates. The statements in paragraphs 137-38 were knowing or recklessly false and misleading, however, because Defendants failed to disclose that a "sudden sustained increase in rates" would harm the Bank by causing the value of the Bank's AFS securities to drop precipitously, severely weaken the Bank's liquidity, and cause PacWest's NII to decline. Indeed, in Q4 2023, PacWest's NII fell 3.65%, from $335 million to $323 million, and in Q1 2023 fell 13.5% further, from $323 million to $279 million.

141.   On July 20, 2022, Defendants filed a PowerPoint presentation with the SEC entitled "Second Quarter 2022 Results: Earnings Release Presentation." The second slide of that presentation stated that "*Higher interest rates should benefit [PacWest's] earnings and show up more in the second half of 2022*."

142.   Defendants reiterated this on July 21, 2022 during the Q2 2022 Call. During that call Defendant Black observed that "[t]he second quarter saw an incredibly volatile rate environment and significantly more economic uncertainty,

47

which has caused us to tap the brakes with the expectation of slower loan growth in the second half of the year." Nevertheless, Black assured investors that, "*[w]e expect the higher interest rates to benefit our earnings over time, and will start to show up in the second half of 2022*."

143.    Later during the Q2 2022 Call, an analyst asked, regarding the Bank's recent increase in net interest income, "[s]hould we think about that quarter-on-quarter growth accelerating from the second quarter levels in the back half of the year?" Olson responded "[y]es, I think so. And if you think about the timing of the different rate hikes, I mean, the last big hike was in mid-June. So *what we've said all along, if you're really going to see more of the real benefits from the hikes and growth in net interest income in the second half of the year and into 2023*."

144.    The statements in paragraphs 140-42 above communicated to investors that the Bank would benefit from an increase in interest rates. These statements were knowing or recklessly false and misleading, however, because Defendants failed to disclose that rising interest rates would harm the Bank by causing the value of the Bank's AFS securities to drop precipitously, severely weaken the Bank's liquidity, and cause PacWest's NII and earnings to decline. Indeed, in Q4 2023, PacWest's NII fell 3.65%, from $335 million to $323 million, and in Q1 2023 fell 13.5% further, from $323 million to $279 million.

145.    On October 20, 2022, Defendants held a call with analysts and investors to discuss PacWest's financial performance in Q3 2022 (the "Q3 2022 Call"). On that call, Black was asked, "On the NII guide, the slow growth or modest growth in Q4. If I put the pieces together for next year like down-ish, flattish balance sheet. I heard your comments on margins. Do you think NII can grow from that fourth quarter number into 2023?" Black replied unequivocally, "*We think it will grow in 2023*."

146.   The statements in paragraph 144 above communicated to investors that the Bank would benefit from an increase in interest rates. These statements were knowing or recklessly false and misleading, however, because Defendants failed to disclose that rising interest rates would harm the Bank by causing the value of the Bank's AFS securities to drop precipitously, severely weaken the Bank's liquidity, and cause PacWest's NII to decline. Indeed, in Q4 2023, PacWest's NII fell 3.65%, from $335 million to $323 million, and in Q1 2023 fell 13.5% further, from $323 million to $279 million.

**C.   <u>False and Misleading Statements About Securities Held For Liquidity Purposes</u>**

147.   Further, far from apprising investors of the damage to the Bank's liquidity and susceptibility to a bank run caused by the increase in interest rates, throughout the Class Period Defendants affirmatively advised investors that they would not need to sell securities held for primary liquidity purposes whose value had declined as a result of rising interest rates at a loss. Specifically, PacWest's 2021 10-K, Q1 2022 10-Q, Q2 2022 10-Q, Q3 2022 10-Q, 2022 10-K, and Q1 2023 10-Q all assured investors that:

> Although we periodically sell securities for portfolio management purposes, *we do not foresee having to sell any impaired securities strictly for liquidity needs and believe that it is more likely than not we would not be required to sell any impaired securities before recovery of their amortized cost*.

148.   The statements in paragraph 146 above were materially false and misleading, however, because Defendants knew or recklessly disregarded that (i) PacWest's faulty liquidity management processes had caused the Bank to rely on interest-rate sensitive long-term securities for primary liquidity, which would collapse in value when interest rates rose and thus that the Bank was likely to have to sell them at a loss, (ii) PacWest's AFS securities portfolio was unhedged, and

thus (iii) there was a material undisclosed risk that the Bank would not be able to continue operating as a standalone entity. Indeed, in Q2 2022, Defendants had sold $393.4 million in impaired AFS securities at a loss of $1.2 million, and in Q4 2022, Defendants sold $1 billion of impaired AFS securities at a loss of $49 million.

### D. False and Misleading Statements Regarding Items 303 and 105 of Regulation S-K

149. Item 7 of Form 10-K and Item 2 of Form 10-Q require SEC registrants to furnish the information called for under Item 303 of Regulation S-K [17 C.F.R. §229.303], Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"). Among other things, Item 303 of Regulation S-K required that PacWest's Class Period Forms 10-K and 10-Q disclose known trends or uncertainties that had, or were reasonably likely to have, a material impact on its revenues or income from continuing operations.

150. In 1989, the SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K concerning the disclosure of material trends or uncertainties. In particular, the interpretative guidance states specifically that when an SEC registrant knows that a competitor has introduced to the marketplace a product similar to its own at a price less than that charged by the registrant, a known uncertainty that is reasonably likely to have a material effect on its future operating results exists, and disclosure is required. The interpretative guidance states, in pertinent part, as follows:

A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

\* \* \*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**Events that have already occurred or are anticipated often give rise to known uncertainties.** For example, a registrant may know that a material government contract is about to expire. The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed. **More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant**, or may have been advised by the government that the contract may not be renewed. The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant. **In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required.**

151.   In 2003, the SEC issued additional interpretative guidance relating to the requirements of Item 303. Such guidance states, in pertinent part:

*We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner. MD&A is a critical component of that communication*. The Commission has long sought through its rules, enforcement actions and interpretive processes to elicit MD&A that not only meets technical disclosure requirements but generally is informative and transparent.

152.   The MD&A disclosures in PacWest's 2021 and 2022 10-Ks, and Q1, Q2 and Q3 2022 10-Qs, and Q1 2022 10-Q it filed with the SEC during the Class Period were knowingly or recklessly materially false and misleading because Defendants failed to disclose the known trends and uncertainties associated with: (i) the Bank's need to sell securities in its AFS Portfolio at a loss because of rising interest rates; and (ii) the fact that PacWest's AFS securities portfolio was unhedged; (iii) rising interest rates would harm the Bank's performance by eviscerating PacWest's primary liquidity and reducing its NII; and (iv) thereby creating a material undisclosed risk that the Bank would not be able to continue

51

operating as a standalone entity. The omission of this information violated the disclosure obligation imposed by Item 303.

153.   In addition, Item 1A of both Form 10-K and Form 10-Q requires SEC registrants to furnish the information called for under Item 105 of Regulation S-K [17 C.F.R. §229.105], Risk Factors. Item 105 of Regulation S-K required that PacWest's 2021 and 2022 10-Ks, and Q1, Q2 and Q3 2022 10-Qs, and Q1 2022 10-Q disclose the most significant matters that make an investment in the Bank risky.

154.   As detailed herein, during the Class Period, PacWest's 2021 and 2022 10-Ks, and Q1, Q2 and Q3 2022 10-Qs, and Q1 2023 10-Q failed to disclose: (1) the risk that the Bank may need to sell its AFS securities (primarily long-term assets) at a loss to satisfy its (primarily short-term) liabilities, which was known to Defendants; (2) the risk that the Bank's Liquidity Ratio would decline as a result of rising interest rates; and (3) the risk that NII would decline as a result of rising interest rates.

155.   Instead, the Bank's SEC filings during the Class Period only disclosed that:

> Effective liquidity management is essential for the operation of our business. Although we have implemented strategies to maintain sufficient and diverse sources of funding to accommodate planned, as well as unanticipated, changes in assets, liabilities, and off-balance sheet commitments under various economic conditions, ***an inability to raise funds through deposits, borrowings, the sale of investment securities and other sources could have a material adverse effect on our liquidity.***

156.   This risk factor completely failed to apprise investors of the risks associated with (i) the Bank's need to sell securities in its AFS Portfolio at a loss because of rising interest rates; (ii) the fact that PacWest's AFS securities portfolio was unhedged; (iii) rising interest rates would harm the Bank's performance by eviscerating PacWest's primary liquidity and reducing its NII; and (iv) thereby

creating a material undisclosed risk that the Bank would not be able to continue operating as a standalone entity. The omission of this information violated the disclosure obligation imposed by Item 105.

**E.     False and Misleading Statements in the Certifications Attached to PacWest's Quarterly and Annual Reports During the Class Period**

157.   Appended as exhibits to the Bank's 2021 10-K were signed certifications pursuant to the Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), in which Defendants Wagner and Olson each certified that he had "reviewed this report on Form 10-K for the for the year ended December 31, 2021 of PacWest Bancorp [and] . . . [b]ased on my knowledge, [the] report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

158.   Also appended to the Bank's 2021 10-K was a signed certification pursuant to 18 U.S.C. § 1350 in which Defendants Wagner and Olson certified that the 2021 10-K "fully complies with the requirements of Section 13(a) or 15(d)" of the Exchange Act and that "the information contained in the [2021 10-K] fairly presents, in all material respects, the financial condition and results of operations of" PacWest.

159.   Appended as exhibits to the Bank's Q1 2022 10-Q, Q2 2022 10-Q, Q3 2022 (the "2022 10-Qs") were signed certifications pursuant to the Section 302 of the Sarbanes-Oxley Act of 2002, in which Defendants Wagner and Olson each certified that he had "reviewed this report on Form 10-Q for the quarterly period ended March 31, 2022 of PacWest Bancorp [and] . . . [b]ased on my knowledge, [the] report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances

1    under which such statements were made, not misleading with respect to the period

2    covered by this report."

3        160.   Also appended to the 2022 10-Qs were signed certifications pursuant

4    to 18 U.S.C. § 1350 in which Defendants Wagner and Olson certified that each

5    2022 10-Q "fully complies with the requirements of Section 13(a) or 15(d)" of the

6    Exchange Act and that "the information contained in the [2022 10-Qs] fairly

7    presents, in all material respects, the financial condition and results of operations

8    of" PacWest.

9        161.   Appended as exhibits to the Bank's 2022 10-K were signed

10   certifications pursuant to the Section 302 of the Sarbanes-Oxley Act of 2002

11   ("SOX"), in which Defendants Taylor and Thompson each certified that he had

12   "reviewed this report on Form 10-K for the for the year ended December 31, 2021

13   of PacWest Bancorp [and] . . . [b]ased on my knowledge, [the] report does not

14   contain any untrue statement of a material fact or omit to state a material fact

15   necessary to make the statements made, in light of the circumstances under which

16   such statements were made, not misleading with respect to the period covered by

17   this report."

18       162.   Also appended to the Bank's 2022 10-K was a signed certification

19   pursuant to 18 U.S.C. § 1350 in which Defendants Wagner and Olson certified that

20   the 2022 10-K "fully complies with the requirements of Section 13(a) or 15(d)" of

21   the Exchange Act and that "the information contained in the [2022 10-K] fairly

22   presents, in all material respects, the financial condition and results of operations

23   of" PacWest.

24       163.   Appended as exhibits to the Bank's Q1 2023 10-Q were signed

25   certifications pursuant to the Section 302 of the Sarbanes-Oxley Act of 2002, in

26   which Defendants Wagner and Olson each certified that he had "reviewed this

27   report on Form 10-Q . . . of PacWest Bancorp [and] . . . [b]ased on my knowledge,

28

1   [the] report does not contain any untrue statement of a material fact or omit to state
2   a material fact necessary to make the statements made, in light of the circumstances
3   under which such statements were made, not misleading with respect to the period
4   covered by this report."

5       164. Also appended to the Q1 2023 10-Q were signed certifications
6   pursuant to 18 U.S.C. § 1350 in which Defendants Wagner and Olson certified that
7   the Q1 2023 10-Q "fully complies with the requirements of Section 13(a) or 15(d)"
8   of the Exchange Act and that "the information contained in the [Q1 2023 10-Qs]
9   fairly presents, in all material respects, the financial condition and results of
10  operations of" PacWest.

11      165. Each of the above statements in paragraphs 156-63 was materially
12  recklessly or knowingly false and misleading because the 2021 and 2022 10-Ks and
13  Class Period 10-Qs "omitted to state a material fact necessary to make the
14  statements made, in light of the circumstances under which such statements were
15  made, not misleading," did not "fully comply with the requirements of Section 13(a)
16  or 15(d) of the Exchange Act" and did not "fairly present[], in all material respects,
17  the financial condition and result of operations of the Bank" because the 2021 and
18  2022 10-Ks and Class Period 10-Qs failed to disclose all material facts necessary to
19  make the statements in those filings not misleading. Specifically, Defendants
20  misrepresented to investors that: (i) PacWest's faulty liquidity management
21  processes had caused the Bank to rely on interest-rate sensitive long-term securities
22  for primary liquidity that collapsed in value when interest rates rose; (ii) PacWest's
23  AFS securities portfolio was unhedged; (iii) rising interest rates would *harm* the
24  Bank; (iv) there was a material undisclosed risk that the Bank would not be able to
25  continue operating as a standalone entity; and (v) as a result of the foregoing,
26  Defendants' positive statements about the Bank's business, operations, and
27  prospects were materially misleading.

28

1

## **THE TRUTH EMERGES**

2      166.   The truth began to emerge on March 22, 2023, before markets opened,

3  when Defendants issued the March 22 Release, which disclosed the extent of the

4  deposit outflows in response to SVB and Signature's failures. The March 22

5  Release disclosed that PacWest's deposits had declined $6.8 billion, or 20%, from

6  the end of 2022. Further, the release belatedly disclosed that the Bank had had to

7  tap federal lending, *i.e.*, on a *de facto* bailout, to stay afloat. On that news, the

8  Bank's share price fell $2.09, or 17.1%. The decline in response to the March 22

9  Release was a materialization of the concealed risk that that the failure of

10  Defendants' liquidity management processes, their reliance on interest-rate

11  sensitive long-term securities for primary liquidity, the weakness of the PacWest's

12  Liquidity Ratio, the $8.0 billion decline in the Bank's primary liquidity would mean

13  that the Bank lacked sufficient liquidity to remain operational without an infusion

14  of federal funds.

15      167.   On May 3, 2023, *Bloomberg* published an article entitled "Regional

16  Banks Sink as PacWest Weighs Strategic Options" ("May 3 Article"). The article

17  revealed that the Bank's share price had plummeted 60% upon reports that PacWest

18  was "***weighing strategic options including a sale***." The May 3 Article was a

19  materialization of the concealed risk that the Bank might not be able to continue

20  operating as a stand-alone concern because of the utter failure of Defendants'

21  liquidity management processes, their reliance on interest-rate sensitive long-term

22  securities for primary liquidity, the weakness of the PacWest's Liquidity Ratio, the

23  $8.0 billion decline in the Bank's primary liquidity, and the decline in PacWest's

24  NII.

25      168.   On this news, PacWest's stock price fell $2.84 per share, or 44.17%,

26  to close at $3.59 per share on May 4, 2023.

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

169.   Then, On May 11, 2023, the risks created by Defendants' misrepresentations fully emerged when PacWest's Q1 2023 10-Q disclosed that the Bank had lost 9.5% of its deposits in response to the May 3 Article and was relying entirely on money borrowed from the federal government, *i.e.*, a de facto government bailout, to stay afloat. It was now virtually certain the Bank could not continue operating in its current form.

170.   On this news, PacWest's stock price fell $1.38 per share, or 22.77%, to close at $4.68 per share on May 11, 2023.

## ADDITIONAL SCIENTER ALLEGATIONS

171.   As set forth above, Defendants each had scienter as to the false and misleading nature of their statements because they each knew or, at a minimum, recklessly disregarded the facts described above for the following reasons.

(a)   Wagner and Black sold substantial amounts of shares at artificially inflated prices during the Class Period in a manner completely inconsistent with their prior share sales.

(b)   Wagner assured investors that the Bank was prepared for interest rate rises in the March 2022 Proxy.

(c)   Defendants educated themselves on PacWest's financial condition before repeatedly assuring investors that the Bank was achieving its financial goals and could operate as a going concern.

(d)   Defendants emphasized to investors that PacWest's future performance depended upon "the effectiveness of [Defendants'] risk management framework," and that "[e]ffective liquidity management is essential for the operation of our business," reflecting their focus on risk and liquidity management.

57

(e)   Defendants removed the Liquidity Ratio from the Bank's Q3 2022 10-Q, 2022 10-K, and Q1 2023 10-Q to avoid alerting investors to the ratio's substantial decline. Defendants only resumed disclosing the Liquidity Ratio in the Bank's Q2 2023 10-Q, after the Merger had been announced.

(f)   Defendants issued the March 10 Release and March 17 Release, which contained false and misleading statements for the express purpose of assuaging investor concerns.

(g)   Defendants Wagner, Taylor, Olson, and Thompson signed SOX certifications attached to SEC filings that they knew contained material misstatements.

172.   In addition to the above allegations, which on their own create a strong inference of scienter, additional factors support a strong inference of Defendants' scienter. Wagner, Taylor, Olson, Thompson, and Black each knew of the false and misleading nature of the statements discussed above, or at a minimum was reckless for not knowing these matters.

173.   Wagner served as PacWest's President, CEO, and Director from prior to the start of the Class Period until January 2023. PacWest identified Wagner as an "Executive Officer" of the Bank during the Class Period.

174.   Taylor has served as PacWest's CEO, President, and Director since January 2023. PacWest identified Taylor as an "Executive Officer" of the Bank during the Class Period.

175.   Olson served as PacWest's Executive VP and CFO from prior to the start of the Class Period until November 2022. PacWest identified Olson as an "Executive Officer" of the Bank during the Class Period.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

176.   Thompson has served as PacWest's Executive VP and CFO since November 2022. PacWest identified Thompson as an "Executive Officer" of the Bank during the Class Period.

177.   Black has served as PacWest's Executive VP of Strategy and Corporate Development since July 1, 2020. PacWest identified Black as an "Executive Officer" of the Bank during the Class Period.

178.   As PacWest's CEO and as a director of the Bank, Wagner was privy to all material information concerning the Bank's primary liquidity, Liquidity Ratio, NII, risk management processes, and ability to continue operating as a standalone entity.

179.   As PacWest's CEO and as a director of the Bank, Taylor was privy to all material information concerning the Bank's primary liquidity, Liquidity Ratio, NII, risk management processes, and ability to continue operating as a standalone entity.

180.   As PacWest's CFO, Olson was privy to all material information concerning the Bank's primary liquidity, Liquidity Ratio, NII, risk management processes, and ability to continue operating as a standalone entity.

181.   As PacWest's CFO, Thompson was privy to all material information concerning the Bank's primary liquidity, Liquidity Ratio, NII, risk management processes, and ability to continue operating as a standalone entity.

182.   As PacWest's Executive VP Strategy and Corporate Development, Black was privy to all material information concerning the Bank's primary liquidity, Liquidity Ratio, NII, risk management processes, and ability to continue operating as a standalone entity.

183.   The fraud alleged herein relates to the core business and operations of PacWest so knowledge of the fraud may be imputed to Defendants. PacWest's very existence depended on its ability to maintain sufficient liquidity to keep operating

1    and to have sufficient risk management protocols in place to manage that liquidity.

2    In addition, NII was a "key performance indicator" of the Bank. As set forth above,

3    Defendants commented consistently throughout the Class Period on the Bank's

4    liquidity, risk management processes, and NII. It would thus be absurd to suggest

5    that Defendants were not informed as to the Bank's primary liquidity, Liquidity

6    Ratio, risk management processes, NII and ability to operate as a standalone entity,

7    and, accordingly, it is appropriate to presume that Defendants were apprised of, had

8    access to, or had actual knowledge of all material information related to PacWest

9    during the Class Period, including the material information that was improperly

10   withheld and/or misrepresented to investors.

11           184.   Further, by virtue of their receipt of information reflecting the true

12   facts regarding PacWest's operations and its marketplace, as well as their control

13   over and/or receipt of the Bank's materially misleading misstatements and/or their

14   associations with the Bank that made them privy to confidential proprietary

15   information concerning PacWest, Defendants were active and culpable participants

16   in the fraudulent scheme alleged herein. Defendants knew of and/or recklessly

17   disregarded the falsity and misleading nature of the information, which they caused

18   to be disseminated to the investing public. The fraud as described herein could not

19   have been perpetrated without the knowledge and/or recklessness and complicity of

20   personnel at the highest level of the Bank, including Defendants.

21                       **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

22           185.   Plaintiff brings this action as a class action pursuant to Federal Rule of

23   Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and

24   entities that purchased or otherwise acquired PacWest securities during the Class

25   Period, and who were damaged thereby (the "Class"). Excluded from the Class are

26   Defendants, the officers and directors of the Bank, at all relevant times, members

27

28

1  of their immediate families and their legal representatives, heirs, successors, or

2  assigns, and any entity in which Defendants have or had a controlling interest.

3       186.   The members of the Class are so numerous that joinder of all members

4  is impracticable. Throughout the Class Period, PacWest's shares actively traded on

5  the NASDAQ. While the exact number of Class members is unknown to Plaintiff

6  at this time and can only be ascertained through appropriate discovery, Plaintiff

7  believes that there are at least hundreds or thousands of members in the proposed

8  Class. Millions of PacWest shares were traded publicly during the Class Period on

9  the NASDAQ. Record owners and other members of the Class may be identified

10 from records maintained by PacWest or its transfer agent and may be notified of the

11 pendency of this action by mail, using the form of notice similar to that customarily

12 used in securities class actions.

13      187.   Plaintiff's claims are typical of the claims of the members of the Class

14 as all members of the Class are similarly affected by Defendants' wrongful conduct

15 in violation of federal law that is complained of herein.

16      188.   Plaintiff will fairly and adequately protect the interests of the members

17 of the Class and has retained counsel competent and experienced in class and

18 securities litigation.

19      189.   Common questions of law and fact exist as to all members of the Class

20 and predominate over any questions solely affecting individual members of the

21 Class. Among the questions of law and fact common to the Class are:

22           (a)    whether the federal securities laws were violated by Defendants'

23 acts as alleged herein;

24           (b)    whether statements made by Defendants to the investing public

25 during the Class Period omitted and/or misrepresented material facts about the

26 business, operations, and prospects of PacWest; and

27

28

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

190.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

191.    The market for PacWest's securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, PacWest's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired PacWest's securities relying upon the integrity of the market price of the Bank's securities and market information relating to PacWest, and have been damaged thereby.

192.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of PacWest's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about PacWest's business, operations, and prospects as alleged herein.

193.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to

be made a series of materially false and/or misleading statements about PacWest's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Bank and its financial well-being and prospects, thus causing the Bank's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Bank's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## **LOSS CAUSATION**

194. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

195. Throughout the Class Period, the price of PacWest's securities was artificially inflated and/or maintained at an artificially high level as a result of Defendants' materially false and misleading statements and omissions identified herein.

196. The price of PacWest's securities significantly declined when the misrepresentations made to the market, and/or the information and risks alleged hereinto have been concealed from the market, and/or the effects thereof materialized and/or were revealed, causing investors' losses. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Bank's securities, Plaintiff and other Class members have suffered significant losses and damages.

63

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **APPLICABILITY OF PRESUMPTION OF RELIANCE**
## **(FRAUD-ON-THE-MARKET DOCTRINE)**

197.   The market for PacWest's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, PacWest's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Bank's securities relying upon the integrity of the market price of PacWest's securities and market information relating to PacWest, and have been damaged thereby.

198.   During the Class Period, the artificial inflation of PacWest's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about PacWest's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of PacWest and its business, operations, and prospects, thus causing the price of the Bank's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Bank's shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Bank's securities at such artificially inflated prices, and each of them has been damaged as a result.

199.   At all relevant times, the market for PacWest's securities was an efficient market for the following reasons, among others:

(a)   PacWest's shares met the requirements for listing and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   As a regulated issuer, PacWest filed periodic public reports with the SEC and/or the NASDAQ;

(c)   PacWest regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)   PacWest was followed by securities analysts employed by brokerage firms who wrote reports about the Bank, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

200.   As a result of the foregoing, the market for PacWest's securities promptly digested current information regarding PacWest from all publicly available sources and reflected such information in PacWest's share price. Under these circumstances, all purchasers of PacWest's securities during the Class Period suffered similar injury through their purchase of PacWest's securities at artificially inflated prices and a presumption of reliance applies.

201.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Bank's business, operations, and financial prospects—information that Defendants

65

were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

202. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of PacWest who knew that the statement was false when made.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

203. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

204.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase PacWest's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each defendant, took the actions set forth herein.

205.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Bank's securities in an effort to maintain artificially high market prices for PacWest's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

206.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce, and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about PacWest's financial well-being and prospects, as specified herein.

207.    Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of PacWest's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the

statements made about PacWest and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Bank's securities during the Class Period.

208. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Bank during the Class Period and members of the Bank's management team, or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Bank, was privy to and participated in the creation, development and reporting of the Bank's internal budgets, plans, projections, and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Bank's management team, internal reports and other data and information about the Bank's finances, operations, and sales at all relevant times; and (iv) each of these Defendants were aware of the Bank's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

209. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing PacWest's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Bank's business,

operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

210.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of PacWest's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Bank's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired PacWest's securities during the Class Period at artificially high prices and were damaged thereby.

211.   At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that PacWest was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their PacWest securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

212.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

213.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Bank's securities during the Class Period.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

214.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

215.   The Individual Defendants acted as controlling persons of PacWest within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Bank's operations and intimate knowledge of the false financial statements filed by the Bank with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Bank, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Bank's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

216.   In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Bank and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

217.   As set forth above, Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions

70

as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Bank's securities during the Class Period.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

### **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: February 19, 2024                    Respectfully submitted,

                                        **POMERANTZ LLP**

                                        */s/ Brian Calandra*
                                        Brian Calandra (*pro hac vice*)
                                        Jeremy Lieberman (*pro hac vice*)
                                        600 3rd Avenue, 20th Floor
                                        New York, NY 10016
                                        bcalandra@pomlaw.com
                                        jalieberman@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

**THE ROSEN LAW FIRM, P.A.**
By: */s/ Jacob Goldberg*
Laurence M. Rosen (SBN 219683)
Jacob Goldberg (*pro hac vice*)
Gonen Haklay (*pro hac vice*)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com
jgoldberg@rosenlegal.com
ghaklay@rosenlegal.com

**THE SCHALL FIRM**
Brian Schall
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
brian@schallfirm.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Brian Calandra, hereby declare under penalty of perjury as follows: I am a

Partner with Pomerantz LLP, with offices at 1100 Glendon Avenue, 15th Floor,

Los Angeles, California 90024 and 600 3rd Avenue, 20th Floor, New York, NY

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

10016, and am admitted to practice in this court *pro hac vice*. I am over the age of eighteen. On February 19, 2024, I electronically filed the following AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on February 19, 2024.

*/s/ Brian Calandra*

BRIAN CALANDRA

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS