**POMERANTZ LLP**
Brian Calandra (*pro hac vice*)
Jeremy Lieberman (*pro hac vice*)
600 3rd Avenue, 20th Floor
New York, NY 10016
bcalandra@pomlaw.com
jalieberman@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
 jpafiti@pomlaw.com

*Co-Lead Counsel for Plaintiffs*

[additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC TAN, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> PACWEST BANCORP, MATTHEW WAGNER, PAUL W. TAYLOR, BART R. OLSON, WILLIAM J. BLACK, AND KEVIN LEWIS THOMPSON, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | 

Case No. 8:23-cv-01685-JWH-ADS

Hon. John W. Holcomb

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

Date: August 9, 2024
Time: 9:00 a.m.
Courtroom: 9D

Complaint Filed: February 19, 2024

---

*Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss*
Case No. 8:23-cv-01685-JWH-ADS

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................1

II.   STATEMENT OF FACTS ..........................................................................3

    A.   PacWest's Growth Explodes in the Lead-Up to the Class Period. ...............3

    B.   Defendants Tout PacWest's Risk Management and Liquidity ......................3

    C.   Contrary to Defendants' Assurances, PacWest's Processes Lead to Collapse In Liquidity and NII During the Class Period ...............................4

        1.   The Start of the Class Period .................................................................4

        2.   Q1 2022 ................................................................................................5

        3.   Q2 2022 ................................................................................................6

        4.   Q3 2022 ................................................................................................7

        5.   Q4 2022 ................................................................................................7

    D.   The Truth Emerges in March 2023 ..............................................................7

    E.   The Merger ...................................................................................................9

III.  ARGUMENT..............................................................................................11

    A.   Standard of Review ....................................................................................11

    B.   The Complaint Pleads Material Falsity.......................................................11

        1.   The Complaint Pleads Deceit Not Mismanagement.............................11

        2.   Defendants' Omission of Their Failure to Hedge the AFS Portfolio Rendered Class Period Statements Materially False ..........13

            a)   General Statements of Opinion Concerning PacWest's Business Practices are Actionable ...........................................13

            b)   Defendants Omitted That The AFS Portfolio Was Unhedged, Rendering Multiple Statements Misleading .........16

            c)   The Complaint Alleges Mixed Forward-Looking Statements and Statements of Present or Historical Fact........21

            d)   Defendants' Omissions of Items 303 and 105 Trend and Risk Render Class Period Statements Misleading .................23

    C.   The Complaint Adequately Alleges Scienter ..............................................24

        1.   Defendants' Omission of the Liquidity Ratio Reflects an Intent to Deceive Investors..............................................................................25

i

2.    Individual Defendants' Assurances to Investors Supports a Strong Inference of Defendants' Scienter..........................................26

3.    Suspicious Stock Sales Support an Inference of Wagner and Black's Scienter ...................................................................28

4.    False SOX Certifications Support a Strong Scienter Inference.........30

5.    The Complaint Alleges Corporate Scienter for PacWest .................30

6.    The Core Operations Doctrine Bolsters a Scienter Inference...........31

7.    A Holistic View Supports a Strong Inference of Scienter................32

D.    The Complaint Adequately Pleads Loss Causation ...................................32

E.    The Complaint Pleads A Section 20(a) Claim ...........................................34

IV.    CONCLUSION.................................................................................................35

ii

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amalgamated Bank v. Facebook, Inc. (In re Facebook, Inc. Sec. Litig.)*,
   2023 WL 6857600 (9th Cir 2023), *amended & superseded*, 87 F.4th 934
   (9th Cir. 2023), *cert. granted on other grounds*, 2024 WL 2883752 (U.S. June 10,
   2024) .................................................................................................................. 33

*Avila v. L.A. Police Dept.*,
   758 F.3d 1096 (9th Cir. 2014) .......................................................................... 29

*Axonic Cap. LLC v. Gateway One Lending & Fin.*,
   2019 WL 4138024 (C.D. Cal. May 22, 2019) ................................................... 26

*Azar v. Yelp, Inc.*,
   2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ................................................... 22

*Backe v. Novatel Wireless, Inc.*,
   642 F. Supp. 2d 1169 (S.D. Cal. 2009) ............................................................. 29

*Baron v. Hyrecar Inc.*,
   2022 WL 17413562 (C.D. Cal. Dec. 5, 2022) ................................................... 30

*Brody v. Ram Tr. Servs., Inc. (In re Stone & Webster, Inc., Sec. Litig.)*,
   414 F.3d 187 (1st Cir. 2005) ............................................................................. 22

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharm, Inc.*,
   2022 WL 4491093 (S.D. Cal. Sept. 27, 2022), *reconsideration denied*,
   2023 WL 1769810 (S.D. Cal. Feb. 2, 2023) ...................................................... 34

*Delaware Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*,
   606 F. Supp. 3d 124 (E.D. Pa. 2022) ........................................................... 25, 26

*Gammel v. Hewlett-Packard Co.*,
   2013 WL 1947525 (C.D. Cal. May 8, 2013) ..................................................... 17

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
   63 F.4th 747 (9th Cir. 2023) ............................................................................. 35

iii

*Grigsby v. BofI Holding, Inc.*,
   979 F.3d 1198 (9th Cir. 2020) .................................................................................. 33

*Hollinger v. Titan Cap. Corp.*,
   914 F.2d 1564 (9th Cir. 1990) (en banc) .................................................................. 30

*In re Alstom SA Sec. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005) ...................................................................... 26

*In re Emerson Radio Corp. Sec. Litig.*,
   2005 WL 8131267 (D.N.J. Dec. 20, 2005) ................................................................ 28

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   618 F. Supp. 2d 311 (S.D.N.Y. 2009) ...................................................................... 26

*In re Hienergy Techs., Inc. Sec. Litig.*,
   2005 WL 3071250 (C.D. Cal. Oct. 25, 2005) ........................................................... 31

*In re Impac Mortg. Hldgs., Inc. Sec. Litig.*,
   554 F. Supp. 2d 1083 (C.D. Cal. 2008) .............................................................. 12, 13

*In re Juniper Networks, Inc. Sec. Litig.*,
   542 F. Supp. 2d 1037 (N.D. Cal. 2008) .................................................................... 34

*In re Marsh & Mclennan Cos. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006) ...................................................................... 28

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
   78 F. Supp. 3d 1215 (N.D. Cal. 2015) ...................................................................... 35

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) .................................................................................. 23

*In re Quality Systems, Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ....................................................... 15, 21, 22, 25

*In re Questcor Sec. Litig.*,
   2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ...................................................... 29, 30

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) .......................................................... 27

iv

*In re SLM Corp. Sec. Litig.*,
   740 F. Supp. 2d 542 (S.D.N.Y. 2010) ........................................................................ 28

*In re Vantive Corp. Sec. Litig.*,
   110 F. Supp. 2d 1209 (N.D. Cal. 2000), *aff'd*, 283 F.3d 1079 (9th Cir. 2002) ........ 29

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) ..................................................................................... 24

*In re WageWorks, Inc., Sec. Litig.*,
   2020 WL 2896547 (N.D. Cal. June 1, 2020)........................................................ 33, 34

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) ....................................................................................... 26

*Jackson v. Microchip Tech. Inc.*,
   2020 WL 1170843 (D. Ariz. Mar. 11, 2020)............................................................. 31

*Karinski v. Stamps.com, Inc.*,
   472 F. Supp. 3d 747 (C.D. Cal. 2020) .................................................................. 14, 15

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ................................................................ 11, 16, 17, 18

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005) ....................................................................................... 33

*Levi v. Atossa Genetics, Inc. (In re Atossa Genetics Inc Sec. Litig.)*,
   868 F.3d 784 (9th Cir. 2017) ........................................................................... 14, 15, 23

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ................................................................................... 14

*Loftus v. Primero Mining Corp.*,
   230 F. Supp. 3d 1209 (C.D. Cal. 2017) ..................................................................... 19

*Macomb County Employees' Ret. Sys. v. Align Tech., Inc.*,
   39 F.4th 1092 (9th Cir. 2022) .................................................................................... 15

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   601 U.S 257 (2024).............................................................................................. 23, 24

v

*Marder v. Lopez*,
    450 F.3d 445 (9th Cir. 2006) ........................................................................ 17

*McGuire v. Dendreon Corp*,
    2008 WL 1791381 (W.D. Wash. Apr. 18, 2008) .......................................... 19

*Mulligan v. Impax Labs, Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ........................................................... 22

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ................................................................ 11, 28

*Noto v. 22nd Century Grp., Inc.*,
    650 F. Supp. 3d 33 (W.D.N.Y. 2023) ........................................................... 27

*Okla. Police Pension and Ret. Sys. v. LifeLock, Inc.*,
    780 F. App'x 480 (9th Cir. 2019) ................................................... 11, 13, 20

*Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt., LLC*,
    595 F.3d 86 (2d Cir. 2010) ........................................................................... 13

*Owens v. Kaiser Found. Health Plan, Inc.*,
    244 F.3d 708 (9th Cir. 2001) ....................................................................... 35

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ..................................................................... 14

*Rabkin v. Lion Biotechnologies, Inc.*,
    2018 WL 905862 (N.D. Cal. Feb. 15, 2018) ............................................... 35

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017) ............................................................................................... 31

*Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017) .......................................................... 27

*Ret. Sys. v. Sterling Fin. Corp.*,
    963 F. Supp. 2d 1092 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017) ............................................................................................... 12

vi

*Ret. Tr. v. RH, Inc.*,
    302 F. Supp. 3d 1028 (N.D. Cal. 2018)....................................................................... 22

*Retail Wholesale & Department Store Union Local 338 Retirement Fund v. Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017) ................................................................................... 19

*Rhode Island v. Alphabet, Inc. (In re Alphabet, Inc. Sec. Litig.)*,
    1 F.4th 687 (9th Cir. 2021) ....................................................................................... 18

*S. Ferry LP, # 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ..................................................................................... 24

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona, Inc.*,
    2024 WL 1898512 (S.D.N.Y. May 1, 2024) .............................................................. 24

*Santa Fe Industries, Inc. v. Green*,
    430 U.S. 462 (1977)................................................................................................... 12

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ..................................................................................... 24

*Shafer v. Glob. Payments, Inc.*,
    2024 WL 2789447 (N.D. Ga. Mar. 29, 2024) ........................................................... 32

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011)......................................... 18

*Skiadas v. Acer Therapeutics Inc.*,
    2020 WL 3268495 (S.D.N.Y. June 16, 2020) ........................................................... 25

*Tellabs, Inc. v. Makor Issues & Rts, Ltd.*,
    551 U.S. 308 (2007)....................................................................................... 11, 24, 25

*Thomas v. Magnachip Semiconductor Corp.*,
    167 F. Supp. 3d 1029 (N.D. Cal. 2016).................................................................... 30

*Tracht Gut, LLC v. L.A. Cnty. Treasurer & Tax Collector (In re Tracht Gut, LLC)*,
    836 F.3d 1146 (9th Cir. 2016) ................................................................................... 16

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
    985 F.2d 1190 (2d Cir. 1993) .................................................................................... 26

vii

**Statutes**

15 U.S.C. 78u-4................................................................................ 11, 18, 34

15 U.S.C. §78j(b) ......................................................................................... 23

15 U.S.C. § 78t(a) ............................................................................... 3, 34, 35

Private Securities Litigation Reform Act of 1995 ............................... 11, 22, 31

**Rules amd Regulations**

17 C.R.F. § 240.10b-5 ...........................................................................23, 24, 29

Fed. R. Civ. P. 8 ....................................................................................... 33

Fed. R. Civ. P. 9 ....................................................................................... 11

Fed. R. Civ. P. 12 ................................................................................. 11, 18

Lead Plaintiffs Aleen Hosdaghian and Onurcan Atak ("Plaintiffs") oppose Defendants'[1] motion to dismiss the Amended Complaint for Violation of the Federal Securities Laws ("Complaint") and state the following:

## I.    INTRODUCTION

This is a class action on behalf of persons and entities that purchased or otherwise acquired securities of PacWest Bancorp ("PacWest" or the "Bank") between February 28, 2022 and May 10, 2023, inclusive ("Class Period"). During the Class Period, Defendants assured investors that PacWest was supported by comprehensive risk and liquidity management processes and that sharply rising interest rates would *benefit* the Bank. Defendants knew, however, that the long-term securities in PacWest's Available-for-Sale ("AFS") securities portfolio ("AFS Portfolio")—the liquidity used to cover customer deposits—were especially sensitive to interest rate increases and would *collapse* in value if interest rates rose. To make matters worse, although Defendants touted the Bank's risk management processes (which would naturally include hedging), Defendants failed to disclose that the AFS Portfolio *was entirely unhedged at all times*.

As interest rates rose, the AFS portfolio collapsed, and the Bank's liquidity plummeted, threatening PacWest's ability to survive. Rather than disclose the truth, Defendants *stopped reporting the Bank's "Liquidity Ratio,"* the sole financial metric by which any investor could easily recognize PacWest's condition and instead lined their pockets by selling stock before the market learned the truth.

---

[1] Defendants are PacWest Bancorp, n/k/a Banc of California ("PacWest" or "Bank"), Matthes P. Wagner, Paul W. Taylor, Bart R. Olson, William J. Black, and Kevin Lewis Thompson. Plaintiffs cite to Defendants' Memorandum of Points and Authorities (Dkt. No. 50-1) as "DBr __." Plaintiffs cite to the Complaint (Dkt. No. 30) as "¶__." Plaintiffs cite to the Declaration of Diane L. McGimsey and annexed exhibits (Dkt. No. 51) as "McGimsey Decl." Unless otherwise noted, for ease of reading, emphasis is added and internal quotations and citations are omitted.

1

That truth slowly leaked out to investors in March and April 2023, as multiple peer banks collapsed, including Silicon Valley Bank ("SVB"), Signature Bank ("Signature") and First Republic Bank ("First Republic"). Recognizing that PacWest had a similar liquidity posture, depositors sought to withdraw their money, cash that PacWest did not have because of the decimated AFS Portfolio. This forced PacWest to seek emergency funding and find another bank to purchase it, and its share price plummeted.

Investors were devastated by Defendants' misrepresentations and filed the Complaint to hold the Bank and certain executives accountable. Defendants now move to dismiss, claiming that the Complaint fails to plead securities fraud. Their arguments fail.

*First*, the Complaint adequately alleges falsity. Then-existing facts belied Defendants' statements about focusing on risk management and touts of the Bank's asset quality. Further, while Defendants warned generally about the possible negative effects of interest rate increases, they ignored their duty to disclose that those risks *had already materialized*, including omitting that the AFS Portfolio was unhedged.

*Second*, the Complaint adequately alleges scienter. In the context of rising interest rates and their failure to hedge the AFS Portfolio, Defendants' strategic decision to stop reporting PacWest's Liquidity Ratio in the fall of 2022 is, at a minimum, compelling evidence of recklessness that borders on intent. Further, Defendants' initial touts that interest rate hikes would benefit the Bank, and later desperate assurances that they had taken action to protect depositors, when Defendants *knew* that they had done nothing to protect AFS Portfolio, bolsters this strong inference of scienter. While these allegations alone create a strong inference of scienter, Defendants Wagner and Black leave no doubt as to Defendants' motivations, as they made large and suspicious stock sales during the Class Period and reap millions of dollars in profits at the expense of investors.

*Third*, the Complaint adequately alleges loss causation, expressly pleading materialization of the risk. Defendants ignore these allegations, instead insisting that the failure to plead mirror-image corrective disclosures is fatal.

2

*Fourth*, the Complaint adequately pleads a primary violation, and control by the Individual Defendants, and so pleads a Section 20(a) claim. For the following reasons, therefore, the Court should deny Defendants' motion to dismiss in its entirety.

## II.   STATEMENT OF FACTS

### A.   PacWest's Growth Explodes in the Lead-Up to the Class Period.

During the Class Period, PacWest operated as a holding company for its wholly owned subsidiary, Pacific Western Bank ("PWB"), a regional bank based in Los Angeles, California. ¶36. Between 2019 and 2021, the Bank's total deposits grew *over 82%* from approximately $19.2 billion to approximately $35 billion. ¶38. Confidential Witness 1 ("CW1"),[2] a vice president and senior loan consultant at PacWest from March 2016 to June 2022, described how PacWest leadership advised CW1 and his colleagues "how much excess capital the bank had." ¶40. At one point, CW1 said he learned from his colleagues that PacWest had $17 billion in deposits that it needed to invest. ¶40.

According to the U.S. Department of the Treasury's Office of the Comptroller Currency ("OCC"), rapid growth can signal risk management weaknesses, increase a bank's risk exposure, and strain the bank's resources, which "can lead to numerous and sometimes sudden bank failures as sectoral economic conditions change." ¶41. This meant that if Defendants failed to properly manage PacWest's liquidity and risk, a large outflow of deposits, a "run on the bank," could threaten the Bank's solvency. ¶42.

### B.   Defendants Tout PacWest's Risk Management and Liquidity.

Defendants touted PacWest's risk management controls and ability to protect the Bank from changing interest rates and liquidity needs. ¶42. Defendants further assured that PacWest's AFS securities were sufficient to manage the Bank's liquidity risks and exposure to interest rate increases. ¶42.

---

[2] CWs are referred to in the masculine to preserve their anonymity.

3

The Bank's annual reports on Form 10-K filed with the SEC for 2021 and 2022 (the "2021 10-K" and "2022 10-K," respectively) emphasized the Bank's "comprehensive risk management process that measures, monitors, evaluates, and manages the risks we assume in conducting our activities." Likewise, each of the Bank's quarterly reports on Form 10-Q filed with the SEC (the "Q1 2022 10-Q," "Q2 2022 10-Q," "Q3 2022 10-Q," and "Q1 2023 10-Q") advised that PacWest's future depended upon "the effectiveness of [its] risk management framework" and "[e]ffective liquidity management is essential for the operation of our business." ¶43. The 2021 and 2022 10-Ks further assured investors that the Bank's "robust approach to risk management" was "another core competency of our business." ¶44. These assurances were essential to investors, who knew that the Bank's rapid growth exposed it to the risks described by the OCC above. ¶41.

The 2021 and 2022 10-Ks further advised that the Bank's "operating results generally depend on [certain] key performance factors," the most prominent of which was net interest income ("NII"). ¶46. The 10-Ks emphasized that PacWest's "NII simulation model" purportedly measured the estimated changes in NII that would result over the ensuing 12-month period "from immediate and sustained changes in interest rates." ¶47.

### C.    Contrary to Defendants' Assurances, PacWest's Processes Lead to Collapse In Liquidity and NII During the Class Period.

Although Defendants assured investors that PacWest's risk management approach, NII simulation model, and other liquidity and risk management processes kept the Bank safe and stable, to the extent that any liquidity or risk management processes existed at all, they were grossly inadequate as during the Class Period the Bank's liquidity deteriorated to the point that PacWest could no longer operate as a stand-alone entity. ¶49.

### 1.    The Start of the Class Period.

At the start of the Class Period, PacWest's 2021 10-K reported that as of December 31, 2021, the Bank had total assets of $40.4 billion and liabilities of $36.4 billion,

4

including $33 billion in customer deposits payable on demand. ¶50. The 2021 10-K stated that PacWest used what it called "primary liquidity," to cover these deposits. ¶52. Primary liquidity was "pools of liquid assets . . . consisting of cash and due from banks, interest-earning deposits in other financial institutions," and the Bank's AFS Portfolio. ¶52.

Defendants' quarterly and annual SEC filings disclosed a "Liquidity Ratio," which was calculated by dividing the Bank's "primary liquidity" by its "total deposits." The ratio enabled investors to easily see the Bank's ability to cover deposit withdrawals. ¶¶52-53. At the end of 2021, PacWest's Liquidity Ratio was 40.6%, meaning the Bank had sufficient liquidity at hand to cover withdrawals of up to 40.6% of its deposits in a short time. ¶55. The 2021 10-K further disclosed that the majority of the Bank's primary liquidity was made up of AFS securities. ¶56. Over 90% of the securities in PacWest's AFS Portfolio were in long-term securities scheduled to mature in over five years, with nearly 60% of those long-term securities scheduled to mature in over ten years. ¶¶56-57. If interest rates rose, the AFS Portfolio would plummet in value, because the longer-term securities were the most sensitive to interest rate changes, *i.e.*, their value will decline more quickly and steeply than shorter term debt securities. In addition, investors did not know that the AFS Portfolio *was completely unhedged*, constituting a massive risk to the Bank's primary liquidity. ¶60. Indeed, the failure to hedge an AFS portfolio when that portfolio is a source of primary liquidity was a direct cause of the failure of Silicon Valley Bank ("SVB") in March 2023. ¶60.

### 2.    Q1 2022

On March 16, 2022, the U.S. Federal Reserve (the "Fed") approved the first interest rate increase since 2018, raising the federal funds rate by 25 basis points, or from 0.25% to 0.50%. ¶62. That rate increase was expected to be the first in a long series of rate increases, "penciled" for "each of the six remaining meetings" in 2022, as well as "three more hikes in 2023." ¶¶63-64. Wagner emphasized that the Bank was prepared for interest

rate increases and had been working to "diversify" its "funding base" because "we have been anticipating an eventual rise in interest rates." ¶65.

Despite Wagner's assurances, PacWest's liquidity situation declined. The Q1 2022 10-Q stated that the Bank's available liquidity to cover deposits declined from 40.6% to 34.6%, in part because the value of securities in PacWest's AFS Portfolio had declined by 6.7%. ¶61. Further, the Bank's reliance on longer term securities rose during Q1 2022, as 93% of the Bank's AFS securities had maturities of over five years, and 80.7% of the Bank's AFS securities experienced declines in that quarter. ¶¶66-67. Defendants nevertheless assured investors that "we do not foresee having to sell any impaired securities strictly for liquidity needs and believe that it is more likely than not we would not be required to sell any impaired securities before recovery of their amortized cost." ¶68.

### 3.    Q2 2022

In Q2 2022, interest rates increased by a total of 125 basis points, or from 0.50% to 1.75% (¶69), and the Bank's AFS Portfolio plummeted 32% from $10.0 billion to $6.8 billion (¶71). Defendants did not reduce the amount of long-term securities in the AFS Portfolio, and even though Defendants had assured investors only three months earlier that they would not sell impaired securities at a loss, Defendants sold $393.4 million in AFS securities at a loss of $1.2 million. ¶74.

The interest rate increases devastated PacWest's Liquidity Ratio, which fell from 34.6% in Q1 2022 to 25.3% in Q2 2022. ¶75. This meant that, between December 31, 2021 and June 30, 2022, the Bank's primary liquidity fell 40% and its Liquidity Ratio fell *by 37.7%*, and its AFS Portfolio experienced $596 million in losses from rising interest rates. ¶¶75-76.

### 4. Q3 2022

The Fed raised interest rates by 150 basis points (or 1.5%) in Q3 2022. ¶77. The Bank's primary liquidity fell to $7.7 billion, or by 45.8% since the start of the Class Period. ¶78. The unhedged AFS Portfolio also declined by 13.1%, to only $5.9 billion. ¶80. By the end of Q3 2022, 99.7% of the AFS Portfolio experienced losses. ¶81.

Rather than address the worsening liquidity ratio, ***Defendants simply stopped disclosing it***. ¶79. Defendants never mentioned the liquidity ratio in the Q3 2022 10-Q, the accompanying October 19, 2022 earnings press release ("Q3 2022 Release") or the October 20, 2022 earnings call with investors ("Q3 2022 Call"). ¶79. Further, Defendants again assured investors that the Bank was not likely to sell securities at a loss.

### 5. Q4 2022

In Q4 2022, the Fed raised interest rates by 125 basis points to 4.50%. ¶82. Although Defendants had assured investors that the Bank would not sell AFS securities, the Bank sold $1 billion of such securities at a $49 million loss to "improve the capital and liquidity position of the Bank." ¶83. Although Defendants had repeatedly emphasized that interest rate increases would ***benefit*** NII, PacWest's NII decreased 3.67% in Q4 2022.

PacWest's primary liquidity fell an additional 19.5% to only $6.2 billion at the end of 2022, which meant that the Bank's primary liquidity had plummeted $8 billion, or 56.3%, in a year. ¶84. The Bank's investment portfolio remained overwhelmingly long-term, with an average duration for AFS securities of 8.2 years. ¶86. As a result, the Liquidity Ratio, which Defendants had stopped reporting, fell by over 50% in 2022. ¶85.

### D. The Truth Emerges in March 2023

In early March 2023, the market learned that credit rating agency Moody's was going to downgrade SVB, which prompted that bank's customers to withdraw $42 billion

of deposits in a single day, causing SVB to fail. ¶91. Like PacWest, SVB's primary liquidity was made up of long-term securities whose value had declined. ¶91.

Recognizing the similarities between SVB's and PacWest's balance sheets, Defendants issued a press release ("March 10 Release") assuring investors that while PacWest's deposits had declined $700 million since the end of 2022, they had "***taken numerous strategic steps over the past four quarters to improve the balance sheet***" and the Bank's asset quality "***remains excellent***" and had "***experienced no significant changes since year-end, including classified assets, non-performing assets, and charge-offs***." ¶¶92-93.

These statements were misleading, as over the prior four quarters Defendants had (i) permitted the Bank's primary liquidity to decline by over $8 billion and Liquidity Ratio to fall by over 50%; (ii) done nothing to mitigate PacWest's exposure to interest rate-sensitive long-term securities; and (iii) let the value of the AFS Portfolio deteriorate.

On March 12, 2023, the FDIC placed Signature Bank ("Signature"), a New York bank specializing in private real estate, private equity, and cryptocurrency services, into receivership. ¶95. Industry observers reported that problems causing SVB and Signature to fail could spread to PacWest, and the Bank's stock price plummeted 53%. ¶96. CW2, a senior vice president at the Bank from March 2018 until he retired in May 2023, described how "all hell broke loose" at PacWest in March 2023, in response to negative news stories. ¶97. Similarly, CW3 stated that negative reporting in the wake of SVB and Signature Bank's failures led many customers to panic and withdraw deposits, and he and his colleagues worked 17-hour days to calm customers and stop outflows. ¶¶98-99.

On March 17, Defendants issued another press release ("March 17 Release"), stating that "available" cash exceeded the amount of the Bank's uninsured deposits, the Bank's "***asset quality remains excellent***," and Defendants had taken "***numerous steps, including leveraging available collateral, over the past week to enhance and fortify our liquidity during this time***." ¶100. Like the March 10 Release, the March 17 Release

misled, touting PacWest's liquidity, but omitting that "available cash" was not on hand, but rather was emergency borrowing capabilities from the U.S. government. In addition, Defendants continued to assert that their assets were "excellent," even though the value of its AFS securities had plummeted in response to rising interest rates. ¶101.

On March 22, 2023, before markets opened, Defendants issued a press release ("March 22 Release") disclosing that PacWest's deposits had declined 20% from the end of 2022 to $27.1 billion, and that the Bank had tapped emergency lending, *i.e.*, obtained a de facto bailout. ¶102. On this news, the Bank's share price fell $2.09, or 17.1%. ¶102.

On April 25, 2023, PacWest issued a press release disclosing its results for Q1 2023 ("Q1 2023 Release"), which revealed that, contrary to Defendants' assurances that increases in interest rates would benefit the Bank's NII, the Bank's NII had plummeted 13.5%, or $43.7 million, in Q1 2023. ¶103. The Q1 2023 Release further disclosed that since PacWest could not sell securities to improve its liquidity, given that the securities' value had plummeted from rising interest rates, Defendants had to sell $2.7 billion in profitable loans to obtain cash. ¶105. Three days later, on April 28, 2023, First Republic Bank ("First Republic") was seized by the FDIC and sold.

## E.    The Merger

On May 3, 2023, after markets closed, Bloomberg published an article entitled "Regional Banks Sink as PacWest Weighs Strategic Options" ("May 3 Article"). ¶107. This was a materialization of the concealed risk that the Bank would not be able to continue operating as a stand-alone concern because of (i) the failure of Defendants' liquidity management processes to ameliorate the Bank's reliance on interest-rate sensitive long-term securities for primary liquidity, (ii) the weakness of the Liquidity Ratio, (iii) the $8.0 billion decline in primary liquidity, and (iv) the decline in NII. ¶107.

Though Defendants confirmed that the May 3 Article was accurate (¶108), only months later, after Defendants had filed a proxy statement in connection with the Merger

9

("Merger Proxy"), did investors learn that PacWest went from stable to needing to merge with another bank in a matter of days. The Merger Proxy described how on May 2, a potential acquirer had delivered a proposal for a cash acquisition of PacWest to "PacWest management," *e.g.*, Taylor and Thompson. ¶109. Then, on May 3, PacWest's Board of Directors, which included Wagner, met with Taylor, Thompson, and others, and instructed Taylor and Thompson to obtain additional bids for PacWest. ¶110. PacWest began contacting "potential acquirers and business combination partners" and PacWest "entered into confidentiality agreements" with ten potential acquirers and/or partners, including Banc of California, who began "preliminary due diligence" on May 4, 2023. ¶111. That same day, the day First Republic had been taken over, *Forbes* reported that PacWest's shares had fallen 28%, and 60% in after-hours trading following the May 3 Article, which CNBC had suggested was "the market's way of signaling which bank is the next one to require a government-assisted rescue." ¶112.

Following the publication of the May 3 and May 4 articles, PacWest's stock price fell from $6.42 on May 3 to $3.25 per share, or 51%, to close at $3.17 per share on May 4, 2023. ¶113.

On May 11, 2023, PacWest filed the Q1 2023 10-Q, disclosing that deposits "had declined approximately 9.5%, with a majority of that decline occurring on May 4th and May 5th after the news reports on the afternoon of May 3rd." ¶115. The 10-Q further disclosed that PacWest had covered withdrawals by borrowing from the federal government. ¶115. According to the 10-Q, although PacWest had over $25 billion in deposits, the Bank only had $15.0 billion in primary and secondary liquidity. ¶115. On this news, PacWest's stock price fell $1.38 per share, or 22.77%, to close at $4.68 per share on May 11, 2023. ¶116. Given PacWest's desperate liquidity situation, Defendants had no choice but to find a buyer for the Bank. On July 25, 2023, it was announced that PacWest had entered into an agreement to be purchased by Banc of California. ¶117. With the threat of a Bank run alleviated, ***Defendants resumed disclosing the Liquidity Ratio***.

10

¶118. The Bank's Q2 2023 10-Q disclosed, for the first time, that the Bank's Liquidity Ratio had declined to 18.6% at the end of 2022. ¶118.

## III.    ARGUMENT

### A.    Standard of Review

Dismissal pursuant to Rule 12(b)(6) "is appropriate only where the complaint lacks a cognizable theory or sufficient facts to support a cognizable theory." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). Courts accept as true all factual allegations and draw all reasonable inferences in plaintiff's favor. *Tellabs, Inc. v. Makor Issues & Rts, Ltd.*, 551 U.S. 308, 322-23 (2007). Exchange Act claims are subject to the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Rule 9(b) of the Federal Rules of Civil Procedure, which require a plaintiff to specify each misleading statement, the reasons why the statement is misleading, and, if an allegation "is made on information and belief . . . state with particularity all facts on which [the] belief is formed." 15 U.S.C. 78u-4(b)(1)(B). Courts should not "raise the bar of the PSLRA any higher than that which is required." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 946 (9th Cir. 2003).

### B.    The Complaint Pleads Material Falsity

#### 1.    The Complaint Pleads Deceit Not Mismanagement

Misstating the Complaint's "core thesis" as management's failure to predict and mitigate the risk of rising interest rates, Defendants assert that the Complaint pleads only inactionable mismanagement. DBr 15-16. While Defendants may, in fact, have mismanaged the bank, the Complaint pleads deceit and not mismanagement.

While mismanagement alone may not be actionable, Defendants may not mislead investors about their course of conduct that forms the basis for their mismanagement or its impact. *Okla. Police Pension and Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 n.4

11

(9th Cir. 2019) (rejecting argument that complaint pleaded mismanagement and not deceit, stating *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 474-79 (1977), "does not protect defendants who mismanage their company and lie to investors about that mismanagement"). That Defendants admit mismanagement here is irrelevant. The Complaint does not blame Defendants for their poor judgment, their selection of a methodology for managing PacWest's exposure to interest rate risk,[3] or their selection of the AFS securities they claimed supported the Bank's liquidity. Rather, in the context of claiming they managed exposure to interest rate risk, Defendants omitted that the AFS Portfolio was unhedged. That omission prevented investors from assessing the risk of increasing interest rates to the AFS Portfolio and, in turn, to PacWest's liquidity. ¶5.

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017), proves the point. There, plaintiffs alleged that the company had under-reserved for loan losses, but failed to support that the defendants knowingly under-reserved or selected an improper reserve calculation methodology. *Id*. at 1118. Thus, the court found that the complaint alleged mismanagement—poor judgment—and not deceit. *Id*. at 1117. Here, the Complaint alleges that Defendants' omission of their failure to hedge the AFS Portfolio rendered their statements about liquidity materially misleading. With full information, investors could have considered, in context, Defendants' failure to hedge the AFS Portfolio and its impact. Defendants' omission disabled the market from evaluating their failure to manage PacWest's exposure to interest rate risk for the AFS Portfolio.[4] Whether Defendants

---

[3] McGimsey Decl. Ex. 1, at 48.

[4] *In re Impac Mortg. Hldgs., Inc. Sec. Litig*., 554 F. Supp. 2d 1083, 1087 (C.D. Cal. 2008) supports the Complaint's adequacy. There, finding inadequate controls, the defendants claimed to have implemented remedial measures, *id*. at 1093, that were ultimately successful. *Id*. at 1095. The complaint alleged that the defendants had no intention of implementing meaningful changes, based on disagreements with former employees who described pushback with respect to their suggestions. *Id*. at 1094. While the defendants

12

mismanaged is not for this Court to decide, for no question exists that they recklessly omitted material information that renders their class period statements about liquidity misleading. *See LifeLock*, 780 F. App'x at 484 (that up to 70% of credit check alerts were stale may show mismanagement but omitting that fact suffices to state a claim for deceit). For that reason, this Court should reject Defendants' attempt to transmogrify the Complaint into one for mismanagement.

### 2. Defendants' Omission of Their Failure to Hedge the AFS Portfolio Rendered Class Period Statements Materially False

#### a) General Statements of Opinion Concerning PacWest's Business Practices are Actionable

Ignoring the Complaint's allegations as a whole and the omission supporting material falsity, Defendants parse phrases, asserting that statements about PacWest's business practices are not false and that those statements are puffery. DBr 17-18.

First, Defendants wrongly assert that the Complaint does not allege that statements about PacWest's business practices were untrue. DBr 17-18. Courts measure a statement's veracity by its ability accurately to inform rather than mislead, not by its literal truth. *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 92 (2d Cir. 2010) ("The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers").

Defendants conveyed a strategy for remaining well-capitalized (¶121) with a comprehensive risk management process, balancing risk and return (¶125). Defendants claimed that this resulted in excellent asset quality, even after year-end 2022. ¶135. Even

---

may have exhibited poor judgment, the court found, their failures *vis a vis* the former employees were mismanagement and not deceit. *Id*. *Impac Mortg* is inapposite because in the context of their positive statements about liquidity, among others, Defendants omitted their failure to hedge the AFS Portfolio, preventing investors from evaluating the impact of their judgment on PacWest.

if each statement may in some sense be literally true, taken together and in context,[5] these statements mislead. For example, in *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200 (9th Cir. 2016), reversing dismissal, the Ninth Circuit found that the statement that "'no serious doubts' about certain loans as of December 31, 2009" may have been technically true, but was nevertheless actionably false because serious doubts about the bank's largest borrower had existed for several months. *Id*. at 1209. "The omission of that fact, combined with the reassurance that everything was fine as of December 31, 2009," the court concluded, "meets the pleading standard for a material omission." *Id*. In context, Defendants' assurances that they focused on capitalization through a comprehensive risk management process, claiming excellent asset quality, was false. The Complaint alleges with particularity that during the Class Period, with rising interest rates, Defendant had not hedged the AFS Portfolio. In turn, the value of the interest rate sensitive securities therein declined materially as interest rates rose. ¶136. Like in *Lloyd*, even if Defendants' individual statements might have been technically true, together they materially misrepresented the state of PacWest's deteriorating asset quality and coagulating liquidity.

Second, Defendants wrongly assert that these statements are puffery, "generic statements of corporate optimism that no reasonable investor would rely on." DBr 18. They ignore, however, both context and content. Statements that are, on their face, "too precise to be considered" puffery may be actionable when a reasonable investor would believe that a defendant both believes their opinion and that it "fairly aligns with the information in the issuer's possession at the time." *Levi v. Atossa Genetics, Inc. (In re*

---

[5] *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc*., 759 F.3d 1051, 1060 (9th Cir. 2014) (in evaluating whether unverifiable opinion is actionable, courts consider the backdrop or context); *see also Karinski v. Stamps.com, Inc*., 472 F. Supp. 3d 747, 753 (C.D. Cal. 2020) (denying dismissal, ruling "reading the passage as a whole, the Court cannot conclude that the statements do not convey that Stamps had a strong relationship with the USPS as a matter of law").

14

*Atossa Genetics Inc Sec. Litig.)*, 868 F.3d 784, 801-03 (9th Cir. 2017) (reversing dismissal, finding actionable a statement of omission where omitted fact conflicted with what a reasonable investor would understand from the opinion). Rather than focusing on the words of the statement alone, surrounding context is critical to evaluating whether a statement of opinion is actionably false. *Id*. at 801 (reviewing words surrounding allegedly false opinion).

As early as March 2022, Defendants publicly disclosed that they anticipated a rise in interest rates. ¶65. By 4Q22, Defendants had caused PacWest to sell $1 billion of AFS Portfolio securities at a 49 basis point loss. ¶83. In early March 2023, several similarly sized U.S. banks failed (¶9) including one because its primary liquidity consisted of similar securities to those that PacWest's AFS Portfolio held, the value of which plummeted as interest rates rose (¶¶9, 91). It is in this context that Defendants stated that PacWest's asset quality "remain[ed] excellent" with no material change since December 31, 2022. ¶93. In *Atossa*, the Court found that the defendants' opinion conveyed that the company complied with FDA rules but failed to disclose an FDA warning. *Atossa*, 868 F.3d at 802. Here, in context of the bank failures and rising interest rates (¶135), opining about "excellent" asset quality without disclosing that Defendants had failed to hedge the AFS Portfolio against interest rate risk did not fairly align with the facts of which Defendants were aware. As such, Defendants' statements are not puffery, rendering their omission of their failure to hedge the AFS Portfolio and the impact therefrom an actionable statement of opinion.[6] *See also Karinski*, 472 F. Supp. 3d at 751-53 (in context of USPS

---

[6] *Macomb County Employees' Ret. Sys. v. Align Tech., Inc*., 39 F.4th 1092 (9th Cir. 2022) is inapposite. The Ninth Circuit reiterated that "'general statements of optimism' made against a clearly pessimistic backdrop 'may form a basis for a securities fraud claim . . . .'" *Id*. at 1099 (citing *Intuitive Surgical, Inc*., 759 F.3d at 1060; *In re Quality Systems, Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017). The Court affirmed, however, because opinions about the company's China market as "great" and "growing significantly for us," were not false: "… at the time Align's executives made the six challenged statements, the company's sales were *still growing* in China, albeit at a diminished rate." *Id*. (emphasis in

15

criticism "of certain aspects of Stamps' business model" and its "terminating certain aspects of the partnership at the time" statement claiming a "strong" relationship was actionable).

### b) Defendants Omitted That The AFS Portfolio Was Unhedged, Rendering Multiple Statements Misleading

The Complaint adequately pleads the falsity of risk warnings, and statements about the effects of interest rate hikes. Defendants omitted disclosure that their AFS Portfolio was entirely unhedged (¶60), affecting PacWest's liquidity and liquidity ratio (which they stopped reporting in 3Q22) (¶79), and causing financial distress. This omission renders false multiple alleged misstatements.

In response, Defendants foist 21 exhibits containing hundreds of pages upon the Court and demand that the Court accept the statements therein as true. *See, e.g.*, DBr 20. Defendants know, however, that they are not entitled to their own set of facts, or competing facts, at the pleading stage. It is black-letter law that this Court may not consider documents incorporated by reference for their truth without converting the motion to dismiss to one for summary judgment.[7] Indeed, in *Khoja*, 899 F.3d at 998, the Ninth Circuit cautioned lower courts to resist "a concerning pattern in securities cases like this one: exploiting [incorporation by reference and judicial notice] improperly to defeat

---

original). Here, when Defendants characterized PacWest's asset quality as "excellent" against the "clearly pessimistic background" of bank failures and rising interest rates' continuing to consume the value of the AFS Portfolio's assets, they affirmatively created an impression of a state of affairs that differed from reality.

[7] *See Tracht Gut, LLC v. L.A. Cnty. Treasurer & Tax Collector (In re Tracht Gut, LLC)*, 836 F.3d 1146, 1150 (9th Cir. 2016) ("At the motion to dismiss phase, the trial court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff.")

16

what would otherwise constitute adequately stated claims at the pleading stage."[8] *Khoja*, 899 F.3d at 998; *see also Gammel v. Hewlett-Packard Co*., 2013 WL 1947525, at *3 (C.D. Cal. May 8, 2013) (documents judicially noticed or incorporated by reference may not be "consider[ed] . . . for the truth of the matters they assert").

Defendants do not even adopt any pretense to attempt to hide that they are trying to create counter-facts to the pleaded allegations with their submitted documents. For example, the Complaint adequately alleges that PacWest's AFS securities were entirely unhedged. ¶60. The Complaint further adequately alleges that Defendants did not tell the market that their AFS Portfolio was entirely unhedged. *Id.* Defendants simply cite to six extraneous documents and ask the Court to accept them for what Defendants claim is their truth, that Defendants *did* tell the market about the unhedged AFS securities. *See* DBr 20. But on their face the six documents Defendants proffer only state that the Bank used "derivatives to manage exposure to . . . interest rate risk," and a list of the Bank's hedges shows that one of them is "interest rate contracts." *See, e.g.,* McGimsey Decl. Ex. 1 at 48. The reasonable investor might believe that their AFS securities were hedged against rises in interest rates. But Defendants are not entitled to this or the opposite inference. That discussion is reserved for summary judgment. At the pleading stage, Plaintiff's inference that Defendants did not disclose that their AFS Portfolio was unhedged is ***plausible*** and must be accepted as true. To consider Defendants documents for their truth would make

---

[8] Defendants acknowledge *Khoja* in their RJN. Dkt. No. 52, at 2. Defendants, citing *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006), ignore completely all the language cited above, claiming, against the controlling law in this Circuit, that this Court may accept documents incorporated by reference for the truth of their assertions. *See* Ex. 52 at 2. But *Khoja* states that it is improper to accept as true anything in documents incorporated by reference to resolve factual disputes against the Complaint's allegations at the pleading stage. *Khoja*, 899 F.3d at 1014. *Marder* was not a securities fraud case and long-predated *Khoja*.

17

it "near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief." *Khoja*, at 998-99.[9]

If the Court considers any of Defendants' documents for the truth of their contents, rather than to provide context or to correct an error in the Complaint, Rule 12(d) requires the Court to convert the motion to dismiss to a motion for summary judgment and to lift the PSLRA's discovery stay, *see* 15 U.S.C. §78u-4(b)(3)(B), permitting full discovery into Plaintiffs' claims. Fed. R. Civ. P. 12(d).

With Defendants' failure to disclose that their AFS securities were unhedged accepted as true, multiple statements are adequately alleged as false. Paragraphs 131 and 133 are risk warnings stating that the fair market value of PacWest's investment securities may be adversely affected by changes in interest rates. It is rendered false by failure to disclose that the AFS securities were unhedged.

Risk disclosures that "speak entirely of as-yet-unrealized risks and contingencies and do not alert the reader that some of these risks may already have come to fruition can mislead reasonable investors." *Rhode Island v. Alphabet, Inc. (In re Alphabet, Inc. Sec. Litig.)*, 1 F.4th 687, 703 (9th Cir. 2021) (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985–87 (9th Cir. 2008) ("But learning that stop-work orders *might* be issued is quite different from knowing they were in fact issued. One indicates a risk, the other a certainty. It goes without saying that investors would treat the two differently")). *See also Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (reversing dismissal, holding that warning of possibility of product liability claims in the abstract is actionable when the risk had come to fruition), *aff'd*, 563 U.S. 27 (2011).

---

[9] The three hedges in Exhibit 1 appear under the heading "Derivatives *Not Designated as Hedging Instruments*." This is an accounting designation. *See* ASC 815. Defendants admit that the three are indeed hedges. *See* DBr 20 ("PacWest's filings disclosed the three derivative assets that PacWest held and explained the purpose of those *hedges*[.]).

The Complaint adequately alleges that PacWest's "securities in its investment portfolio" had already declined by hundreds of millions of dollars and its liquidity ratio had plummeted. ¶¶6, 84, 91, 101, 105. The hypothetical risk, therefore, had "come to fruition," and the risk warnings are adequately alleged as false.[10]

Defendants' claim of no "nexus" between the omissions and the misstatements is similarly without merit. *See* DBr 21-22. As noted above, the Complaint pleads that the drop in value of PacWest's investment securities was caused in large part by its failure to hedge those investments, establishing the nexus. Defendants' cited cases are distinguishable or inapposite. *Retail Wholesale & Department Store Union Local 338 Retirement Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1277-79 (9th Cir. 2017), is inapposite. The court in that case found statements about Hewlett-Packard's ethics code immaterial, and not objectively verifiable. That issue is irrelevant here, as other than separate challenges as to puffery, Defendants do not argue that the metrics discussed in the Complaint are immaterial. *Loftus v. Primero Mining Corp.*, 230 F. Supp. 3d 1209, 1232-33 (C.D. Cal. 2017), is distinguishable. In that case, Defendants' vanilla statement did not create an impression materially different from the one that existed. Here, by contrast, Defendants created the impression that the AFS securities were hedged (¶60) and admit, as noted above, that this fact is material to whether investors were misled. Finally, *McGuire v. Dendreon Corp*, 2008 WL 1791381, at *6-7 (W.D. Wash. Apr. 18, 2008), is distinguishable. In fact, *McGuire* found that if the problems identified factually were "severe," its ruling may have been different. *Id.* at *7. Here, problems were severe. Failure to hedge the AFS Portfolio led to massive losses, Defendants created the impression that the AFS securities were hedged (¶60), and Defendants admit the materiality of hedging.

[10] Defendants implicitly admit that a failure to disclose that the AFS securities were unhedged establishes falsity, as they explicitly argue that the risk warnings were not false **because** investors knew the securities were unhedged. DBr 22. As discussed above, Plaintiffs are entitled to the inference that this fact was not disclosed.

19

Finally, Defendants misconstrue the reason for the falsity of the statements about the effect of rising interest rates on PacWest. *See* ¶¶137-46. These statements are not false for the truth of Defendants' positive statements about interest rate hikes, but for their omission of the negative impact of rising interest rates, and especially their omission that the AFS Portfolio was unhedged, and that rising interest rates were negatively affecting PacWest's liquidity.

"[O]nce defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *LifeLock*, 780 Fed. App'x at 483 (quoting *Khoja*, 899 F.3d at 1009). "[C]ompanies mislead investors when they tout their products' capabilities but fail to disclose significant flaws that undercut those capabilities." *Id.*

For example, in ¶¶138-39, Defendants touted in the 2022 10-K, that sustained interest rate increases would increase PacWest's "net interest income" ("NII"), a positive development. This statement is not false for the truth of the NII statement. Having discussed the positive effects of rising interest rates, however, Defendants were duty-bound to disclose "adverse information that cuts against the positive information." Specifically, the statements in ¶¶138-39 (as well as ¶¶141-43) are adequately alleged as false for Defendants' failure to also disclose that their AFS Portfolio was unhedged, and therefore rising interest rates were negatively affecting PacWest's liquidity (¶60) to the point that Defendants simply stopped disclosing their plummeting liquidity ratio (¶79).

*LifeLock* is on point. In that case, defendants touted the "real-time nature of its identity theft alerts," a positive. *LifeLock*, 780 Fed. App'x at 483. Defendants failed, however, to disclose a concealed flaw that caused 70% of such alerts to be sent only in a week. *Id.* Similarly here, Defendants conveyed to investors that PacWest would benefit from an increase in interest rates. ¶¶139-40. But Defendants failed to disclose that "a sudden sustained increase in rates would harm the bank by causing the value of the Bank's

20

AFS securities to drop precipitously, severely weaken[ing] the Bank's liquidity," and that the AFS Portfolio was unhedged. ¶140. The statements regarding the effect of rising interest rates on PacWest are also adequately alleged as false.

### c)   The Complaint Alleges Mixed Forward-Looking Statements and Statements of Present or Historical Fact

Defendants assert that the Complaint pleads pure forward-looking statements. *See* DBr 24-28. Defendants are wrong. In fact, the complained about paragraphs[11] are "mixed" statements of present or historical fact upon which positive future predictions are based. The PSLRA's safe harbor does ***not*** protect the non-forward-looking portions of a mixed statement. Having discussed the already-existing interest rate hikes, Defendants were duty-bound to disclose the negative effects of those hikes, and specifically to disclose PacWest's liquidity ratio and the fact that its entire portfolio was unhedged, eroding the value of its AFS Portfolio.[12] Their failure to do so renders them reckless, and renders their statements false and misleading.[13]

In *Quality Systems*, 865 F.3d at 141, the Ninth Circuit reversed dismissal, holding that the safe harbor does not protect from liability the non-forward-looking elements in mixed statements. "[A] defendant," this Court wrote, "may not transform non-forward-looking statements into forward-looking statements that are protected by the safe harbor

---

[11] The Motion's "forward-looking" section cites to ¶¶129, 142, 143, and 145. *See* DBr 25.

[12] Plaintiffs do not challenge the forward-looking segment of any mixed statements. Indeed, Plaintiffs do not challenge Defendants' business judgment in choosing not to hedge their AFS Portfolio. Plaintiffs challenge Defendants' failure ***to disclose*** that the portfolio was unhedged, and the effect of that decision, given the rising interest rates, on the value of PacWest's AFS Portfolio and liquidity ratio.

[13] The adequacy of risk warnings is irrelevant to an analysis of the falsity of present or historical fact. *Quality Sys.*, 865 F.3d at 1148.

21

provisions of the PSLRA by combining non-forward-looking statements about past or current facts with forward-looking statements about projected revenues and earnings." 865 F.3d at 1141. *See also Mulligan v. Impax Labs, Inc.*, 36 F. Supp. 3d 942, 964 (N.D. Cal. 2014) (statements of present fact do not become forward looking because a defendant bases a future prediction upon it).

In *Quality Systems*, the defendants had real time access to current sales and pipeline sales. The defendants misrepresented the current or past state of their pipeline, basing future revenue and earnings growth projections on those misrepresentations. 865 F.3d at 1136. Among the mixed statements were "our pipeline current and our pipeline future are very robust," *id.* at 1137, and "there is nothing drying up and there is nothing slowing down." *Id.* at 1143. The Defendants made these statements in the context of predicting future revenues and earnings. *Id.* at 1147. Notwithstanding the connection of current or historical elements to forward-looking statements, the Ninth Circuit held that the PSLRA's safe harbor did not protect the non-forward-looking portions that the complaint had adequately alleged were false. *Id.* at 1142, 1150. *See also Azar v. Yelp, Inc.*, 2018 WL 6182756, at *13 & n.2 (N.D. Cal. Nov. 27, 2018) (citing *Quality Systems*, holding that portion of mixed statement "[t]hat's a fairly proven model that we're pretty good at operating" was non-forward-looking); *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1040 n.6 (N.D. Cal. 2018) (citing *Quality Systems*, holding that portion of mixed statement creating impression that defendant had made "inventory investments in RH Modern" was non-forward-looking); *Brody v. Ram Tr. Servs., Inc. (In re Stone & Webster, Inc., Sec. Litig.)*, 414 F.3d 187 (1st Cir. 2005) (holding that claiming then-current access to cash sufficient to meet "anticipated" funding needs was actionable).

These cases are directly on point. When Defendants spoke of then-existing "rising interest rates" on January 27, 2023, in the context of predicting a "significant opportunity . . . to improve our performance," *see* ¶129, they were duty-bound to disclose that their

22

AFS securities portfolio was completely unhedged. ¶¶79, 85. Disclosure is required under Section 10(b) and Rule 10b-5(b) when necessary to make statements made, in the light of the circumstances under which they were made, not misleading. *Atossa*, 868 F.3d at 800 (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)). Similarly, in ¶¶141-43, Defendants spoke of the positive effects of already-rising interest rates on net income. Having so spoken, Defendants were duty-bound to disclose that their AFS Portfolio was unhedged (¶¶59-60) and that failing to hedge their AFS Portfolio was causing the value of that portfolio to plummet. ¶80. Their failure to disclose the negative circumstances attached to the interest rate hikes rendered their statement misleading.[14]

The mixed statements are not purely forward-looking, and the present or historical portions are adequately pleaded as false.

### d)   Defendants' Omissions of Items 303 and 105 Trend and Risk Render Class Period Statements Misleading

Without analysis, Defendants assert that *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S 257, 265 (2024) ("The failure to disclose information required by Item 303 can support a Rule 10b–5(b) claim *only* if the omission renders affirmative statements made misleading"), a decision that post-dates the Complaint, renders the Complaint's allegations of Items 105 and 303 omissions inactionable. DBr 28. Not so.

*Macquarie*, however, renders as a nullity the holding in *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014), where the Ninth Circuit held that Item 303

---

[14] The other mixed statements were false and Defendants reckless. Paragraphs 141-43 also involved statements about future benefits from already-existing and then-current interest rate hikes, and are false for the same reasons the statement in ¶129 is false. The statement in ¶145 survives for the same reason, as Defendant Black, commenting on the basis of then-existing interest rate hikes, stated that the rising interest rate hikes would lead to a growing NII in 2023. Defendants were duty-bound to discuss the already-observed negative effects of the interest rate hikes on PacWest's finances.

does not create a duty to disclose. Instead, omitting Items 303 and 105 disclosures is actionable if the omission of, for example, a trend renders other disclosures materially misleading. *See San Antonio Fire & Police Pension Fund v. Dentsply Sirona, Inc.*, 2024 WL 1898512, at *6 (S.D.N.Y. May 1, 2024) (dismissing complaint with leave to amend for failure to connect Item 303 allegations to SEC filings with specificity).[15]

Here, among other things, the Complaint pleads that as the Class Period progressed and interest rates rose, Defendants failed to disclose known trends associated with Defendants' failure to hedge the AFS Portfolio and likelihood that rising interest rates would force it to sell securities in the AFS Portfolio as a loss. ¶152. The Complaint ties the omission of the trends (and Item 105 risk disclosure) directly to Defendants' misrepresentation of their "strategies" effectively to manage liquidity. ¶155. Without disclosure of the known trends and the additional risk relating to Defendants' choice not to hedge the AFS Portfolio, Defendants' statements about effective liquidity management are false. Thus, the Complaint adequately ties Items 303 and 105 omissions directly to statements their omissions render actionably misleading under *Macquarie*.

### C.    The Complaint Adequately Alleges Scienter

Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016). "Recklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b-5." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012). When analyzing scienter, the court must determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation . . . meets that standard." *Tellabs*, 551 U.S. at 310; *see also S. Ferry LP, # 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). "The inference that

---

[15] Presumably, the Ninth Circuit would apply *Macquarie* to evaluate whether an Item 105 omission was actionable in the Rule 10b-5 context.

24

the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 309-10, 324. Rather, "it must be cogent and at least as compelling as any opposing inference." *Id*. at 310, 314. Plaintiffs can plead a strong inference of scienter through circumstantial evidence. *See, e.g.*, *Quality Sys.*, 865 F.3d at 1146.

### 1. Defendants' Omission of the Liquidity Ratio Reflects an Intent to Deceive Investors

The inference of scienter is strengthened by Defendants omission of PacWest's Liquidity Ratio in its SEC filings in the latter half of the Class Period. Until Q3 2022, Defendants made it easy for investors to see the Bank's ability to cover deposits by including a chart calculating the Liquidity Ratio, chart defining and detailing the elements that PacWest considered its "primary liquidity." *See* ¶¶52-54, 61, 75. After the ratio collapsed by 37.7% in only six months, however, Defendants—without explanation—removed the chart from the Q3 2022 10-Q, 2022 10-K, and Q1 2023 10-Q, stopped defining "primary liquidity," and omitted the Liquidity Ratio altogether. *See* ¶¶79, 118; McGimsey Decl. Ex. 7 at 135–37, Ex. 9 at 177–80, Ex. 14 at 231–33.

Omitting the chart from the Bank's SEC filings allowed Defendants to, among other things, deceive investors by avoiding drawing attention to the fact that the Liquidity Ratio had declined to only 18.6% at the end of 2022. ¶118. Defendants removed all doubt as to their intentions after the Merger was announced on July 25, 2023. ¶¶117-18 Reporting the Bank's Q2 2023 results only two weeks later, Defendants re-inserted the chart into the Q2 2023 10-Q and disclosed the Liquidity Ratio. ¶118. It is hard to imagine more direct evidence of intentional deception than altering a disclosure to avoid alarming investors. *See, e.g.*, *Delaware Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*, 606 F. Supp. 3d 124, 139–40 (E.D. Pa. 2022) (allegations that defendants altered financial reporting to mask declines in "organic growth" support scienter); *Skiadas v. Acer Therapeutics*

*Inc.*, 2020 WL 3268495, at \*10 (S.D.N.Y. June 16, 2020) ("Defendants' decision to alter the wording of their public statements" supports an inference of scienter).

Defendants assert that despite the removal, investors could have used other information in the latter-Class Period SEC filings to calculate the ratio for themselves. *See* DBr 30. But Defendants ignore that their removal of "primary liquidity" required investors to reconstruct the Liquidity Ratio by consulting multiple SEC filings from different quarters, without having a current definition of "primary liquidity." *See United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) ("buried" information is insufficient to constitute adequate disclosure); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 325 (S.D.N.Y. 2009) ("This Court cannot rule that the scattered disclosures in various amendments, annexes and exhibits to the Prospectus and Registration Statement were sufficient as a matter of law to disclose the material facts to reasonable investors."); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 n.11 (S.D.N.Y. 2005) ("An investor should not be called upon to piece together buried information from distinct parts of financial statements in order to understand basic aspects of a company's finances.").

Defendants' strategic removal of the chart and ratio, to prevent investors from realizing the truth, and their restoration when the coast was clear, evidence their reckless disregard of whether the changes would mislead investors, which is powerful evidence of scienter. *See AdaptHealth Corp.*, 606 F. Supp. at 140 ("defendants acted recklessly by" changing how it reported growth "in the face of danger of misleading investors").

### 2. Individual Defendants' Assurances to Investors Supports a Strong Inference of Defendants' Scienter

"[T]he most powerful evidence of scienter" includes misleading "response[s] to repeated questions" by analysts. *See Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009); *Axonic Cap. LLC v. Gateway One Lending & Fin.*, 2019 WL

4138024, at *10 (C.D. Cal. May 22, 2019). Likewise, a scienter inference is "further strengthened when circumstances indicate that public statements were made to placate the market in response to inquiries about accounting practices." *Noto v. 22nd Century Grp., Inc.*, 650 F. Supp. 3d 33, 47 (W.D.N.Y. 2023); *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 552 (S.D.N.Y. 2017) (defendants' campaign "to placate the market in reaction to the inquiries by the media, analysts, investors and the SEC . . . provides cogent support for the inference of scienter"). Here, the Complaint alleges both misleading responses to analysts and a campaign to "placate the market."

For example, on the Q2 2022 Call, an analyst inquired as to whether NII would rise in response to interest rate increases. ¶143. Rather than acknowledge the truth, Olson doubled down, saying, "what we've said all along, if *you're really going to see more of the real benefits from the hikes and growth in net interest income in the second half of the year and into 2023*." *See id.* Similarly, on the Q3 2022 Call, analysts again asked if "NII can grow from that fourth quarter number into 2023," and Black responded, "[w]e think it will grow in 2023." ¶145. These assurances were false—NII promptly declined in Q4 2022 and Q1 2023—thus strengthening a scienter inference. ¶¶137, 146, 148.

The Bank's March 10 and March 17 Releases were issued to quell investor concern about PacWest's solvency, as well as to try to stem the withdrawal of deposits. ¶¶92-101. Both releases emphasized that Defendants had "taken numerous strategic steps over the past four quarters to improve the balance sheet," the Bank's asset quality "remains excellent" and the Bank had "experienced no significant changes since year-end." ¶¶93, 100. They were false, however, as Defendants had permitted the Bank's primary liquidity to decline by over $8 billion and Liquidity Ratio to fall by over 50%; done nothing to mitigate PacWest's exposure to long-term securities; and let the value of PacWest's AFS Portfolio deteriorate. ¶¶94, 101-02. Courts routinely infer scienter from such misleading assurances. *See, e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *16 (S.D.N.Y. Nov. 26, 2018) (attempts to placate the market in reaction to inquiries supports

27

strong inference of scienter); *In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 486 (S.D.N.Y. 2006) (aggressive support for the company's business practices in the face of questioning supports scienter).

### 3. Suspicious Stock Sales Support an Inference of Wagner and Black's Scienter

"Unusual or suspicious stock sales by corporate insiders" support a strong inference of scienter "when they are dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *See No. 84 Emp.-Teamster*, 320 F.3d at 938. "Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insiders prior trading history." *Id.* Defendants Wagner and Black's sales were suspicious in time and amount and inconsistent with their trading history, supporting a strong inference of scienter.[16]

During the Class Period, Wagner sold 197,727 shares of PacWest stock worth approximately $5.8 million, dwarfing Wagner's sales in each of the prior two years, when he sold a combined total of only 69,528 shares from February 28, 2020 to February 27, 2021, for $2.7 million. ¶26. Further, certain trades were timed to capitalize on Defendants' misstatements. Wagner sold 66,659 shares worth $1,749,932 on November 25, 2022 and 17,725 shares worth $428,791 on December 9, 2022, mere weeks after the Defendants filed the Q3 2022 10-Q on November 8, 2022, which contained misstatements inflating PacWest's share price, and for the first time, omitted the Liquidity Ratio. ¶¶26, 79;

---

[16] That only Wagner and Black allegedly traded suspiciously does not diminish the inference of scienter. *See In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558 (S.D.N.Y. 2010) ("While the absence of sales by Andrews undermines the claim of scienter against him, that does not exculpate Sallie Mae or Lord"); *In re Emerson Radio Corp. Sec. Litig.*, 2005 WL 8131267, at \*15 (D.N.J. Dec. 20, 2005) (sales suspicious where two of four individual defendants sold shares).

McGimsey Decl. ¶9; Calandra Decl. Exs. 2-3.[17] Similarly, during the Class Period Defendant Black sold 24,310 PacWest shares during the Class Period for nearly $684,000. ¶30. His sales were also inconsistent with his trading over the prior two years, when he did not sell any PacWest shares at all. *Id.* Further, Black sold 18,794 shares for approximately $494,846, only weeks after the Bank filed its Q2 2022 10-Q on August 8, 2022. Calandra Decl. Ex. 1. Accordingly, Wagner and Black's trades were inconsistent with prior trading patterns, executed "in such a way as to indicate they took advantage of their false statements," and thus bolster a scienter inference. *See In re Questcor Sec. Litig.*, 2013 WL 5486762, at *17 (C.D. Cal. Oct. 1, 2013); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1191 (S.D. Cal. 2009) (trades multiple times larger than pre-class period trades support scienter inference).

Defendants' argument that the Complaint does not detail Wagner and Black's trading is mistaken. *See* DBr 33. The Complaint expressly alleges the amount of shares Wagner and Black sold during the Class Period, that the trades were timed to take advantage of share prices inflated by misrepresentations, and that the trades were inconsistent with Wagner and Black's respective trading histories.[18] These details are sufficient because "courts should give less weight to the fact sales may represent a small portion of the defendant's holdings if the amount of money made from the sale is

---

[17] The Court may judicially notice Wagner's specific sales on November 25, 2022 and December 9, 2022. *In re Vantive Corp. Sec. Litig.*, 110 F. Supp. 2d 1209, 1219 (N.D. Cal. 2000), *aff'd*, 283 F.3d 1079 (9th Cir. 2002) ("[t]he Court may consider SEC filings" when evaluating stock sales.

[18] Defendants do not argue that these trades are not suspicious because they were made pursuant to Rule 10b5-1 trading plans. *See* DBr 33. Accordingly, this argument is waived. *Avila v. L.A. Police Dept.*, 758 F.3d 1096, 1101 (9th Cir. 2014) (arguments not in opening brief waived). In any event, the use of a Rule 10b5-1 plan is an affirmative defense that does not rebut well-pled allegations of scienter during consideration of a motion to dismiss. *See Questcor Sec. Litig.*, 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013).

29

sufficiently high in magnitude." *See Baron v. Hyrecar Inc.*, 2022 WL 17413562, at *15 (C.D. Cal. Dec. 5, 2022) (sales support inference of scienter where inconsistent with prior trading and grossed proceeds or $5.2 million and $1.2 million, respectively, to individual defendants); *Questcor*, 2013 WL 5486762, at *16 (finding plaintiffs adequately alleged strong inference of scienter on a holistic basis where timing and consistency with prior trading history of stock sales was suspicious, regardless of percentage of sales).

### 4. False SOX Certifications Support a Strong Scienter Inference

Although not sufficient alone, SOX certifications signed by Defendants Wagner, Taylor, Olson, and Thompson during the Class Period, attached to the Bank's Class Period SEC filings (¶¶157-65), contribute to a strong inference of Defendants' scienter because these certifications were signed knowingly or recklessly disregarding that each 10-K and 10-Q contained misleading representations and omissions, including that rising interest rates would not adversely affect NII (¶138); and assuring investors that the Bank would not have to sell any impaired securities for liquidity needs (¶147). *See, e.g.*, *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016). Further, contrary to the Motion (*see* DBr 30), the Complaint *does* allege Defendants' recklessness in signing the certifications by, *inter alia*, their failure to disclose that the AFS Portfolio was unhedged, even though a typical investor would infer the portfolio was hedged (*see* ¶¶60, 165), and abrupt removal of the Liquidity Ratio (*see* ¶¶79, 118; McGimsey Decl. Ex. 7 at 135–37; Ex. 9 at 177–80; Ex. 14 at 231–33).

### 5. The Complaint Alleges Corporate Scienter for PacWest

The Individual Defendants' scienter can be imputed to PacWest. The Ninth Circuit recognizes "corporate scienter" or respondeat superior liability for a corporation under 10(b) and 10b-5 based on common law agency principles. *See Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1576-78 (9th Cir. 1990) (en banc) (imputing individual officer's

30

knowledge to the company); *Jackson v. Microchip Tech. Inc.*, 2020 WL 1170843, at \*11 (D. Ariz. Mar. 11, 2020) ("Microchip had constructive knowledge of the facts known by the individual Defendants *and other corporate officers*"); *In re Hienergy Techs., Inc. Sec. Litig.*, 2005 WL 3071250, at \*8 (C.D. Cal. Oct. 25, 2005).

### 6.  The Core Operations Doctrine Bolsters a Scienter Inference

It is well-established that allegations regarding management's role "may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information," or "such allegations may be sufficient, without accompanying particularized allegations, where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Reese v. Malone*, 747 F.3d 557, 576 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017).

During the Class Period, Defendants emphasized that the Bank had a "comprehensive risk management process that measures, monitors, evaluates, and manages the risks we assume in conducting our activities," that PacWest's future performance depended upon "the effectiveness of [its] risk management framework" and that "[e]ffective liquidity management is essential for the operation of our business." ¶43. Defendants further advised investors that the Bank's "operating results generally depend on [certain] key performance factors," particularly net interest income. ¶46. Given this focus on risk management and liquidity, and the importance of these issues to investors and the Bank, especially in the wake of the failures of Signature Bank and SVB, it would be absurd to suggest that Defendants did not know that the Bank's AFS securities portfolio was overwhelming made up of various long-term securities that were scheduled to mature in over five years, which made them susceptible to rising interest rates, and that the AFS Portfolio was entirely unhedged. ¶¶56, 60

### 7. A Holistic View Supports a Strong Inference of Scienter

The Complaint's allegations, considered holistically, support a strong inference of scienter by alleging (a) Defendants' removal of the Liquidity Ratio from SEC filings; (b) Defendants' false statements to analysts and campaign to placate concerned investors; (c) Wagner and Black's suspicious trades; (d) Defendants' false SOX certifications; (e) Defendants' roles and focus on the Bank's liquidity.

Defendants do not offer *any* plausible non-fraudulent explanation for their conduct, and instead only attack individual allegations in isolation, which is not sufficient to overcome the inference created by the above allegations. *See Shafer v. Glob. Payments, Inc.*, 2024 WL 2789447, at \*9 (N.D. Ga. Mar. 29, 2024) (denying dismissal where "Defendants attack Plaintiffs' scienter allegations individually and fail to consider how all facts taken together give rise to a strong inference of scienter"). And while Defendants claim that they disclosed "the precise risks at issue," thereby "negat[ing] an inference of scienter" (DBr 34), as set forth in Section III.B.2.c *supra*, the risk factors here were *misleading* because they warned of risks that had already come to pass.

### D. The Complaint Adequately Pleads Loss Causation

Defendants claim that the three disclosures causing loss did not "correct" earlier statements. DBr 34. The plain language of the Complaint, however, discuss these disclosures as materializations of the risk, not corrective disclosures.[19] The Complaint adequately pleads that the risks to the value of the AFS Portfolio, hidden by Defendants' failure to disclose that the portfolio was unhedged, materialized with each of the three disclosures. Loss causation is adequately pleaded.

---

[19] By failing to address materialization of risk, Defendants waive any argument in opposition. Defendants' cited cases are corrective disclosure cases. DBr 34-35.

32

Pleading loss causation is a "low bar" at the pleading stage. *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020). Plaintiffs' loss causation allegations are governed by Rule 8, requiring only a "short and plain statement of the claim." *Amalgamated Bank v. Facebook, Inc. (In re Facebook, Inc. Sec. Litig.)*, 2023 WL 6857600, at *13 (9th Cir 2023), *amended & superseded*, 87 F.4th 934 (9th Cir. 2023), *cert. granted on other grounds*, 2024 WL 2883752 (U.S. June 10, 2024). "At the pleading stage, it is generally inappropriate to dismiss for failure to establish loss causation." *Id.* at *13. Plaintiffs need allege only a "plausible" inference that the "revelation of fraudulent activity, rather than changing market conditions or other unrelated factors, proximately caused the decline in defendant's stock price." *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1204–06 (9th Cir. 2020). "[A] misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis in original).

Plaintiffs allege three events partially revealing the truth concealed by Defendants' false and misleading statements: (1) PacWest's March 22, 2023, disclosure of the extent of deposit outflows and that PacWest turned to the federal government for a *de facto* bailout (¶166); (2) PacWest's May 3, 2023, disclosure that it was considering a sale (¶167); and (3) PacWest's May 11, 2023, announcement that it had lost approximately 10% of its deposits and needed a bailout (¶¶169-70).

Plaintiffs issued "short and plain statements of the claim[s]." For example (¶166), concerning revelation that PacWest's deposits had declined 20%, states that:

> The decline in response to the March 22 Release was a materialization of the concealed risk that that the failure of Defendants' liquidity management processes, their reliance on interest-rate sensitive long-term securities for primary liquidity, the weakness of the PacWest's Liquidity Ratio, the $8.0 billion decline in the Bank's primary liquidity would mean that the

33

> Bank lacked sufficient liquidity to remain operational without an infusion of federal funds.

This statement suffices at the pleading stage. Defendants' failure to disclose that its AFS securities portfolio was entirely unhedged hid the weakness of that portfolio from investors, and the insufficiency of that portfolio if enough depositors wanted their money back. Paragraph 167 contains similar language, and ¶169 contains language related to the effect of a run on the bank, that effect hidden by Defendants' failure to disclose that its AFS Portfolio was unhedged, and what that meant when interest rates rose precipitously. *See City of Birmingham Relief & Ret. Sys. v. Acadia Pharm, Inc.*, 2022 WL 4491093, at *14 (S.D. Cal. Sept. 27, 2022) (denying motion to dismiss, zone of risk concealed by Defendants' omission of adverse information about Phase III trial materialized when FDA denied new drug approval), *reconsideration denied*, 2023 WL 1769810 (S.D. Cal. Feb. 2, 2023); *In re WageWorks*, 2020 WL 2896547, at *8 (materialization of risk after defendants "cooked the books," then revealed the risk, lack of revenue, concealed by defendants' fraudulent statements).

Further, PacWest's inability to continue as a going concern but for a bailout and eventual purchase, and the effect of the bank run on its liquidity are all within the "zone of risk" concealed by Defendants' failure to disclose that its AFS Portfolio was entirely unhedged. Whether the failure to hedge the portfolio was a good or bad decision is irrelevant. The zone of risk included the possibility that interest rate hikes would decimate an unhedged portfolio. Defendants' failure to disclose that the portfolio was unhedged formed the basis for the loss causation.

### E.    The Complaint Pleads A Section 20(a) Claim

To state a claim under Section 20(a), Plaintiffs must allege a primary violation of the Exchange Act, and that the individual defendants controlled the entity liable for the primary violation. 15 U.S.C. § 78t(a); *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1053–54 (N.D. Cal. 2008). The Complaint alleges a primary violation by

34

PacWest, and thus also alleges Section 20(a) claims against the Individual Defendants. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 781 (9th Cir. 2023).

Plaintiffs also adequately allege the Individual Defendants' control. "Whether a defendant is a control person is an intensely factual question, and a plaintiff will survive a motion to dismiss on allegations that individual defendants, by virtue of their position, could and did control and influence the company." *Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at *19 (N.D. Cal. Feb. 15, 2018). Here, the Individual Defendants were senior officers and directors of PacWest who directly participated in the management of PacWest and signed or made the statements alleged herein. ¶¶26-30, 42-171. This is more than sufficient to satisfy Plaintiffs' light burden to allege control. *See In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1228 (N.D. Cal. 2015).

## IV. CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion. Alternatively, if any part of the Complaint is dismissed, Plaintiffs respectfully request leave to replead. *See Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001).

Dated: June 19, 2024                    Respectfully submitted,


                                        **POMERANTZ LLP**

                                        By: /s/ *Brian Calandra*

                                        Jeremy A. Lieberman (*pro hac vice*)
                                        Brian Calandra(*pro hac vice*)
                                        600 Third Avenue, 20th Floor
                                        New York, New York 10016
                                        Telephone: (212) 661-1100
                                        Facsimile: (212) 661-8665
                                        Email: jalieberman@pomlaw.com

35

Email: cdavid@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Facsimile: (917) 463-1044
jpafiti@pomlaw.com

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Jacob Goldberg*

Laurence M. Rosen, Esq. (SBN 219683)
Jacob Goldberg (*pro hac vice*)
Gonen Haklay (*pro hac vice*)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com
jgoldberg@rosenlegal.com
ghaklay@rosenlegal.com

**THE SCHALL FIRM**
Brian Schall
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
brian@schallfirm.com

*Attorneys for Plaintiffs*

36

## CERTIFICATE OF SERVICE

I, BRIAN CALANDRA, hereby declare under penalty of perjury as follows: I am a partner with Pomerantz LLP, with offices at 1100 Glendon Avenue, 15th Floor Los Angeles, California 90024, and am admitted to practice in this court *pro hac vice*. I am over the age of eighteen. On June 19, 2024, I electronically filed the above Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Amended Complaint for Violation of the Federal Securities Laws with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on June 19, 2024.

/s/ *Brian Calandra*
Brian Calandra