# EXHIBIT B

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE JOHN W. HOLCOMB, JUDGE PRESIDING**

CERTIFIED TRANSCRIPT

| | |
|---|---|
| Eric Tan, individually and on behalf of all others similarly situated, | ) ) ) ) |
| PLAINTIFF, | ) ) |
| vs. | ) SACV NO. 8:23-cv-01685-JWH ) |
| PacWest Bancorp, et al., | ) ) |
| DEFENDANTS. | ) ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

FRIDAY, OCTOBER 25, 2024

10:00 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFF, Eric Tan, individually and on
behalf of all others similarly situated:

BRIAN CALANDRA
POMERANTZ LLP
600 THIRD AVENUE
20th FLOOR
NEW YORK, NEW YORK 10016
(212) 661-1100
bcalandra@pomlaw.com

FOR THE DEFENDANTS, PacWest Bancorp, et al.:

DIANE L. MCGIMSEY
SULLIVAN & CROMWELL, LLP
1888 CENTURY PARK EAST
SUITE 200
LOS ANGELES, CALIFORNIA 90067
(310) 712-6600
mcgimseyd@sullcrom.com

ADAM S. PARK
SULLIVAN & CROMWELL, LLP
1888 CENTURY PARK EAST
SUITE 200
LOS ANGELES, CALIFORNIA 90067
(310) 712-8800
parisa@sullcrom.com

CAROLINE BLACK
SULLIVAN & CROMWELL, LLP
1888 CENTURY PARK EAST
SUITE 2100
LOS ANGELES, CALIFORNIA 90067
(310) 712-6640
blackcar@sullcrom.com

**SANTA ANA, CALIFORNIA; FRIDAY, OCTOBER 25, 2024; 10:00 A.M.**

**-o0o-**

THE CLERK:  Calling Item No. 3, Case No. 8:23-cv-01685, Eric Tan versus PacWest Bancorp, et al.

Counsel, if you'd, please, state your appearances for record, beginning with the plaintiff.

MR. CALANDRA:  Good morning, Your Honor.

Brian Calandra, Pomerantz LLP, on behalf of the Plaintiffs Aleen Hosdaghian and Onurcan Atak.

THE COURT:  Mr. Calandra, good morning to you.

MR. CALANDRA:  Good morning.

MS. McGIMSEY:  Good morning, Your Honor.

Diane McGimsey of Sullivan & Cromwell, on behalf of the defendants.

MR. PARIS:  Good morning, Your Honor.

Adam Paris, Sullivan & Cromwell for the defendants.

MS. BLACK:  Good morning, Your Honor.

Caroline Black of Sullivan & Cromwell for the defendants.

THE COURT:  All right, Counsel.  Good morning.  Welcome.

We're here -- well, I have it down for two purposes:  One is defendants' motion to dismiss the amended

*Deborah D. Parker, U.S. Court Reporter*

complaint and also for a scheduling conference, but I was probably too hasty on the scheduling conference given that this is a securities case, right?

Okay.  So let's do it this way.  My last four motions to dismiss in various types of cases, I've actually started with the plaintiff, because I want to make sure I understand thoroughly the claims that are asserted.

So if you don't mind, I'll start with you, Mr. Calandra.  I have some questions, and I'll have some questions for the defendant; and then, I'll listen to whatever argument you wish to provide to me.

MR. CALANDRA:  Would you prefer I take the lectern, Your Honor?

THE COURT:  Yes, please.

All right.  I've reviewed -- tried to review thoroughly the first amended complaint and the papers that have been filed.  And, again, let me make sure I understand your theories and your allegations in the complaint.

Now, is there any statement that defendants have allegedly made that you're alleging is misleading on its own?

MR. CALANDRA:  And you mean by that, Your Honor, misleading on its face and not because it failed to disclose something?

THE COURT:  Let's start -- yes, let's start with

5

that.

MR. CALANDRA:  We would say, Your Honor, that the misstatements alleged in paragraphs 125 and 127 regarding a comprehensive risk framework are --

THE COURT:  Hold on one second.  Let me get that in front of me.

Let me -- and let me pause you there.  Defendant, hopefully, in my view provided a table at the end of defendants' motion of what defendant regards as the statements that are being attacked.  Is that -- did they get those statements right?

MR. CALANDRA:  Well, we disagree with the grounds that they challenge them on.

THE COURT:  Of course.  Of course.  But in terms of the statements themselves?

MR. CALANDRA:  Yes, they did.

THE COURT:  Okay.  All right.  So in terms of misleading on its own, you're saying 125 through 127, those paragraphs set forth those statements?

MR. CALANDRA:  125 and 127.  And then in addition, paragraph 147, we do not foresee having to sell any securities at a loss.  And that paragraph contains a number of statements, because it's like -- the same statement is repeated in a number of different paragraphs.  And we would say that by the second quarter of 2022, at which point they

6

were selling securities at a loss, to say nothing of -- in Q3 when 99.7 percent --

*(Court Reporter requests clarification for the record.)*

MR. CALANDRA:  I was getting all worked up.

-- that 99 -- by Q3, 99.7 percent of their AFS portfolio had experienced a loss and by Q4, 99.8 percent of their portfolio had experienced a loss and they a second time sold securities at a loss; that those statements in those two specific documents -- the Q3, 10-Q for 2022 and the 2022, 10-K -- are false on their face.

The remaining statements are misleading, because there was an obligation to disclose that they did not fulfill.

THE COURT:  I'm jumping ahead in my notes, but you raise sort of this timing -- what I regard as a timing issue.

*(Pause.)*

THE COURT:  Well, let me come back to that.  Let me go in the order that I'm thinking of things.

Now, is it also plaintiffs' theory here in the complaint that defendants' statements as a whole gave off a false or misleading impression?

MR. CALANDRA:  That's correct.  When -- at the time the class period began, this was a bank that had

*Deborah D. Parker, U.S. Court Reporter*

exploded in size.  Its deposits had gone from 19 million to 35 million.  And there are risks inherent in that that defendants were clearly cognizant of, because they were issuing vague cautionary statements about them.  And in their 2022 proxy, they addressed them; most specifically, the potential for rising interest rates.

And as we allege in paragraph 65, they affirmatively said in effect, *We are prepared for rising interest rates.  We are ready.*

And then in their ensuing public disclosures, whether it be in 10-Ks and 10-Qs or on earnings calls, they gave a series of statements that were specifically designed to make investors comfortable with the fact that interest rates were going to rise and what risks were presented to the bank as a result of that.

And so you see them saying, *We have a risk framework that allows us to -- that gets us out in front of any risks that are coming to us.  We're not going to have to sell anything at a loss which is important, because if we sell our --*

Sorry.  Again, debate club in high school.  It never -- you can take the guy out of the debate club; you can't take the debate club out of the guy.

*We don't foresee having to sell any securities, because if investors withdrew their funds, that's where the*

*liquidity would come from to fulfill those investments. They affirmatively said, Rising interest rates will benefit us. And if there's any problem with interest rates, we can't really predict it. It may decline.*

And then when you compare that to what was happening at the time they were making these statements, they were trying to say, *We are prepared.* And then as the class period moved along, *This is fine.* The way I like to think of it is there's a cartoon -- a comic strip of a dog sitting in a room that's catching on fire and just keep saying *This is fine*, as the fire keeps rising and rising and rising. That's exactly what was happening here as they made later statements up until March 10th and even March 17th where they keep insisting things were fine, while keeping investors in the dark about how bad things they were.

THE COURT: I found my notes on the timing issue. So the bank -- you allege the bank made a statement on March 17th, 2023 that, in essence -- and this may be a quote -- "Asset quality remains excellent" --

MR. CALANDRA: Yes.

THE COURT: -- correct?

Is it plaintiffs' theory that at the time the bank made that statement, the bank's asset portfolio had declined significantly in value?

MR. CALANDRA: Yes.

9

THE COURT:  And is it defendants' -- I'm sorry, plaintiffs' theory that defendants, by that time -- March 17th -- Saint Patrick's Day -- 2023 -- defendants had already sought a bailout?

MR. CALANDRA:  They were -- they announced the bailout on March 22nd when they -- by March 17th, I believe, they were still saying that *We're in good shape.  We haven't had -- we are -- Our asset quality is excellent.*  It was just a general reassurance to the market that our theory is -- was false, because the amount of deposits they had versus their liquid securities portfolio, which was 97 percent long-term securities, that just -- that statement was false.

Certainly, if they had said, *We have -- Our asset quality is strong, even though it's unhedged and predominately long-term weighted*, then I think it would be a much closer question.  But they just -- and part of what makes that so misleading is that, at this time, Signature Bank and Silicon Valley Bank were failing.

So this was directly an attempt to try to keep this company from -- keep the bank from going under, which it ultimately did.  Even though it didn't declare bankruptcy, it still sought a bailout from the Government and from --

THE COURT:  The bailout timing, what are your

*Deborah D. Parker, U.S. Court Reporter*

specific allegations about the timing of the bailout?  You said March 22nd, 2023, the bank announced?

MR. CALANDRA:  Yes.  On March -- those allegations are in paragraph, I believe, 103.

Yes.  On paragraph 102, Defendants disclosed in a release that they had to tap federal lending on the bailout to stay afloat.  So I get myself in trouble when I make these kinds of guesses, but it sounds like you're asking me if we allege that they had already received a bailout by March 17th.

THE COURT:  Your sense is correct.  I'm trying to understand your allegations -- plaintiffs' allegations and plaintiffs' theory about the timing of the bailout, the timing of when the bank took steps to obtain a bailout versus the timing of the statement on March 17th that "Asset Quality Remains Excellent."

MR. CALANDRA:  Those allegations are uniquely within the knowledge of defendants.  And although we have investigated and tried to find former employees to provide those allegations, we -- they do not appear on the face of the complaint.  However, because that's uniquely within the defendants' knowledge and because you see -- our corrected disclosure is based on a materialization of the risk, we don't think we have to allege that on March 16th, defendants told the Government that they would accept a bailout.

11

We think that it's -- that's more of a loss causation issue and that defendants knew what they were saying on March 17th was false, just on the basis of the construction of their portfolio, the values of the -- there was -- at this point, they were standing on the cliff's edge taking a step forward. It wasn't reasonable for them to say, *We're not walking off a cliff.*

THE COURT: If the actual facts are -- and, of course, I don't know what they are. I don't think plaintiff yet knows what they were. But if the actual facts are that defendants hopelessly mismanaged -- the individuals hopelessly mismanaged the bank, believed their statement on March 17th, the "Asset quality remains excellent," stupidly days later realized they needed a bailout, sought the bailout and announced it on March 22nd, there's no securities violation here. There may be other torts. But in terms of what claims are in this case, your claims would fail, if those are the actual facts, correct?

MR. CALANDRA: That's the important part. If those are the actual facts. Because at this stage, as I know you know extremely well, it's not proper to make inferences in defendants' favor. But assuming that we're at summary judgment, I'm not prepared to say there would be no claim of any kind, because the bailout itself is not the only materialization of the risk. There's also the fact

12

that the bank could not survive on its own.  But it would certainly make the claim very challenging.

THE COURT:  So it's plaintiffs' theory that plaintiff has -- plaintiffs have alleged enough here with the curious timing of the statement that "Asset quality remains excellent" and then five days later, an announcement that the bank is seeking or has sought a bailout; is that correct?

MR. CALANDRA:  That's correct.  There was nothing that happened in those five days that would make a bailout any more necessary than it was on March 17th.

THE COURT:  Plaintiffs also allege that the bank made reassurances -- my words perhaps, not yours -- the bank made reassurances that it would not need to sell off securities to maintain liquidity.  That's a part of what plaintiffs allege.

MR. CALANDRA:  Correct.

THE COURT:  And what was -- what was the timing of those reassurances in contrast to when the bank actually sold securities to maintain liquidity?

MR. CALANDRA:  So defendants made those assurances quarterly.  They said it in February of 2022, May of 2022, August of 2022, November of 2022, and February of 2023. Over that time, they twice had to sell securities at a loss to maintain -- in part to maintain liquidity.  And they did

not change that disclosure.  They kept saying, *We won't have to do this.*  At the same time, they were doing it without acknowledging that they, in fact -- without correcting or providing a reason why their prior statement that they wouldn't have to do this was incorrect.

As to your specific -- the granular detail of your timing question, perhaps the statements at the start of the class period, in February of 2022, or in August, they hadn't yet done that.  But certainly by -- I'm sorry, February and May of 2022.  But certainly by August, they knew, and we would say they knew earlier that that statement just was not true, because 80.7 percent -- and we allege this in paragraph 61 -- 80.7 percent of their available for sale securities had experienced losses.  So if they were going to sell something for liquidity, even after May of 2022, that sale was going to probably be at some kind of loss.

THE COURT:  You said that defendants twice sold securities in this critical period.  What were those two times and where is that alleged?

MR. CALANDRA:  Paragraph 75.  And let me make sure I have that exactly right.  Apologies.  Paragraph 74.  And that's for Q2.  And then in Q4, it is paragraph 83, so...

THE COURT:  So plaintiffs know when defendants sold securities, because defendants disclosed that information in -- was it a 10-Q?

*Deborah D. Parker, U.S. Court Reporter*

14

MR. CALANDRA:  Yes.  In both cases.  And to be -- just to be precise, Your Honor, defendant -- plaintiffs know that the securities had been sold.  Defendants continued to deny that the securities would be sold as it were.

THE COURT:  So you're saying in 10-Qs, defendants both said, *Hey, we've sold securities*?  And also said, *Nothing to see here.  We have no need or intention to sell securities*?

MR. CALANDRA:  That's correct.

THE COURT:  So both of those statements appear in the same 10-Q?

MR. CALANDRA:  Same 10-Q.

THE COURT:  As alleged in paragraphs 74 and 83?

MR. CALANDRA:  Correct.

THE COURT:  I took us off -- I started by asking about whether part of plaintiffs' theory is that defendants' statements as a whole were false or misleading.  Walk me through -- I think you started this, but walk me again, please, through your theory for why the statements and admissions as a whole are misleading.

MR. CALANDRA:  Certainly.  So this bank, because it had grown so quickly, was at risk of a collapse, because it's a risk inherent in a bank that grows this quickly.  And as interest rates were rising, defendants in a way to address inventor concerns that were inherent in what was

15

happening, endeavored to say, *We are prepared and everything is fine.*  And they said *We are prepared* by affirmatively describing their risk framework, by saying from the top that *We won't have to sell any securities at a loss.*  By saying, *An increase in interest rates will benefit us.*  By saying that *Our whole theory of bank management is to run a profitable, sound bank with a focus on the future* is the effect of that.

And then, also, rather than saying, *In the risk factors, we have a risk of declines in our available for sales portfolio, because it's heavily weighted to long-term securities,* they just kind of shrugged and said, *We might have a risk.*  But that risk certainly -- that risk by the time the class period began or shortly thereafter was already coming to pass, because the value of the available for sale security portfolio was dropping, even though they hadn't sold anything yet.  You can see from their disclosures that the value of the portfolio was dropping.

The key part of what made these -- what made these representations false is that any investor looking at a bank that relied on an available for sale portfolio for its deposit liquidity would assume that that available for sale portfolio wasn't wholly exposed to interest rate fluctuation.  And that's what happened here.  This was wholly exposed, unhedged to interest rate fluctuation and

16

that's why we cite the article in *Financial Times*, from March of 2023, which basically said that this is what had brought down Signature and Silicon Valley Bank.  And it was absolutely absurd that a bank would set itself up this way.  And this is exactly how PacWest had set itself up.

And now defendants emphasize that we didn't say it was hedged, but that's -- that's kind of the rub is if they list three derivatives that they call nonhedging derivatives and say that should have put investors on notice that there were no other hedges in the entire -- in the entire bank, let alone the available for-sale portfolio, that is just a bridge too far.  And you can see why it's a bridge too far, because when the bank was sold or purchased, the disclosure in the 2023 merger proxy disclosed that it wasn't hedged.  If that disclosure was sufficient, they wouldn't have needed to disclose later that it wasn't hedged.

THE COURT:  A couple follow-up questions.  You mentioned that article.  Is that the article -- the article to which you referred to just now, is that the article that defendants challenge?  Defendants responded to your request for judicial notice.

MR. CALANDRA:  We weren't seeking judicial notice of that, and I --

THE COURT:  Well, I think defendants say -- they ask me not to take account of that -- is that the article

you're referring to?

MR. CALANDRA:  No.  If -- I was under the impression that defendants were challenging our ability -- our request for judicial notice of Forms 4.  We -- they had -- sometimes I talk too fast, even for me.

*(Overtalking:  Unable to report.)*

MR. CALANDRA:  Yes.  That's the short version. They cited an article, didn't seek judicial notice for it. We said you shouldn't notice it.

THE COURT:  Got it now.  Thank you.

Do plaintiffs allege the defendants made any statement or did anything to make investors think that the AFS portfolio was hedged?

MR. CALANDRA:  Yes.  And this is -- this is exactly what we've been describing.  They did not say it is hedged.  But by saying we have a comprehensive risk framework, we are well-capitalized and profitable and our securities may decline, as well as interest rate increases will benefit us, that created the impression in investors that this was hedged -- that the AFS portfolio was hedged, because no bank would expose -- especially, a bank with this much deposits -- no bank would go completely exposed on its only source of deposit -- or its primary source of deposit redemption funds, especially in a market where 90 percent of these securities would directly be affected by rises in

18

interest rates and everybody knew and defendants had advised that they were expecting rates to increase.

THE COURT:  That's an inference that you're asking me to make.  I must make inferences favorable to the plaintiff here on a Rule 12(b)(6) motion.  That's an inference that you're asking me to make; is that correct?

MR. CALANDRA:  Correct.  And the basis for whether a statement is misleading, as Your Honor knows very well but just to reiterate -- is whether it would mislead a reasonable investor.  A reasonable investor in a bank with a massive amount of deposits supported by available for-sale securities would expect -- would read these statements to mean this portfolio was hedged.

THE COURT:  That makes sense, but how do I know that for the purposes of this analysis, this Rule 12(b)(6) analysis?  How do I know what a reasonable investor would know, would think, based upon these alleged statements and omissions?

MR. CALANDRA:  One, you can look at the *Financial Times* article which said what the market expected of a bank in this situation.  But the -- the question you've raised is, sort of, that's just part and parcel of this process.  So you look at these statements, and you make -- you put yourself in the shoes of the reasonable investor. And you say, *All right.  Would a reasonable investor for the*

*Deborah D. Parker, U.S. Court Reporter*

19

*purposes of accepting everything that I've alleged* -- that the plaintiffs have alleged is true -- *would a reasonable investor approach these, this way?*

And there isn't a way, I would submit, that you can really, short of the federal code saying, *This is what a reasonable investor thinks.* You have to look at the context and the circumstances that are alleged. And the context and circumstances are a bank that's growing quickly that knew its investors would be concerned about its exposure and then it barked to say, *Don't worry. Nothing to see here,* even though there was definitely something to see and that the AFS portfolio was unhedged.

THE COURT: If I come to the conclusion that the bank statements about its comprehensive risk portfolio, if I come to the conclusion that those statements are mere puffery, are there other statements or omissions that are enough to satisfy your Rule 10(b)(5) pleading standard?

MR. CALANDRA: It's the 12(b)(6), PSLRA pleading standard. And I'm saying this only because my very qualified counsel would probably bring it up.

10(b)(5) is the you can't lie. The PSLRA is: You must say how you lie with sufficient specificity.

My security professor would be thrilled with me.

THE COURT: While we're on PSLRA, where should I look? What statute?

20

MR. CALANDRA:  You know, 770 -- I can -- I can find that for Your Honor.

THE COURT:  78?

MR. CALANDRA:  77 might be securities and 78 might be -- it's been so long since I actually cite -- no, I bet I -- it is, Your Honor.

THE COURT:  Well, we can come back to that.

MR. CALANDRA:  No, no.  I bet I have it right here.  10(b)(5) -- here we go.  15 U.S.C. 78U-4, 78J(b) and 78T(a).

THE COURT:  Are you on the statute?

MR. CALANDRA:  Yes.  That's the --

THE COURT:  So the section is 78U-4 and then the subsection is what?

MR. CALANDRA:  Oh, no, they're actually -- I believe there are three different sections.

THE COURT:  Oh, I'm sorry.

MR. CALANDRA:  It's 78U, 78J, 78T.

THE COURT:  Well, that's a lot of -- that's a lot of statutory material.

MR. CALANDRA:  That is, but that's -- and that's the backdrop to what we're -- to what we're going after here which is, under the PSLRA, we have to allege the who, what, where, when and why of the fraud.  We have to say what statements are misleading and why they are misleading.  And

*Deborah D. Parker, U.S. Court Reporter*

21

that we've done now in our position.  But as you look at the -- if you take comprehensive risk framework as puffery, which we obviously disagree with --

THE COURT:  I understand that.

MR. CALANDRA:  Yes.  And I won't repeat myself.

I would say that the "do not foresee having to sell," if these securities -- that almost implies that these securities are hedged, because we wouldn't have to sell them at a loss.  And we would say that that's false in its own right, because they, at the time -- it had experienced so much losses that any sale, essentially, would result in -- would result in a loss, but I don't -- and then I don't think that comprehensive risk framework is fatal to our claims, because the statements that "Interest rate increases will benefit the bank," as well as "We may experience declines if interest rates rise," those also combined with the "We don't foresee having to sell," they're specific statements and they suggest there's more here than just the face value of these securities that you see.  There's something backing them.

THE COURT:  So plaintiffs point to defendants' statements tauting the banks risk management practices and the beneficial nature of rising interest rates.  So is it plaintiffs' theory that in view of those statements by the bank, the bank's failure to disclose the liquidity ratio --

*Deborah D. Parker, U.S. Court Reporter*

let me stop there -- is that misleading?

MR. CALANDRA:  We have not alleged that the failure to disclose the liquidity ratio itself made any statement misleading.  We have not alleged that.  What we allege based on that is that they knew what they were doing.  They were trying to mislead investors.  And it's difficult to imagine a more direct way of being misleading than making it more difficult for an investor to figure out what you had prominently displayed previously and then reinserting that ratio when the danger has passed.

I don't really think that defendants with a straight face can say it didn't make any difference; because if it didn't, they wouldn't have taken it out in the first place and certainly would not have put it back as soon as the danger past.  But what's important about that is that it shows their intent or recklessness with the truth.  They wanted to prevent investors from seeing how perilous the situation was for the bank.

THE COURT:  And is that part of your scienter argument as well?

MR. CALANDRA:  It is.  Yes, Your Honor, it is.

THE COURT:  So same question with respect to the decision not to hedge the AFS portfolio.

MR. CALANDRA:  That we do not -- Your Honor, defendants assert that we are claiming that they mismanaged

23

the bank.  That's not the basis of our claims.  The act of not hedging is not --

THE COURT:  That mere mismanagement wouldn't be actionable under the claims that you have asserted here.

MR. CALANDRA:  Correct.  And we do not allege that they defrauded bank investors by mismanaging the bank.  What we say is that they needed to tell investors how -- they needed to tell investors the truth about the bank's financial condition, and they didn't do that.  So it wasn't the decision to not hedge the AFS portfolio that was problematic.  It was the fact that they assured investors everything was fine and didn't say at the same time, *By the way, this portfolio was unhedged.*

THE COURT:  What is the specific false impression that the banks alleged statements and omissions that you point to gave to investors?

MR. CALANDRA:  We are prepared for interest rates to rise and the bank is not -- the bank's financial condition is sound, even though interest rates are rising.  That's the impression that was given.  And the third, of course, would be:  We are prepared, and it is sound because -- and as a result of -- or implicit in that is that the portfolio was hedged.  An unhedged portfolio would mean the bank is neither prepared nor sound.  And it wasn't either of those.

24

THE COURT:  I think part of your allegations are that the bank's statements referencing a comprehensive risk management framework and a robust approach to risk management were misleading.

MR. CALANDRA:  Correct.

THE COURT:  Now, is that because the bank did not have a comprehensive risk management scheme?

MR. CALANDRA:  No -- well, the problem isn't that -- whether or not there was a comprehensive risk management scheme.  That might be puffery.  The problem is when you say we have a risk management scheme, an investor -- and we get at this through the *Financial Times* article -- would infer that that includes hedging the sole basis for your deposits.  And so if they wanted to say *We have a composite risk framework,* they would also need to say *Our portfolio is not hedged.*  And you can see why defendants know this, because in the 2023 merger proxy, they said that.  They said it wasn't hedged.

THE COURT:  Where, specifically, in the complaint do you allege that?

MR. CALANDRA:  Allege -- it's paragraph 65 -- no, that's not paragraph 65.  It is paragraph 50 -- I believe it's 100 and --

*(Pause.)*

MR. CALANDRA:  Bear with me for one moment,

*Deborah D. Parker, U.S. Court Reporter*

25

Your Honor.

THE COURT:  Of course.

MR. CALANDRA:  Paragraph 118.  And in paragraph 118:

"Now that the danger of a bank run on PacWest had passed, Defendants resumed disclosing the Liquidity Ratio"...

I think I have -- now, that's -- you were referring to the reference to the 2023 merger agreement. Did I get my wires crossed?  I think I did, but I will be able to find that reference as well.  So it's actually -- it is here.

THE COURT:  Well, backing up.  So I asked the question about bank's statements about its comprehensive risk management framework and its robust approach to risk management.  And you confirmed that you alleged that those statements are misleading.

MR. CALANDRA:  Yes.

THE COURT:  I said, *Is that because the bank did not have a comprehensive risk management scheme?*  I understood your answer to be:  *No.  If the bank did not have a comprehensive scheme, then its statements would be mere puffery, or could be mere puffery.*

MR. CALANDRA:  What I said --

THE COURT:  And then --

*Deborah D. Parker, U.S. Court Reporter*

26

MR. CALANDRA:  Oh, I'm sorry, Your Honor.

THE COURT:  And then you provided an explanation. And what I meant to ask is:  The explanation that you provided, where can I look in the complaint to find that explanation?

MR. CALANDRA:  I would -- those exact words did not -- I don't know if they appear in a specific paragraph of the complaint I can point to, but that is -- as Your Honor knows when you're evaluating the allegations of a complaint, you look at the complaint holistically.  And that's the holistic import of what we are alleging here.

THE COURT:  Now, you allege that the bank stopped reporting liquidity ratio at some point.

MR. CALANDRA:  In November of '22, when it dipped below 25 percent.

THE COURT:  How could investors have been able to find or calculate the bank's liquidity ratio at that point?

MR. CALANDRA:  It would be my position that they couldn't, because you weren't exactly sure how the bank was now calculating its liquidity ratio, given that it had removed all reference to the liquidity ratio from the Q3 202210-Q, as well as -- Q3 2022 10-Q, as well as the 2022 10-K.  And they still provided elements of what perhaps would make up the liquidity ratio, but you can see them capitalizing on this in the March 10th -- March 10th release

where they say *Everything is fine.*

Because in there, they don't use the word "liquidity ratio."  They say "liquidity position," and they include their loans which are what they have taken from the depositors and put in -- you know, they've lent out. There's their profit model is taking -- paying 2 percent on a depositor and taking in 4 percent.  But they are now referring to that somewhat differently in the March 10th release.

So the only reason -- and defendants make this point in their briefing.  The only reason that we were able to calculate what the liquidity ratio was at the end of 2022 is that we went to how they were calculating it when they resumed disclosing it in 2023 and backed that out.  At the time, it was not clear -- it was, I would say, impossible for an investor to know for sure what that ratio was since defendants seemed to be moving around that definition.

But, also, the case law -- and we cited a couple of cases that show that making investors do that work to kind of back this out and then comparing it to other documents, that's not a defense at this stage on a motion to dismiss.

THE COURT:  To calculate the liquidity ratio in general, one takes primary liquidity, liquidity divided by total deposits --

*Deborah D. Parker, U.S. Court Reporter*

28

MR. CALANDRA:  And --

THE COURT:  -- is that correct?

MR. CALANDRA:  Yes.  Depending on how you define primary liquidity.  But, yes, it's the cash on hand, long term and short-term securities, less what's pledged and money owed to them from other banks.  Add that up and you generally get primary liquidity.

THE COURT:  That's basically what I took from the papers here.  Primary liquidity is cash on hand, sums due from banks, interest earning deposits and unpledged AFS securities?

MR. CALANDRA:  Correct.  Well, not only AFS.  I think held to maturity securities are in there as well.

THE COURT:  I missed the word.  What kind of securities?

MR. CALANDRA:  Held to maturity.  That distinction has more to do with tax treatment.

THE COURT:  Okay.  And then we talked a little bit about scienter.  And you confirmed that some of your argument supports your scienter argument.  What else -- what other specific facts do you have -- do you allege that establish scienter for the individual defendants?

MR. CALANDRA:  The stock sales.  The CEO -- at the very moment they pulled the liquidity ratio disclosure, or they pulled the chart -- sold in two transactions 1.5 -- at

least 1.5 million, maybe even closer to 2 million worth of shares and he sold them on November 9th and in the second week of December. And those -- his sales during the class period overall were completely out of proportion with his sales in the same period prior to the class period. And this is powerful evidence of his scienter. He was trying to capitalize on misrepresentations that were made in the Q3, 10-Q, and he did that.

Defendants raise a couple of arguments against this inference. One of them being that it's a sale -- some of these transactions, not the two I just mentioned but others were sales for tax purposes. That to me is of no moment, although they cite some case law. But it's unclear if in those cases the courts appreciated that these sales for tax purposes weren't nondiscretionary; they were completely discretionary. Rather than pay cash to cover tax liabilities, they remitted shares. And there's no reason that should be treated differently in terms of capitalizing on an amount of money -- and to the extent.

THE COURT: I missed the --

MR. CALANDRA: The amount of the returns. There's no reason to consider, I use this to pay taxes to be any different from, I use this to buy a home in Florida.

THE COURT: Okay.

MR. CALANDRA: And then that -- also,

Defendant Black had multiple sales.  And they all appear, based on his Forms 4 to be for tax purposes.  But in the same way, that is still an accretion to wealth that was completely out of proportion to his prior sales, given that he didn't have any at all.

Defendants bring up the fact that when Wagner made his sales, the stock price went up after he made them, but the case they cite for that, *Ronconi*, it's just not what happened here.  In *Ronconi*, a person sold shares at 49 -- at 54.  The stock then went up to 73 and fell back to 49.  So if he was trying to profit, why on earth would he sell at 54, instead of waiting for it to go up for 73?

Here, in the time between when Wagner sold, in November and December, he sold at 27 and 24.  The stock price went up a dollar or two before it then collapsed in March down to 9.  So this is not a case where he sold and then it zoomed up, and he didn't get the benefit of that. He sold at the same level, essentially, and then the stock just dropped later.

And although it is true that courts often look at the distance between the sale and the corrected disclosure -- you're selling on the night before it plummets -- pursuant *Questcor*, which is 2013 Westlaw 5486762 [sic], at 17, a sale right after a misrepresentation has the same suspicious -- the same level of suspicion.

*Deborah D. Parker, U.S. Court Reporter*

31

The reason why we didn't include *Questcor* -- that principle in our papers is defendants raise that for the first time on reply, and we don't think Your Honor should -- we think Your Honor should ignore that argument, since it was raised for the first time on reply, but should you -- that -- the argument on selling before -- selling before the stock price went up, that's the reason why we think that argument is without merit.

THE COURT:  All right.  Thank you.  Those were my questions for plaintiff at this time.

Let me turn to defendants, please.

*(Pause.)*

THE COURT:  Ms. McGimsey --

MS. McGIMSEY:  Yes, your Honor.

THE COURT:  -- am I pronouncing your name properly?

MS. McGIMSEY:  You are.

THE COURT:  If I mispronounce it, please let me know.

MS. McGIMSEY:  You got it just right.

THE COURT:  Same thing.  I've got some questions and then I'll ask you to make any additional argument that you would like to.

So on this timing issue, in terms of the bailout, at the time of the March 17th, 2023 -- I guess it was an 8K

32

and a press release on that day, correct?

MS. McGIMSEY:  Correct.

THE COURT:  Had the bank -- and this may or may not be in the record -- had the bank received or sought a bailout at that time?

MS. McGIMSEY:  Your Honor, I think the first thing we need to do is to put this into context and sort of correct the assumption or assertion that this was a bailout. This wasn't a bailout.

THE COURT:  Okay.  I don't want to get caught up in a characterization.  And that's fine.  I understand your point.  But there was a -- the bank sought some sort of financial assistance from the Government.  Is that fair?

MS. McGIMSEY:  The bank, as is disclosed repeatedly in filing after filing after filing, we talked a little bit about primary liquidity and secondary liquidity. And as the bank consistently disclosed, its secondary liquidity was the ability to tap into lending from the Federal Home Loan Bank -- I think it was -- of San Francisco and the Federal Reserve Bank.

THE COURT:  So instead of "bailout," what if I used the words exercise its ability to tap into secondary liquidity?

MS. McGIMSEY:  That would work, Your Honor.

THE COURT:  So on March 17th of 2023, had the bank

*Deborah D. Parker, U.S. Court Reporter*

attempted to or actually tapped into its secondary liquidity sources?

MS. McGIMSEY:  I don't think there's any allegation, Your Honor, as to whether they had or hadn't at that point in time.

THE COURT:  It's not in the record?

MS. McGIMSEY:  It's not in the record.

THE COURT:  And then help me out.  March 22nd, 2023, the bank disclosed that it had tapped into that secondary liquidity?

MS. McGIMSEY:  Correct.

THE COURT:  Okay.  Was there any way for investors to know before March of 2023 that the bank largely held long-term securities?

MS. McGIMSEY:  Yes, Your Honor.  I think we cited various points in the record in the chart that we -- the chart that we provided has an appendix.  The bank regularly consistently, quarter after quarter, disclosed the entirety of the composition of its securities portfolio.  It disclosed the types of securities.  It disclosed the duration of the securities.  It disclosed the interest rates for the securities, and it also disclosed the unrealized losses on those securities.

THE COURT:  Okay.  Hold on one second, please.

When you say chart, you're referring to Appendix A

34

of your opening brief?

MS. McGIMSEY:  I am.

THE COURT:  Where specifically can I look there to see that investors were provided with that information about the bank largely holding long-term securities?

MS. McGIMSEY:  So this would be on page A4 of the chart in the first column.  We cited it for both the disclosure of the primary liquidity and the disclosure of the amount of AFS securities.

THE COURT:  So page A4?

MS. McGIMSEY:  In the first box.

THE COURT:  First box.  Got it.  Is that the best place for me to look?

MS. McGIMSEY:  That is, Your Honor.

THE COURT:  Got it.  Thank you.

Does the record disclose whether or not defendants had already sold securities to meet liquidity needs when they told investors that they did not foresee having to sell securities to meet liquidity needs?

MS. McGIMSEY:  Your Honor, I think on that allegation, it's important because to look at the specific -- the specific allegations -- the disclosure, the statement and the allegation, the statement itself -- and you're correctly quoting the statement:

"We do not foresee having to sell any

35

impaired securities strictly for

liquidity needs."

Now, the bank did disclose when it sold securities at a loss.  But there's no allegation in the complaint, no factual allegation that demonstrates that they had to sell securities for liquidity needs.  And that's a different thing than selling securities for a loss, because the bank was trying to reposition its balance sheet and get some of the losses off of its balance sheet.  The statement --

THE COURT:  So the purpose of the sale matters.

MS. McGIMSEY:  The purpose of the sale matters. And the purpose of the sale matters a lot in the context of why we're here.  Remember, because we're here not -- our position is -- not because of statements that were made about net interest income in 2022.  We're here because in March -- on March 10th of 2023, the California Regulator closed Silicon Valley Bank after a period of two days -- one day where investors were withdrawing a million dollars a minute and all of a sudden there was a huge concern about there being runs on the bank.  And that goes directly to the issue of:  Will the bank have to sell securities to meet liquidity needs?

The bank here was disclosing -- to the extent it had changes in its deposit levels, it disclosed those.  And it didn't -- there's no -- there's no allegation that they

*Deborah D. Parker, U.S. Court Reporter*

36

needed to sell securities because too many depositors were taking their money out of the bank.  The allegation here is only that they sold securities -- some securities at a loss, and it was disclosed.

THE COURT:  So I understood Mr. Calandra to tell me that in paragraphs 74 and 83 of the first-amended complaint, plaintiffs allege that in Q2 and Q4, defendants disclosed both that they -- I'm paraphrasing somewhat -- disclosed both that they would not need to sell securities but also that they did sell securities.

MS. McGIMSEY:  So I think there's two different allegations here.  There's one, the allegation that they're not going to sell securities; and then, there's the allegation that we believe that we will not be required to sell securities.  And there's a timing issue.  And I don't think that the complaint alleges that at the time that they said "We would not be required to sell any impaired securities before recovery of their amortized costs" --

THE COURT:  Slow down just a bit.

MS. McGIMSEY:  Sorry.  And this was an assurance in Q1 of 2022.  There's no allegation that they, in fact, had at that time -- had to sell those securities.  Now, they did later sell securities at a loss.  But at that time, there's not an allegation that they had already when they made that statement sold securities -- impaired securities

37

before recovery of their amortized cost which is what the statement says.

(Pause.)

THE COURT:  So is it defendants' position or argument that mismanaging a corporation, mismanaging a bank is different than telling investors that you're doing a good job managing the bank when you know that you're not?

MS. McGIMSEY:  Well, yes, Your Honor, for a couple of reasons.  I mean, one, we would say that -- whatever words are used, telling investors that we're doing a good job managing the bank would not be a material misstatement, because it would amount to corporate puffery or however you want to characterize it.  Because that's not a statement that any reasonable investor could rely on in articulating what it means to be doing a good job.  So we would say that it's a very different thing.

The question here is, you know, looking at the very specific statements that were made.  Were those statements false or misleading?  And, really, when you look at this case, it's -- I know that co-counsel pointed to a couple of statements that they contend are false on their face.  But when you look at the complaint as a whole, it's about omissions.  It is really about the failure -- failure to disclose the alleged over-reliance on long-dated, interest rate sensitive securities which was disclosed every

single quarter and the alleged failure to disclose that the AFS securities portfolio was not hedged, which was also disclosed by virtue of detailed disclosures about what was hedged.  And so while their words *We did not hedge the AFS securities portfolio* do not appear in the securities filing, you had a colloquy --

(Court Reporter requests clarification for the record.)

THE COURT:  Slow down.

MS. McGIMSEY:  Sorry.

THE COURT:  -- colloquy with --

MS. McGIMSEY:  -- colloquy with counsel about what a reasonable investor would discern from these filings.  And we would submit that any reasonable investor would read these disclosures -- these detailed disclosures about the derivative instruments that were used for hedges and understand that the AFS securities portfolio was not hedged. The disclosures are very clear about the types of hedging instruments that it uses.  It discloses -- it details what they are and then it details the amounts.

And any reasonable investor would review this and see that there's no hedging of the AFS portfolio.  And one of the reasons -- well, one of the arguments that sort of counsel relies on, on this sort of broader statements about risk management is that any investor would have assumed that

*Deborah D. Parker, U.S. Court Reporter*

this was hedged.

        But if that's the case, if the AFS portfolio is so big and so material to the bank's liquidity, any reasonable investor would assume that if there were hedges, they would be disclosed in the pages -- the three pages of every single securities filing that they made that disclosed what was hedged.  And it wasn't there.  And that was sufficient to alert any reasonable investor that the securities portfolio was not hedged.

        THE COURT:  And you agree that that's the standard that I use when I look at the complaint:  The reasonable investor standard.  What would the reasonable investor have known or understood or be misled about?

        MS. McGIMSEY:  Yes.

        THE COURT:  Can you help me with that?  How do I know how a reasonable investor would interpret these statements?

        MS. McGIMSEY:  I think that's a difficult question, Your Honor.  I think you have to look at the statements overall and what would be -- what you would believe a reasonable investor would consider material and the case law as to what needs to be disclosed.  Unfortunately, there's not -- you know, it's not -- there's no sort of magic bullet as to how you discern what a reasonable investor would discern.  A lot of it is just

40

common sense.

And, you know, the question is: Would a reasonable investor expect the bank to disclose everything it's not doing when it's got every quarter after quarter, 150 pages of disclosures about what it is doing? And we would submit that they would not.

THE COURT: On a Rule 12(b)(6) motion, I have to take every plausible allegation that a plaintiff makes as true and any reasonable inferences from those plausible allegations I have to take in favor of the plaintiff, correct?

MS. McGIMSEY: Correct.

THE COURT: What about this reasonable investor standard? Does the -- stating it colloquially, does the plaintiff get the benefit of the doubt in terms of my view of what a reasonable investor would know and understand and conclude?

MS. McGIMSEY: No, Your Honor. A reasonable investor -- the reasonable investor standard is the reasonable investor standard. Unfortunately, what you're getting at is there's not a lot of sort of meat on the bone in terms of the case law as to what a reasonable investor would expect, because a lot of it is just -- it's common sense. There's no expectation that a reasonable investor be the most sophisticated investor but also no expectation that

*Deborah D. Parker, U.S. Court Reporter*

a -- you know, that the disclosures would have to be easily discernible by the least informed investor.

Because there's the presumption, right? -- and this goes to the whole market efficiency issue -- that, you know, the group of investors as a whole take in the information and then that information gets priced into the market.  So it comes to sort of a middle ground of the least sophisticated investors and the most sophisticated investors, and they take the information they incorporated and it gets incorporated into the market price.  Unfortunately, that doesn't really give you, again, a standard to use for the reasonable investor.  I wish I could cite a case for you that would tell you exactly how to discern that.

What we would argue is:  Just look at the disclosures.  And when you read the disclosures as a whole and you read a disclosure that discloses *This is how we used derivative instruments* and there's no disclosure that the AFS portfolio is hedged, it's not reasonable to assume that the AFS portfolio is hedged.  And plaintiffs' response to that is, *Well, these other statements about our comprehensive risk management process, that's what would make a reasonable investor think that this was hedged,* but the cases are very, very clear that a reasonable investor doesn't really take into account statements like we have a

42

comprehensive risk management process. They don't even look at that, because --

THE COURT: That's puffery.

MS. McGIMSEY: That's puffery, because what does that mean, right?

THE COURT: We're a good bank.

MS. McGIMSEY: Right.

THE COURT: Okay. I asked plaintiffs' counsel about -- at some point defendants stopped reporting the liquidity ratio. How would investors have been able to find or calculate the bank's liquidity ratio at that point? And he said investors could not.

Do you have a different answer?

MS. McGIMSEY: We disagree, Your Honor.

The inputs to the liquidity ratio, the amount of deposits and then the assets that were used for primary liquidity were disclosed. There were, you know, again, quarter after quarter after quarter of filings that described what primary liquidity is, what secondary liquidity is.

THE COURT: So November of 2022, that's when plaintiffs' counsel says that defendants at some point -- at that time defendants did not report the liquidity ratio.

MS. McGIMSEY: Correct.

THE COURT: That's the allegation.

*Deborah D. Parker, U.S. Court Reporter*

43

MS. McGIMSEY:  Yeah.

THE COURT:  If an investor wanted to determine the liquidity ratio in November of 2022, how would an investor have been able to do that?  Would the investor have to look at the previous disclosures?  And what previous disclosure would that be?

MS. McGIMSEY:  They could start just by looking at the disclosure itself in which the quarterly filing, which we have at Exhibit 9, pages 177 to 180, which at 177 has detailed information about the deposits and then following that there's detailed information about the company's liquidity and how that liquidity was comprised.

Now, there's -- there's some sort of focus on kind of the terminology:  Primary versus secondary liquidity.  We don't think that matters.  Those are terms that make things sort of easier to bucket things.  But the same information is disclosed as to, sort of, what the liquidity is, right?  What -- how much is cash?  How much are securities?  How much is interest on funds that are placed in other banks?  And then also, you know, without necessarily using the term "secondary liquidity," how much is borrowings -- potential borrowings that they could make from the Federal Home Loan Bank, or the Federal Reserve Bank.

THE COURT:  I don't want to belabor this too much, but the bank previously disclosed its liquidity ratio in

44

previous filings --

MS. McGIMSEY:  Yes.

THE COURT:  -- correct?

MS. McGIMSEY:  Yes.

THE COURT:  Actually gave a number?

MS. McGIMSEY:  It did.

THE COURT:  And no number is given by the bank in the November 22 disclosure, correct?

MS. McGIMSEY:  Correct.

THE COURT:  But you're saying an investor could calculate it -- could calculate the same number -- I mean, using the same formula that the bank used for the liquidity ratio in previous filings, an investor could figure that out from -- you've pointed to Exhibit 9 pages 177 to 180. That's your contention?

MS. McGIMSEY:  Correct.  And I think there's too much focus on sort of the liquidity ratio itself.  That's just math, right?  The real issue for a reasonable investor is how -- what are the deposits?  How much liquidity is there to cover those deposits?

Now, again, post-Silicon Valley Bank failure, there's a lot more focus on this because of the run on the bank which, you know, had not, obviously, happened for many, many, many years.  And so there may be more focus on liquidity ratios and more focus on needing a higher

45

liquidity ratio.  But, ultimately, the information that any investor who was concerned about a bank's liquidity to cover its deposit liabilities had the information right there: Here's what the deposit liabilities are.  Here's what the assets are that are available to cover those liabilities.

You don't need to do the math in order to see that, you know -- I don't have the numbers in my head, but if you have 30 -- you know, $30 billion of deposits in one quarter and, you know, $15 billion of primary liquidity in one quarter and the next quarter it's 10, you don't need to do the math for a reasonable investor to understand that the liquidity ratio, if you want to look at ratios, has fallen. You can do the math.  The information was right there that -- the information that would be material to any investor -- the amount of deposits in the amount of liquidity available -- was consistently disclosed.

Now, we don't dispute the fact, couldn't dispute the fact that the nature and the way that it was disclosed changed.  But if you look at the principal case that the plaintiffs rely on *Delaware County versus AdaptHealth*, which is from the Eastern District of Pennsylvania, in 2022, that's a completely different situation, because there, there had been a reporting of growth that was broken out by strategic growth and organic growth -- so strategic acquisitions and organic growth.  And then they started to

46

reporting that number together. And what the Court focused on was that there's no way to know from these disclosures how much of the growth is from organic growth. This is entirely different. If an investor wanted to know the liquidity ratio, they just do the math.

THE COURT: Okay. Final question. And I'm not sure this bears on my decision on this motion, but I'm curious. What's going on in similar cases involving, say, Silicon Valley Bank?

There's a case that Judge Donato has up in the Northern District, correct?

MS. McGIMSEY: Correct.

THE COURT: What's the status of that case?

MS. McGIMSEY: I believe the status is that he's taken the motion to dismiss under submission but has not issued a ruling was the last to my understanding that I saw.

THE COURT: Are there other cases that involve -- probably not your clients here, but Silicon Valley Bank or other similar -- let me just say similarly situated banks?

MS. McGIMSEY: We would in the first instance say that we're not a similarly situated bank, because you have to look at all --

THE COURT: Fair enough.

MS. McGIMSEY: -- the disclosures collectively and each bank has its own different disclosures.

47

I don't know, Your Honor, if there's a security litigation that arose out of the First Republic closure or out of Signature Bank.  I would expect that there are, given where we are these days, but I don't know.

THE COURT:  Okay.  All right.  I want to hear argument now, but, first, Madam Court Reporter, do you need a break?

We've got an 11:00 o'clock matter.  We have to loop back to that 9:00 o'clock matter.  Do you want a short break now?

THE COURT REPORTER:  I think so, Your Honor.

THE COURT:  Okay.  All right.  We've been going for an hour and 10 minutes or so on this case.  Let's take a 10-minute break, and I'll hear some more.  I'll hear argument.  I'm not sure --

Let me ask:  How much argument do you think you have?

MS. McGIMSEY:  Your Honor, not very much.  I think that your questions hit on all of the key points.  If plaintiff has a few points that they want to make -- plaintiffs' counsel -- we would probably have some response.

THE COURT:  So maybe 10 minutes, per side?  Is that enough?

MR. CALANDRA:  I have four sentences.

THE COURT:  Okay.  So maybe less than 10 minutes.

*Deborah D. Parker, U.S. Court Reporter*

And the reason I'm asking you is to give a heads-up to counsel for my 11:00 o'clock matter.

Thank you for your patience.  Sorry this is taking -- sorry for you it's taking longer than I'd hope, but this is very helpful to me.

So 10-minute break.  And then we'll come back on this case, and then we'll go to 11:00 o'clock calendar.

Madam Clerk?

*(The Court confers with the clerk.)*

THE COURT:  Well, let's give it a shot.

Counsel, sometimes misreport how long they're arguing.

*(Laughter.)*

MS. McGIMSEY:  We're going to be counting sentences.

THE COURT:  Well, I intended, Ms. McGimsey, to turn to you.  Did you have any argument beyond the answers to my question?

MS. McGIMSEY:  We would just like the opportunity to respond to plaintiffs' counsel.

THE COURT:  It's your motion, so I'll give you the last word.  So thank you.

Okay. Mr. Calandra.

MR. CALANDRA:  Your Honor, when you asked about whether defendants had disclosed that their sales at a loss

49

were for capital and liquidity, my adversary said that they were not.  But if you look at the plain text of paragraph 83, at least as alleged in the complaint, with regard to Q4, the bank said, *We sold these at a loss to* "improve the capital and liquidity position of the bank." And in the same document said that they saw no need to do that.

The second point I wanted to make was, it was discussed at length about what a reasonable investor would take away from the lack of a disclosure of hedging the AFS portfolio.  In paragraph 60, which I, unfortunately, couldn't pull when I was at the podium earlier, the merger proxy disclosed that it was unhedged.  If a reasonable investor would know that the AFS portfolio was unhedged, there would be no need later to make that disclosure.  And it's -- the reason why it was disclosed is because the value of the AFS portfolio could not be set, given that it was unhedged.

And then, finally, Your Honor, with regard to the liquidity ratio, although the line items were there, instructions for how to calculate it or even the fact that a liquidity ratio had been previously disclosed were not.  So the only way an investor would be able to know if they needed a liquidity -- to calculate a liquidity ratio would be to go back in time.

50

THE COURT:  You told me earlier that you were able to back into it.

MR. CALANDRA:  Correct.  Only because when they resumed something that was alighted, if this was so meaningless and just math, why did they then resume disclosing it after everything was fine?  And the only reason I was able to do that was because I saw that later they were still using the same formula and were deriving at a different formula based on those numbers.

A lot of commas in there.  I still say that's four sentences.

*(Laughter.)*

THE COURT:  Fair enough.  Thank you, Counsel.

Reply, please.

MS. McGIMSEY:  Thank you, Your Honor.

Just to address those few points.  Counsel pointed to paragraph 83 that refers to the sale of AFS securities at a loss.  The disclosure makes clear it was to improve the capital and liquidity position of the bank.  That's not the same as the needing to sale securities to satisfy liquidity needs.

And second point regarding the disclosure of the hedging and the merger proxy, the paragraph 60, I'm not exactly sure what the language is because paragraph 60 doesn't actually quote the merger proxy.  But the fact that

*Deborah D. Parker, U.S. Court Reporter*

51

there may be in a merger proxy a disclosure relating to hedging does not necessarily imply that the prior disclosures were unclear, because it's being made in a very different context.

And if you actually look at the merger proxy, it makes the same -- very same disclosures about the derivative portfolio as the prior quarterly and annual statements.  We did not find any statement in there about the hedging, but it's possible since it wasn't cited in here that we had missed it.

The last point on the liquidity ratio.  Any reasonable investor that knows what a liquidity ratio is can calculate the liquidity ratio.

THE COURT:  And could have done so from what you've presented to me as Exhibit 9.

MS. McGIMSEY:  Correct, Your Honor.

THE COURT:  Okay.

(Pause.)

THE COURT:  All right.  Anything else on this motion?

MR. CALANDRA:  Nothing from plaintiffs, Your Honor.

MS. McGIMSEY:  No, Your Honor.

THE COURT:  All right.  It was a very helpful argument.  Thank you.

52

I'm going to take the motion under submission and give you a written order on it.

On the scheduling conference, as I said earlier, I think I've jumped the gun. I don't think I can actually have a scheduling conference yet until I rule on this motion, assuming that claims survive, correct?

MS. McGIMSEY: Correct.

MR. CALANDRA: Yes, Your Honor.

THE COURT: Okay. All right. Anything else we can accomplish in this case today?

MS. McGIMSEY: No, Your Honor.

MR. CALANDRA: No, Your Honor.

MS. McGIMSEY: We appreciate the time.

MR. CALANDRA: Yes, likewise.

THE COURT: Again, I appreciate the argument. Very interesting case. I'll think about this and get you an order as soon as I can and then we'll take it from there.

I don't know what I'm going to do. So if claims survive, then we'll proceed to a scheduling conference thereafter.

All right. Counsel, have a good rest of the day and stand by.

MR. CALANDRA: Thank you. You as well, Your Honor.

THE CLERK: All rise. This Court is in recess.

*Deborah D. Parker, U.S. Court Reporter*

53

*(At 11:22 a.m., proceedings were adjourned.)*

-oOo-

*Deborah D. Parker, U.S. Court Reporter*

54

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  November 1, 2024

_____/s/DEBORAH D. PARKER___
DEBORAH D. PARKER, OFFICIAL REPORTER

*Deborah D. Parker, U.S. Court Reporter*

MR. CALANDRA: [71]
MR. PARIS: [1] 3/16
MS. BLACK: [1] 3/19
MS. McGIMSEY: [51]
 3/13 31/14 31/17 31/20
 32/2 32/6 32/14 32/24
 33/3 33/7 33/11 33/15
 34/2 34/6 34/11 34/14
 34/20 35/11 36/11
 36/20 37/8 38/10 38/12
 39/14 39/18 40/12
 40/18 42/4 42/7 42/14
 42/24 43/1 43/7 44/2
 44/4 44/6 44/9 44/16
 46/12 46/14 46/20
 46/24 47/18 48/14
 48/19 50/15 51/16
 51/23 52/7 52/11 52/13
THE CLERK: [2] 3/3
 52/25
THE COURT
REPORTER: [1] 47/11
THE COURT: [117]

**$**

$15 [1] 45/9
$15 billion [1] 45/9
$30 [1] 45/8
$30 billion [1] 45/8

**'**

'22 [1] 26/14

**-**

-o0o [1] 3/2
-oOo [1] 53/2

**/**

/s/DEBORAH [1] 54/12

**0**

01685 [1] 3/4
053 [1] 1/22

**1**

1-053 [1] 1/22
1.5 [1] 28/25
1.5 million [1] 29/1
10 [7] 19/17 19/21 20/9
 45/10 47/13 47/22
 47/25
10-K [2] 6/11 26/23
10-Ks [1] 7/11
10-minute [2] 47/14
 48/6
10-Q [6] 6/10 13/25
 14/11 14/12 26/22 29/8
10-Qs [2] 7/11 14/5
100 [1] 24/23
10016 [1] 2/5
102 [1] 10/5
103 [1] 10/4
10342 [1] 1/20
10:00 [2] 1/17 3/1
10th [3] 8/13 26/25
 27/8
1100 [1] 2/6
118 [2] 25/3 25/4

11:00 [2] 47/8 48/2
11:00 o'clock [1] 48/7
11:22 [1] 53/1
12 [4] 18/5 18/15 19/18
 40/7
125 [3] 5/3 5/18 5/20
127 [3] 5/3 5/18 5/20
147 [1] 5/21
15 [1] 20/9
150 [1] 40/5
16th [1] 10/24
17 [1] 30/24
177 [3] 43/9 43/9 44/14
17th [11] 8/13 8/18 9/3
 9/6 10/10 10/15 11/3
 11/13 12/11 31/25
 32/25
180 [2] 43/9 44/14
1888 [3] 2/10 2/14 2/18
19 million [1] 7/1

**2**

2 million [1] 29/1
2 percent [1] 27/6
200 [2] 2/10 2/14
2013 [1] 30/23
2022 [19] 5/25 6/10
 6/11 7/5 12/22 12/22
 12/23 12/23 13/8 13/10
 13/15 26/22 26/22
 27/12 35/15 36/21
 42/21 43/3 45/21
202210-Q [1] 26/22
2023 [14] 8/18 9/3 10/2
 12/23 16/2 16/14 24/17
 25/9 27/14 31/25 32/25
 33/9 33/13 35/16
2024 [3] 1/16 3/1 54/9
20th [1] 2/5
2100 [1] 2/18
212 [1] 2/6
22 [1] 44/8
229-4305 [1] 1/23
22nd [4] 9/6 10/2 11/15
 33/8
24 [1] 30/14
25 [2] 1/16 3/1
25 percent [1] 26/15
27 [1] 30/14
28 [1] 54/3

**3**

30 [1] 45/8
310 [3] 2/11 2/15 2/19
35 million [1] 7/2

**4**

4 percent [1] 27/7
411 [1] 1/22
4305 [1] 1/23
49 [2] 30/9 30/10

**5**

50 [1] 24/22
54 [2] 30/10 30/12
5486762 [1] 30/23

**6**

60 [3] 49/11 50/23
 50/24

600 [1] 2/4
61 [1] 13/13
65 [3] 7/7 24/21 24/22
657 [1] 1/23
6600 [1] 2/11
661-1100 [1] 2/6
6640 [1] 2/19

**7**

712-6600 [1] 2/11
712-6640 [1] 2/19
712-8800 [1] 2/15
73 [2] 30/10 30/12
74 [3] 13/21 14/13 36/6
75 [1] 13/20
753 [1] 54/2
77 [1] 20/4
770 [1] 20/1
78 [2] 20/3 20/4
78J [2] 20/9 20/18
78T [2] 20/10 20/18
78U [1] 20/18
78U-4 [2] 20/9 20/13

**8**

80.7 [1] 13/13
80.7 percent [1] 13/12
83 [5] 13/22 14/13 36/6
 49/3 50/17
8800 [1] 2/15
8:23-cv-01685-JWH [1]
 1/9
8K [1] 31/25

**9**

90 percent [1] 17/24
90067 [3] 2/11 2/15
 2/19
92701 [1] 1/23
97 percent [1] 9/12
99 [1] 6/6
99.7 [1] 6/2
99.7 percent [1] 6/6
99.8 percent [1] 6/7
9:00 [1] 47/9
9th [1] 29/2

**A**

a.m [3] 1/17 3/1 53/1
A4 [2] 34/6 34/10
ability [3] 17/3 32/18
 32/22
able [8] 25/11 26/16
 27/11 42/10 43/4 49/23
 50/1 50/7
about [36] 7/4 8/15
 10/1 10/13 14/16 19/9
 19/14 22/15 23/8 25/14
 25/14 28/19 32/16 34/4
 35/15 35/19 37/23
 37/23 38/3 38/12 38/15
 38/18 38/24 39/13 40/5
 40/13 41/21 42/9 43/10
 43/11 45/2 48/24 49/9
 51/6 51/8 52/16
above [1] 54/5
above-entitled [1] 54/5
absolutely [1] 16/4
absurd [1] 16/4
accept [1] 10/25

accepting [1] 19/1
accomplish [1] 32/10
account [2] 16/25
 41/25
accretion [1] 30/3
acknowledging [1]
 13/3
acquisitions [1] 45/25
act [1] 23/1
actionable [1] 23/4
actual [4] 11/8 11/10
 11/18 11/20
actually [10] 4/5 12/19
 20/5 20/15 25/11 33/1
 44/5 50/25 51/5 52/4
ADAM [2] 2/13 3/17
AdaptHealth [1] 45/20
Add [1] 28/6
addition [1] 5/20
additional [1] 31/22
address [2] 14/25
 50/16
addressed [1] 7/5
adjourned [1] 53/1
admissions [1] 14/20
adversary [1] 49/1
advised [1] 18/1
affected [1] 17/25
affirmatively [3] 7/8
 8/2 15/2
afloat [1] 10/7
AFS [20] 6/7 17/13
 17/20 19/12 22/23
 23/10 28/10 28/12 34/9
 38/2 38/4 38/17 38/22
 39/2 41/19 41/20 49/11
 49/14 49/17 50/17
AFS portfolio [2] 6/7
 49/11
after [12] 13/15 20/22
 30/7 30/24 32/15 32/15
 33/18 35/17 40/4 42/18
 42/18 50/6
again [7] 4/17 7/21
 14/18 41/11 42/17
 44/21 52/15
against [1] 29/9
agree [1] 39/10
agreement [1] 25/9
ahead [1] 6/15
al [3] 1/10 2/8 3/5
Aleen [1] 3/10
alert [1] 39/8
alighted [1] 50/4
all [21] 1/6 2/2 3/22
 4/15 5/17 6/5 18/25
 26/21 30/1 30/5 31/9
 35/19 46/22 47/5 47/12
 47/19 51/19 51/24 52/9
 52/21 52/25
allegation [13] 33/4
 34/21 34/23 35/4 35/5
 35/25 36/2 36/12 36/14
 36/21 36/24 40/8 42/25
allegations [12] 4/18
 10/1 10/3 10/12 10/12
 10/17 10/20 24/1 26/9
 34/22 36/12 40/10
allege [16] 7/7 8/17

10/9 10/24 12/12 12/16
 13/12 17/9 20/23 22/5
 23/5 24/20 24/21 26/12
 28/21 36/7
alleged [15] 5/3 12/4
 13/19 14/13 18/17 19/1
 19/2 19/7 22/2 22/4
 23/15 25/16 37/24 38/1
 49/3
allegedly [1] 4/20
alleges [1] 36/16
alleging [2] 4/20 26/11
allows [1] 7/17
almost [1] 21/7
alone [1] 16/11
along [1] 8/8
already [5] 9/4 10/9
 15/15 34/17 36/24
also [15] 4/1 6/21
 11/25 12/12 14/6 15/9
 21/16 24/15 27/18
 29/25 33/22 36/10 38/2
 40/25 43/20
although [4] 10/18
 29/13 30/20 49/20
am [2] 31/15 34/2
amended [3] 3/25 4/16
 36/6
amortized [2] 36/18
 37/1
amount [9] 9/10 18/11
 29/19 29/21 34/9 37/12
 42/15 45/15 45/15
amounts [1] 38/20
ANA [4] 1/3 1/15 1/23
 3/1
analysis [2] 18/15
 18/16
ANGELES [3] 2/11
 2/15 2/19
announced [3] 9/5
 10/2 11/15
announcement [1]
 12/6
annual [1] 51/7
answer [2] 25/21 42/13
answers [1] 48/17
any [32] 4/19 5/21 7/18
 7/24 8/3 11/24 12/11
 15/4 15/20 17/11 21/11
 22/3 22/12 29/22 30/5
 31/22 33/3 33/12 34/25
 36/17 37/14 38/14
 38/21 38/25 39/3 39/8
 40/9 45/1 45/14 48/17
 51/8 51/11
anything [5] 7/19
 15/17 17/12 51/19 52/9
Apologies [1] 13/21
appear [5] 10/20 14/10
 26/7 30/1 38/5
appearances [2] 1/25
 3/6
appendix [2] 33/17
 33/25
appreciate [2] 52/13
 52/15
appreciated [1] 29/14
approach [3] 19/3 24/3

**A**

approach... [1] 25/15
are [60]
argue [1] 41/15
arguing [1] 48/12
argument [15] 4/11 22/20 28/20 28/20 31/4 31/6 31/8 31/22 37/5 47/6 47/15 47/16 48/17 51/25 52/15
arguments [2] 29/9 38/23
arose [1] 47/2
around [1] 27/17
article [9] 16/1 16/18 16/18 16/18 16/19 16/25 17/8 18/20 24/13
articulating [1] 37/14
as [52] 5/9 6/16 6/22 7/7 7/15 8/7 8/11 8/12 11/20 13/6 14/4 14/13 14/17 14/20 14/24 17/18 17/18 18/8 21/1 21/2 21/15 21/15 22/14 22/14 22/20 23/22 25/11 26/8 26/22 26/22 26/22 26/22 28/13 32/14 32/17 33/4 37/22 39/22 39/24 40/8 40/22 41/5 41/16 43/17 49/3 50/20 51/7 51/15 52/3 52/17 52/17 52/23
ask [4] 16/25 26/3 31/22 47/16
asked [3] 25/13 42/8 48/24
asking [5] 10/8 14/15 18/3 18/6 48/1
assert [1] 22/25
asserted [2] 4/7 23/4
assertion [1] 32/8
asset [7] 8/19 8/23 9/8 9/14 10/16 11/13 12/5
Asset Quality [1] 10/16
assets [2] 42/16 45/5
assistance [1] 32/13
assume [3] 15/22 39/4 41/19
assumed [1] 38/25
assuming [2] 11/22 52/6
assumption [1] 32/8
assurance [1] 36/20
assurances [1] 12/21
assured [1] 23/11
Atak [1] 3/10
attacked [1] 5/10
attempt [1] 9/20
attempted [1] 33/1
August [3] 12/23 13/8 13/10
available [9] 13/13 15/10 15/15 15/21 15/22 16/11 18/11 45/5 45/16
AVENUE [1] 2/4
away [1] 49/10

**B**

back [9] 6/19 20/7 22/14 27/20 30/10 47/9 48/6 49/25 50/2
backdrop [1] 20/22
backed [1] 27/14
backing [2] 21/20 25/13
bad [1] 8/15
bailout [20] 9/4 9/6 9/23 9/25 10/1 10/6 10/9 10/13 10/14 10/25 11/14 11/15 11/24 12/7 12/10 31/24 32/5 32/8 32/9 32/21
balance [2] 35/8 35/9
Bancorp [3] 1/10 2/8 3/4
bank [85]
bank's [10] 8/23 21/25 23/8 23/18 24/2 25/14 26/17 39/3 42/11 45/2
bankruptcy [1] 9/23
banks [6] 21/22 23/15 28/6 28/10 43/19 46/19
barked [1] 19/10
based [5] 10/23 18/17 22/5 30/2 50/9
basically [2] 16/2 28/8
basis [4] 11/3 18/7 23/1 24/14
bcalandra [1] 2/6
be [47] 7/11 8/18 9/16 11/16 11/23 13/16 14/1 14/2 14/4 17/25 19/9 19/23 20/4 20/5 23/3 23/21 24/10 25/10 25/21 25/22 25/23 26/18 27/17 29/18 29/22 30/2 32/4 34/6 36/14 36/17 37/11 37/15 39/5 39/13 39/20 39/22 40/24 41/1 43/6 44/24 45/14 48/14 49/15 49/17 49/23 49/25 51/1
Bear [1] 24/25
bears [1] 46/7
because [51] 4/6 4/23 5/23 6/12 7/3 7/19 7/25 9/10 10/21 10/22 11/20 11/24 13/12 13/24 14/21 14/22 15/11 15/15 16/13 17/21 19/19 21/8 21/10 21/14 22/12 23/22 24/6 24/17 25/19 26/19 27/2 34/21 35/7 35/13 35/14 35/15 36/1 37/12 37/13 40/23 41/3 42/2 42/4 44/22 45/22 46/21 49/16 50/3 50/7 50/24 51/3
been [10] 4/17 14/3 17/15 20/5 26/16 42/10 43/4 45/23 47/12 49/22
before [7] 30/15 30/22 31/6 31/6 33/13 36/18 37/1
began [2] 6/25 15/14

**C**

beginning [1] 3/7
behalf [4] 1/6 2/2 3/9 3/14
being [5] 5/10 22/7 29/10 35/20 51/3
belabor [1] 43/24
believe [7] 9/6 10/4 20/16 24/22 36/14 39/21 46/14
believed [1] 11/12
below [1] 26/15
beneficial [1] 21/23
benefit [6] 8/2 15/5 17/19 21/15 30/17 40/15
best [1] 34/12
bet [2] 20/5 20/8
between [2] 30/13 30/21
beyond [1] 48/17
big [1] 39/3
billion [2] 45/8 45/9
bit [3] 28/18 32/16 36/19
BLACK [3] 2/17 3/20 30/1
blackcar [1] 2/20
bone [1] 40/21
borrowings [2] 43/21 43/22
both [6] 14/1 14/6 14/10 34/7 36/8 36/9
box [2] 34/11 34/12
break [4] 47/7 47/10 47/14 48/6
BRIAN [2] 2/3 3/9
bridge [2] 16/12 16/12
brief [1] 34/1
briefing [1] 27/11
bring [2] 19/20 30/6
broader [1] 38/24
broken [1] 45/23
brought [1] 16/3
bucket [1] 43/16
bullet [1] 39/24
buy [1] 29/23

**C**

CALANDRA [6] 2/3 3/9 3/11 4/9 36/5 48/23
calculate [9] 26/17 27/12 27/23 42/11 44/11 44/11 49/21 49/24 51/13
calculating [2] 26/20 27/13
calendar [1] 48/7
CALIFORNIA [8] 1/2 1/15 1/23 2/11 2/15 2/19 3/1 35/16
call [1] 16/8
Calling [1] 3/3
calls [1] 7/11
can [20] 7/22 15/17 16/12 18/19 19/5 20/1 20/1 20/7 22/12 24/16 26/4 26/8 26/24 34/3 39/15 45/13 51/12 52/4 52/10 52/17
can't [3] 7/23 8/4 19/21

capital [3] 49/1 49/5 50/19
capitalize [1] 29/7
capitalized [1] 17/17
capitalizing [2] 26/25 29/18
CAROLINE [2] 2/17 3/20
cartoon [1] 8/9
case [19] 3/4 4/3 11/17 27/18 29/13 30/8 30/16 37/20 39/2 39/22 40/22 41/13 45/19 46/10 46/13 47/13 48/7 52/10 52/16
Case No. 8:23-cv-01685 [1] 3/4
cases [7] 4/5 14/1 27/19 29/14 41/24 46/8 46/17
cash [4] 28/4 28/9 29/16 43/18
catching [1] 8/10
caught [1] 32/10
causation [1] 11/2
cautionary [1] 7/4
CENTRAL [1] 1/2
CENTURY [3] 2/10 2/14 2/18
CEO [1] 28/23
certainly [7] 9/14 12/2 13/9 13/10 14/21 15/13 22/14
CERTIFICATE [1] 53/3
CERTIFIED [1] 1/5
certify [1] 54/2
challenge [2] 5/13 16/20
challenging [2] 12/2 17/3
change [1] 13/1
changed [1] 45/19
changes [1] 35/24
characterization [1] 32/11
characterize [1] 37/13
chart [5] 28/25 33/16 33/17 33/25 34/7
circumstances [2] 19/7 19/8
cite [5] 16/1 20/5 29/13 30/8 41/13
cited [5] 17/8 27/18 33/15 34/7 51/9
claim [2] 11/24 12/2
claiming [1] 22/25
claims [8] 4/7 11/17 11/17 21/14 23/1 23/4 52/6 52/18
clarification [2] 6/3 38/7
class [6] 6/25 8/8 13/8 15/14 29/3 29/5
clear [4] 27/15 38/18 41/24 50/18
clearly [1] 7/3
clerk [2] 48/8 48/9
clients [1] 46/18
cliff [1] 11/7

cliff's [1] 11/5
closed [1] 35/17
closer [2] 9/17 29/1
closure [1] 47/2
club [3] 7/21 7/22 7/23
co [1] 37/20
co-counsel [1] 37/20
code [2] 19/5 54/3
cognizant [1] 7/3
collapse [1] 14/22
collapsed [1] 30/15
collectively [1] 46/24
colloquially [1] 40/14
colloquy [3] 38/6 38/11 38/12
column [1] 34/7
combined [1] 21/16
come [6] 6/19 8/1 19/13 19/15 20/7 48/6
comes [1] 41/7
comfortable [1] 7/13
comic [1] 8/9
coming [2] 7/18 15/15
commas [1] 50/10
common [2] 40/1 40/23
company [1] 9/21
company's [1] 43/11
compare [1] 8/5
comparing [1] 27/20
complaint [16] 4/1 4/16 4/18 6/22 10/21 24/19 26/4 26/8 26/10 26/10 35/4 36/7 36/16 37/22 39/11 49/3
completely [5] 17/22 29/4 29/16 30/4 45/22
composite [1] 24/15
composition [1] 33/19
comprehensive [13] 5/4 17/16 19/14 21/2 21/13 24/2 24/7 24/9 25/14 25/20 25/22 41/22 42/1
comprised [1] 43/12
concern [1] 35/19
concerned [2] 19/9 45/2
concerns [1] 14/25
conclude [1] 40/17
conclusion [2] 19/13 19/15
condition [2] 23/9 23/19
conference [6] 4/1 4/2 52/3 52/5 52/19 54/7
confers [1] 48/9
confirmed [2] 25/16 28/19
conformance [1] 54/6
consider [2] 29/22 39/21
consistently [3] 32/17 33/18 45/16
construction [1] 11/4
contains [1] 5/22
contend [1] 37/21
contention [1] 44/15
context [5] 19/6 19/7

**C**

context... [3] 32/7 35/12 51/4
continued [1] 14/3
contrast [1] 12/19
corporate [1] 37/12
corporation [1] 37/5
correct [33] 6/24 8/21 10/11 11/18 12/8 12/9 12/17 14/9 14/14 18/6 18/7 23/5 24/5 28/2 28/12 32/1 32/2 32/8 33/11 40/11 40/12 42/24 44/3 44/8 44/9 44/16 46/11 46/12 50/3 51/16 52/6 52/7 54/4
corrected [2] 10/22 30/21
correcting [1] 13/3
correctly [1] 34/24
cost [1] 37/1
costs [1] 36/18
could [13] 12/1 25/23 26/16 37/14 41/12 42/12 43/7 43/22 44/10 44/11 44/13 49/17 51/14
couldn't [3] 26/19 45/17 49/12
counsel [16] 2/1 3/6 3/22 19/20 37/20 38/12 38/24 42/8 42/22 47/21 48/2 48/11 48/20 50/13 50/16 52/21
counting [1] 48/14
County [1] 45/20
couple [5] 16/17 27/18 29/9 37/8 37/21
course [5] 5/14 5/14 11/9 23/21 25/2
COURT [9] 1/1 1/21 1/21 6/3 38/7 46/1 47/6 48/9 52/25
courts [2] 29/14 30/20
cover [4] 29/16 44/20 45/2 45/5
created [1] 17/19
critical [1] 13/18
CROMWELL [6] 2/9 2/13 2/17 3/14 3/17 3/20
crossed [1] 25/10
CSR [1] 1/20
curious [2] 12/5 46/8
cv [2] 1/9 3/4

**D**

danger [3] 22/10 22/15 25/5
dark [1] 8/15
Date [1] 54/9
dated [1] 37/24
day [4] 9/3 32/1 35/18 52/21
days [5] 11/14 12/6 12/10 35/17 47/4
ddparker.com [1] 1/24
debate [3] 7/21 7/22 7/23

DEBORAH [3] 1/20 34/12 54/12
December [2] 29/3 30/14
decision [3] 22/23 23/10 46/7
declare [1] 9/22
decline [2] 8/4 17/18
declined [1] 8/23
declines [2] 15/10 21/16
defendant [5] 4/10 5/7 5/9 14/2 30/1
Defendant Black [1] 30/1
defendants [45] 1/11 2/8 3/15 3/18 3/21 4/19 7/3 9/2 9/3 10/5 10/18 10/24 11/2 11/11 12/21 13/17 13/23 13/24 14/3 14/5 14/24 16/6 16/20 16/20 16/24 17/3 17/11 18/1 22/11 22/25 24/16 25/6 27/10 27/17 28/22 29/9 30/6 31/2 31/11 34/16 36/7 42/9 42/22 42/23 48/25
defendants' [9] 3/25 5/9 6/22 9/1 10/22 11/22 14/16 21/21 37/4
defense [1] 27/21
define [1] 28/3
definitely [1] 19/11
definition [1] 27/17
defrauded [1] 23/6
Delaware [1] 45/20
demonstrates [1] 35/5
deny [1] 14/4
Depending [1] 28/3
deposit [6] 15/22 17/23 17/23 35/24 45/3 45/4
depositor [1] 27/7
depositors [2] 27/5 36/1
deposits [13] 7/1 9/10 17/22 18/11 24/14 27/25 28/10 42/16 43/10 44/19 44/20 45/8 45/15
derivative [3] 38/16 41/18 51/6
derivatives [2] 16/8 16/8
deriving [1] 50/8
described [1] 42/19
describing [2] 15/3 17/15
designed [1] 7/12
detail [1] 13/6
detailed [4] 38/3 38/15 43/10 43/11
details [2] 38/19 38/20
determine [1] 43/2
DIANE [2] 2/9 3/14
did [24] 5/10 5/16 6/13 9/22 12/25 17/12 17/15 24/6 25/10 25/10 25/19 25/21 26/6 29/8 34/18 35/3 36/10 36/23 38/4

42/23 44/6 48/17 50/5 51/8
didn't [11] 9/22 16/6 17/8 22/12 22/13 23/9 23/12 30/5 30/17 31/1 35/25
difference [1] 22/12
different [13] 5/24 20/16 29/23 35/6 36/11 37/6 37/16 42/13 45/22 46/4 46/25 50/9 51/4
differently [2] 27/8 29/18
difficult [3] 22/6 22/8 39/18
dipped [1] 26/14
direct [1] 22/7
directly [3] 9/20 17/25 35/20
disagree [3] 5/12 21/3 42/14
discern [4] 38/13 39/24 39/25 41/14
discernible [1] 41/2
disclose [10] 4/23 6/13 16/16 21/25 22/3 34/16 35/3 37/24 38/1 40/3
disclosed [29] 10/5 13/24 16/14 32/14 32/17 33/9 33/18 33/20 33/20 33/21 33/22 35/24 36/4 36/8 36/9 37/25 38/3 39/5 39/6 39/22 42/17 43/17 43/25 45/16 45/18 48/25 49/13 49/16 49/22
discloses [2] 38/19 41/17
disclosing [4] 25/7 27/14 35/23 50/6
disclosure [19] 10/23 13/1 16/13 16/15 28/24 30/22 34/8 34/8 34/22 41/17 41/18 43/5 43/8 44/8 49/10 49/15 50/18 50/22 51/1
disclosures [16] 7/10 15/18 38/3 38/15 38/15 38/18 40/5 41/1 41/16 41/16 43/5 46/2 46/24 46/25 51/3 51/6
discretionary [1] 29/16
discussed [1] 49/9
dismiss [4] 3/25 4/5 27/22 46/15
displayed [1] 22/9
dispute [2] 45/17 45/17
distance [1] 30/21
distinction [1] 28/16
DISTRICT [5] 1/1 1/2 1/21 45/21 46/11
divided [1] 27/24
DIVISION [1] 1/3
do [33] 4/4 5/21 10/20 13/2 13/5 17/11 18/14 18/16 21/6 22/24 23/5 23/9 24/20 27/19 28/17 28/21 28/21 32/7 34/25

38/5 39/15 42/13 43/4 45/6 45/11 45/18 46/5 47/6 47/9 47/16 49/6 50/7 52/18
document [1] 49/6
documents [2] 6/10 27/21
does [5] 34/16 40/14 40/14 42/4 51/2
doesn't [3] 41/11 41/25 50/25
dog [1] 8/9
doing [7] 13/2 22/5 37/6 37/10 37/15 40/4 40/5
dollar [1] 30/15
dollars [1] 35/18
don't [27] 4/8 7/24 10/24 11/9 11/9 19/10 21/12 21/12 21/17 22/11 26/7 27/2 31/3 32/10 33/3 36/15 42/1 43/15 43/24 45/6 45/7 45/10 45/17 47/1 47/4 52/4 52/18
Donato [1] 46/10
done [3] 13/9 21/1 51/14
doubt [1] 40/15
down [5] 3/24 16/3 30/16 36/19 38/9
dropped [1] 30/19
dropping [2] 15/16 15/18
due [1] 28/9
duration [1] 33/21
during [1] 29/3

**E**

each [1] 46/25
earlier [4] 13/11 49/12 50/1 52/3
earning [1] 28/10
earnings [1] 7/11
earth [1] 30/11
easier [1] 43/16
easily [1] 41/1
EAST [3] 2/10 2/14 2/18
Eastern [1] 45/21
Eastern District [1] 45/21
edge [1] 11/5
effect [2] 7/8 15/8
efficiency [1] 41/4
either [1] 23/25
elements [1] 26/23
else [3] 28/20 51/19 52/9
emphasize [1] 16/6
employees [1] 10/19
end [2] 5/8 27/12
endeavored [1] 15/1
ensuing [1] 7/10
entire [2] 16/10 16/10
entirely [1] 46/4
entirety [1] 33/18
entitled [1] 54/5

Eric [3] 1/6 2/2 3/4
especially [2] 17/21 17/24
essence [1] 8/18
essentially [2] 21/11 30/18
establish [1] 28/22
et [3] 1/10 2/8 3/5
et al [1] 3/5
evaluating [1] 26/9
even [11] 8/13 9/15 9/22 13/15 15/16 17/5 19/10 23/19 29/1 42/1 49/21
every [4] 37/25 39/5 40/4 40/8
everybody [1] 18/1
everything [6] 15/1 19/1 23/12 27/1 40/3 50/6
evidence [1] 29/6
exact [1] 26/6
exactly [7] 8/12 13/21 16/5 17/15 26/19 41/13 50/24
excellent [5] 8/19 9/8 10/16 11/13 12/6
exercise [1] 32/22
Exhibit [3] 43/9 44/14 51/15
Exhibit 9 [3] 43/9 44/14 51/15
expect [4] 18/12 40/3 40/23 47/3
expectation [2] 40/24 40/25
expected [1] 18/20
expecting [1] 18/2
experience [1] 21/15
experienced [4] 6/7 6/8 13/14 21/10
explanation [3] 26/2 26/3 26/5
exploded [1] 7/1
expose [1] 17/21
exposed [3] 15/23 15/25 17/22
exposure [1] 19/9
extent [2] 29/19 35/23
extremely [1] 11/21

**F**

face [6] 4/23 6/11 10/20 21/19 22/12 37/22
fact [10] 7/13 11/25 13/3 23/11 30/6 36/21 45/17 45/18 49/21 50/25
factors [1] 15/10
facts [5] 11/8 11/10 11/18 11/20 28/21
factual [1] 35/5
fail [1] 11/18
failed [1] 4/23
failing [1] 9/19
failure [6] 21/25 22/3 37/23 37/23 38/1 44/21
fair [3] 32/13 46/23 50/13

## F

fallen [1] 45/12
false [11] 6/11 6/23 9/10 9/13 11/3 14/17 15/20 21/9 23/14 37/19 37/21
far [2] 16/12 16/12
fast [1] 17/5
fatal [1] 21/13
favor [2] 11/22 40/10
favorable [1] 18/4
February [4] 12/22 12/23 13/8 13/9
federal [6] 10/6 19/5 32/19 32/20 43/22 43/23
fell [1] 30/10
few [2] 47/20 50/16
figure [2] 22/8 44/13
filed [1] 4/17
filing [6] 32/15 32/15 32/15 38/5 39/6 43/8
filings [4] 38/13 42/18 44/1 44/13
Final [1] 46/6
finally [1] 49/19
financial [6] 16/1 18/20 23/9 23/18 24/12 32/13
Financial Times [1] 18/20
find [7] 10/19 20/2 25/11 26/4 26/17 42/10 51/8
fine [8] 8/8 8/11 8/14 15/2 23/12 27/1 32/11 50/6
fire [2] 8/10 8/11
first [12] 4/16 22/13 31/3 31/5 32/6 34/7 34/11 34/12 36/6 46/20 47/2 47/6
first-amended [1] 36/6
five [2] 12/6 12/10
FLOOR [1] 2/5
Florida [1] 29/23
fluctuation [2] 15/24 15/25
focus [6] 15/7 43/13 44/17 44/22 44/24 44/25
focused [1] 46/1
follow [1] 16/17
follow-up [1] 16/17
following [1] 43/10
foregoing [1] 54/3
foresee [6] 5/21 7/24 21/6 21/17 34/18 34/25
format [1] 54/6
former [1] 10/19
Forms [2] 17/4 30/2
formula [3] 44/12 50/8 50/9
forth [1] 5/19
forward [1] 11/6
found [1] 8/16
four [3] 4/4 47/24 50/10
FOURTH [1] 1/22
framework [9] 5/4 7/17
15/3 17/17 21/2 21/13 24/3 24/15 25/15
Francisco [1] 32/19
fraud [1] 20/24
FRIDAY [2] 1/16 3/1
front [2] 5/6 7/17
fulfill [2] 6/14 8/1
funds [3] 7/25 17/24 43/19
future [1] 15/7

## G

gave [4] 6/22 7/12 23/16 44/5
general [2] 9/9 27/24
generally [1] 28/7
get [11] 5/5 5/10 10/7 24/12 25/10 28/7 30/17 32/10 35/8 40/15 52/16
gets [3] 7/17 41/6 41/10
getting [2] 6/5 40/21
give [5] 41/11 48/1 48/10 48/21 52/2
given [7] 4/2 23/20 26/20 30/4 44/7 47/3 49/17
go [6] 6/20 17/22 20/9 30/12 48/7 49/25
goes [2] 35/20 41/4
going [12] 7/14 7/18 9/21 13/14 13/16 20/22 36/13 46/8 47/12 48/14 52/1 52/18
gone [1] 7/1
good [13] 3/8 3/11 3/12 3/13 3/16 3/19 3/22 9/7 37/6 37/10 37/15 42/6 52/21
got [7] 17/10 31/20 31/21 34/12 34/15 40/4 47/8
Government [3] 9/23 10/25 32/13
granular [1] 13/6
ground [1] 41/7
grounds [1] 5/12
group [1] 41/5
growing [1] 19/8
grown [1] 14/22
grows [1] 14/23
growth [6] 45/23 45/24 45/24 45/25 46/3 46/3
guess [1] 31/25
guesses [1] 10/8
gun [1] 52/4
guy [2] 7/22 7/23

## H

had [42] 6/7 6/8 6/25 7/1 8/23 9/3 9/8 9/10 9/14 10/6 10/9 12/24 13/14 14/3 14/22 16/2 16/5 17/5 18/1 21/10 22/8 25/6 26/20 30/1 32/3 32/4 32/25 33/4 33/9 34/17 35/5 35/24 36/22 36/22 36/24 38/6 44/23 45/3 45/23 48/25 49/22 51/9
hadn't [3] 13/8 15/17 33/4
hand [2] 28/4 28/9
happened [4] 12/10 15/24 30/9 44/23
happening [3] 8/6 8/12 15/1
has [12] 12/4 12/7 22/10 28/17 30/24 33/17 43/9 45/12 46/10 46/15 46/25 47/20
hasty [1] 4/2
have [66]
haven't [1] 9/7
having [6] 5/21 7/24 21/6 21/17 34/18 34/25
he [12] 29/2 29/6 29/8 30/5 30/7 30/11 30/11 30/14 30/16 30/17 30/18 42/12
he's [1] 46/14
head [1] 45/7
heads [1] 48/1
heads-up [1] 48/1
hear [3] 47/5 47/14 47/14
heavily [1] 15/11
hedge [3] 22/23 23/10 38/4
hedged [21] 16/7 16/14 16/16 17/13 17/16 17/20 17/20 18/13 21/8 23/23 24/16 24/18 38/2 38/4 38/17 39/1 39/7 39/9 41/19 41/20 41/23
hedges [3] 16/10 38/16 39/4
hedging [8] 23/2 24/13 38/18 38/22 49/10 50/23 51/2 51/8
held [4] 28/13 28/16 33/13 54/5
help [2] 33/8 39/15
helpful [2] 48/5 51/24
here [28] 3/24 6/21 8/12 11/16 12/4 14/7 15/24 18/5 19/10 20/9 20/9 20/22 21/18 23/4 25/12 26/11 28/9 30/9 30/13 35/13 35/13 35/15 35/23 36/2 36/12 37/17 46/18 51/9
Here's [2] 45/4 45/4
hereby [1] 54/2
Hey [1] 14/6
high [1] 7/21
higher [1] 44/25
his [6] 29/3 29/4 29/6 30/2 30/4 30/7
hit [1] 47/19
HOLCOMB [1] 1/4
Hold [2] 5/5 33/24
holding [1] 34/5
holistic [1] 26/11
holistically [1] 26/10
home [3] 29/23 32/19 43/22
Honor [42] 3/8 3/13 3/16 3/19 4/13 4/22 5/2
14/2 18/8 20/2 20/6 22/21 22/24 25/1 26/1 26/9 31/3 31/4 31/14 32/6 32/24 33/4 33/15 34/14 34/20 37/8 39/19 40/18 42/14 47/1 47/11 47/18 48/24 49/19 50/15 51/16 51/22 51/23 52/8 52/11 52/12 52/24
HONORABLE [1] 1/4
hope [1] 48/4
hopefully [1] 5/8
hopelessly [2] 11/11 11/12
Hosdaghian [1] 3/10
hour [1] 47/13
how [29] 8/15 16/5 18/14 18/16 19/22 22/17 23/7 26/16 26/19 27/13 28/3 39/15 39/16 39/24 41/13 41/17 42/10 43/3 43/12 43/18 43/18 43/18 43/21 44/19 44/19 46/3 47/16 48/11 49/21
however [2] 10/21 37/12
huge [1] 35/19

## I

I'd [1] 48/4
I'll [8] 4/8 4/9 4/10 31/22 47/14 47/14 48/21 52/16
I'm [17] 6/15 6/20 9/1 10/11 11/23 13/9 19/19 20/17 26/1 36/8 46/6 46/7 47/15 48/1 50/23 52/1 52/18
I've [5] 4/5 4/15 19/1 31/21 52/4
ignore [1] 31/4
imagine [1] 22/7
impaired [3] 35/1 36/17 36/25
implicit [1] 23/22
implies [1] 21/7
imply [1] 51/2
import [1] 26/11
important [4] 7/19 11/19 22/15 34/21
impossible [1] 27/15
impression [5] 6/23 17/3 17/19 23/14 23/20
improve [2] 49/5 50/18
include [2] 27/4 31/1
includes [1] 24/13
income [1] 35/15
incorporated [2] 41/9 41/10
incorrect [1] 13/5
increase [2] 15/5 18/2
increases [2] 17/18 21/14
individual [1] 28/22
individually [2] 1/6 2/2
individuals [1] 11/11
infer [1] 24/13
inference [3] 18/3 18/6
29/10
inferences [3] 11/22 18/4 40/9
information [12] 13/25 34/4 41/6 41/6 41/9 43/10 43/11 43/16 45/1 45/3 45/13 45/14
informed [1] 41/2
inherent [3] 7/2 14/23 14/25
inputs [1] 42/15
insisting [1] 8/14
instance [1] 46/20
instead [2] 30/12 32/21
instructions [1] 49/21
instruments [3] 38/16 38/19 41/18
intended [1] 48/16
intent [1] 22/16
intention [1] 14/7
interest [21] 7/6 7/9 7/13 8/2 8/3 14/24 15/5 15/23 15/25 17/18 18/1 21/14 21/16 21/23 23/17 23/19 28/10 33/21 35/15 37/25 43/19
interesting [1] 52/16
interpret [1] 39/16
inventor [1] 14/25
investigated [1] 10/19
investments [1] 8/1
investor [50] 15/20 18/10 18/10 18/16 18/24 18/25 19/3 19/6 22/8 24/12 27/16 37/14 38/13 38/14 38/21 38/25 39/4 39/8 39/12 39/12 39/16 39/21 39/25 40/3 40/13 40/16 40/19 40/19 40/20 40/22 40/24 40/25 41/2 41/12 41/23 41/24 43/2 43/3 43/4 44/10 44/13 44/18 45/2 45/11 45/15 46/4 49/9 49/14 49/23 51/12
investors [27] 7/13 7/25 8/15 16/9 17/12 17/19 19/9 22/6 22/17 23/6 23/7 23/8 23/11 23/16 26/16 27/19 33/12 34/4 34/18 35/18 37/6 37/10 41/5 41/8 41/9 42/10 42/12
involve [1] 46/17
involving [1] 46/8
is [138]
isn't [2] 19/4 24/8
issue [8] 6/17 8/16 11/2 31/24 35/21 36/15 41/4 44/18
issued [1] 46/16
issuing [1] 7/4
it [123]
it's [36] 5/23 9/15 11/1 11/21 12/3 14/23 15/11 16/12 19/18 20/5 20/18 22/6 24/21 24/23 25/11

**I**

**it's...** **[21]** 28/4 29/10 29/13 30/8 33/6 33/7 34/21 37/16 37/20 37/22 39/23 40/4 40/4 40/23 41/19 45/10 48/4 48/21 49/16 51/3 51/9
**Item** **[1]** 3/3
**items** **[1]** 49/20
**its** **[26]** 4/20 4/23 5/18 7/1 12/1 15/21 17/22 17/23 19/9 19/9 19/14 21/9 25/14 25/15 25/22 26/20 32/17 32/22 33/1 33/19 35/8 35/9 35/24 43/25 45/3 46/25
**itself** **[7]** 11/24 16/4 16/5 22/3 34/23 43/8 44/17

**J**

**job** **[3]** 37/7 37/11 37/15
**JOHN** **[1]** 1/4
**JUDGE** **[2]** 1/4 46/10
**judgment** **[1]** 11/23
**judicial** **[5]** 16/21 16/22 17/4 17/8 54/7
**jumped** **[1]** 52/4
**jumping** **[1]** 6/15
**just** **[28]** 8/10 9/9 9/12 9/17 11/3 13/11 14/2 15/12 16/11 16/19 18/9 18/22 21/18 29/11 30/8 30/19 31/20 36/19 39/25 40/23 41/15 43/7 44/18 46/5 46/19 48/19 50/5 50/16
**JWH** **[1]** 1/9

**K**

**keep** **[4]** 8/10 8/14 9/20 9/21
**keeping** **[1]** 8/14
**keeps** **[1]** 8/11
**kept** **[1]** 13/1
**key** **[2]** 15/19 47/19
**kind** **[7]** 11/24 13/16 15/12 16/7 27/20 28/14 43/13
**kinds** **[1]** 10/8
**knew** **[6]** 11/2 13/10 13/11 18/1 19/8 22/5
**know** **[37]** 11/9 11/21 11/21 13/23 14/2 18/14 18/16 18/17 20/1 24/17 26/7 27/5 27/16 31/19 33/13 37/7 37/17 37/20 39/16 39/23 40/2 40/16 41/1 41/5 42/17 43/20 44/23 45/7 45/8 45/9 46/2 46/4 47/1 47/4 49/14 49/23 52/18
**knowledge** **[2]** 10/18 10/22
**known** **[1]** 39/13
**knows** **[4]** 11/10 18/8 26/9 51/12
**Ks** **[1]** 7/11

**L**

**lack** **[1]** 49/10
**language** **[1]** 50/24
**largely** **[2]** 33/13 34/5
**last** **[4]** 4/4 46/16 48/22 51/11
**later** **[8]** 8/13 11/14 12/6 16/16 30/19 36/23 49/15 50/7
**Laughter** **[2]** 48/13 50/12
**law** **[4]** 27/18 29/13 39/22 40/22
**least** **[4]** 29/1 41/2 41/7 49/3
**lectern** **[1]** 4/13
**lending** **[2]** 10/6 32/18
**length** **[1]** 49/9
**lent** **[1]** 27/5
**less** **[2]** 28/5 47/25
**let** **[13]** 4/17 5/5 5/7 5/7 6/19 6/19 13/20 16/11 22/1 31/11 31/18 46/19 47/16
**let's** **[5]** 4/4 4/25 4/25 47/13 48/10
**level** **[2]** 30/18 30/25
**levels** **[1]** 35/24
**liabilities** **[4]** 29/17 45/3 45/4 45/5
**lie** **[2]** 19/21 19/22
**like** **[6]** 5/23 8/8 10/8 31/23 41/25 48/19
**likewise** **[1]** 52/14
**line** **[1]** 49/20
**liquid** **[1]** 9/11
**liquidity** **[72]**
**list** **[1]** 16/8
**listen** **[1]** 4/10
**litigation** **[1]** 47/2
**little** **[2]** 28/18 32/16
**LLP** **[5]** 2/4 2/9 2/13 2/17 3/9
**Loan** **[2]** 32/19 43/22
**loans** **[1]** 27/4
**long** **[9]** 9/12 9/16 15/11 20/5 28/4 33/14 34/5 37/24 48/11
**long-dated** **[1]** 37/24
**long-term** **[5]** 9/12 9/16 15/11 33/14 34/5
**longer** **[1]** 48/4
**look** **[23]** 18/19 18/23 19/6 19/25 21/1 26/4 26/10 30/20 34/3 34/13 34/21 37/19 37/22 39/11 39/19 41/15 42/1 43/4 45/12 45/19 46/22 49/2 51/5
**looking** **[3]** 15/20 37/17 43/7
**loop** **[1]** 47/9
**LOS** **[3]** 2/11 2/15 2/19
**loss** **[19]** 5/22 6/1 6/7 6/8 6/9 7/19 11/1 12/24 13/16 15/4 21/9 21/12 35/4 35/7 36/3 36/23 48/25 49/4 50/18
**losses** **[4]** 13/14 21/11

**M**

33/23 35/9
lot **[8]** 20/19 20/19 35/12 39/25 40/21 40/23 44/22 50/10

**M**

**Madam** **[2]** 47/6 48/8
**made** **[19]** 4/20 8/12 8/17 8/23 12/13 12/14 12/21 15/19 15/19 17/11 22/3 29/7 30/6 30/7 35/14 36/25 37/18 39/6 51/3
**magic** **[1]** 39/24
**maintain** **[4]** 12/15 12/20 12/25 12/25
**make** **[23]** 4/6 4/17 7/13 10/7 11/21 12/2 12/10 13/20 17/12 18/4 18/4 18/6 18/23 22/12 26/24 27/10 31/22 41/23 43/15 43/22 47/20 49/8 49/15
**makes** **[5]** 9/18 18/14 40/8 50/18 51/6
**making** **[3]** 8/6 22/7 27/19
**management** **[13]** 15/6 21/22 24/3 24/4 24/7 24/10 24/11 25/15 25/16 25/20 38/25 41/22 42/1
**managing** **[2]** 37/7 37/11
**many** **[4]** 36/1 44/23 44/24 44/24
**March** **[26]** 8/13 8/13 8/18 9/3 9/6 9/6 10/2 10/3 10/10 10/15 10/24 11/3 11/13 11/15 12/11 16/2 26/25 26/25 27/8 30/16 31/25 32/25 33/8 33/13 35/16 35/16
**March 10th** **[3]** 8/13 26/25 27/8
**March 10th of [1]** 35/16
**March 10th release [1]** 26/25
**March 16th** **[1]** 10/24
**March 17th** **[11]** 8/13 8/18 9/3 9/6 10/10 10/15 11/3 11/13 12/11 31/25 32/25
**March 22nd** **[4]** 9/6 10/2 11/15 33/8
**March of [1]** 16/2
**market** **[6]** 9/9 17/24 18/20 41/4 41/7 41/10
**massive** **[1]** 18/11
**material** **[5]** 20/20 37/11 39/3 39/21 45/14
**materialization** **[2]** 10/23 11/25
**math** **[6]** 44/18 45/6 45/11 45/13 46/5 50/5
**matter** **[4]** 47/8 47/9 48/2 54/5
**matters** **[4]** 35/10 35/11 35/12 43/15

**maturity** **[2]** 28/13 28/16
**may** **[12]** 8/4 8/18 11/16 12/22 13/10 13/15 17/18 21/15 32/3 32/3 44/24 51/1
**maybe** **[3]** 29/1 47/22 47/25
**MCGIMSEY** **[4]** 2/9 3/14 31/13 48/16
**mcgimseyd** **[1]** 2/12
**me** **[31]** 4/11 4/17 5/5 5/6 5/7 5/7 6/19 6/20 10/8 13/20 14/17 14/18 16/25 17/5 18/4 18/6 19/23 22/1 24/25 29/12 31/11 31/18 33/8 34/13 36/6 39/15 46/19 47/16 48/5 50/1 51/15
**mean** **[6]** 4/22 18/13 23/23 37/9 42/5 44/11
**meaningless** **[1]** 50/5
**means** **[1]** 37/15
**meant** **[1]** 26/3
**meat** **[1]** 40/21
**meet** **[3]** 34/17 34/19 35/21
**mentioned** **[2]** 16/18 29/11
**mere** **[4]** 19/15 23/3 25/22 25/23
**merger** **[8]** 16/14 24/17 25/9 49/12 50/23 50/25 51/1 51/5
**merit** **[1]** 31/8
**middle** **[1]** 41/7
**might** **[4]** 15/12 20/4 20/4 24/10
**million** **[5]** 7/1 7/2 29/1 29/1 35/18
**mind** **[1]** 4/8
**minute** **[3]** 35/19 47/14 48/6
**minutes** **[3]** 47/13 47/22 47/25
**mislead** **[2]** 18/9 22/6
**misleading** **[17]** 4/20 4/23 5/18 6/12 6/23 9/18 14/17 14/20 18/8 20/25 20/25 22/1 22/4 22/7 24/4 25/17 37/19
**misled** **[1]** 39/13
**mismanaged** **[3]** 11/11 11/12 22/25
**mismanagement** **[1]** 23/3
**mismanaging** **[3]** 23/6 37/5 37/5
**mispronounce** **[1]** 31/18
**misreport** **[1]** 48/11
**misrepresentation** **[1]** 30/24
**misrepresentations** **[1]** 29/7
**missed** **[3]** 28/14 29/20 51/10
**misstatement** **[1]** 37/11

**misstatements** **[1]** 5/3
**model** **[1]** 27/6
**moment** **[3]** 24/25 28/24 29/13
**money** **[3]** 28/6 29/19 36/2
**more** **[10]** 11/1 12/11 21/18 22/7 22/8 28/17 44/22 44/24 44/25 47/14
**morning** **[7]** 3/8 3/11 3/12 3/13 3/16 3/19 3/22
**most** **[3]** 7/5 40/25 41/8
**motion** **[11]** 3/25 5/9 18/5 27/21 40/7 46/7 46/15 48/21 51/20 52/1 52/6
**motions** **[1]** 4/5
**moved** **[1]** 8/8
**moving** **[1]** 27/17
**Mr** **[2]** 3/11 48/23
**Mr.** **[2]** 4/9 36/5
**Mr. Calandra** **[2]** 4/9 36/5
**Ms** **[1]** 31/13
**Ms.** **[1]** 48/16
**Ms. McGimsey** **[1]** 48/16
**much** **[13]** 9/17 17/22 21/11 43/18 43/18 43/19 43/21 43/24 44/17 44/19 46/3 47/16 47/18
**multiple** **[1]** 30/1
**must** **[2]** 18/4 19/22
**my** **[17]** 4/4 5/8 6/15 8/16 12/13 19/19 19/23 25/10 26/18 31/9 40/15 45/7 46/7 46/16 48/2 48/18 49/1
**myself** **[2]** 10/7 21/5

**N**

**name** **[1]** 31/15
**nature** **[2]** 21/23 45/18
**necessarily** **[2]** 43/20 51/2
**necessary** **[1]** 12/11
**need** **[10]** 12/14 14/7 24/15 32/7 36/9 45/6 45/10 47/6 49/6 49/15
**needed** **[6]** 11/14 16/15 23/7 23/8 36/1 49/24
**needing** **[2]** 44/25 50/20
**needs** **[7]** 34/17 34/19 35/2 35/6 35/22 39/22 50/21
**neither** **[1]** 23/24
**net** **[1]** 35/15
**never** **[1]** 7/22
**NEW** **[2]** 2/5 2/5
**next** **[1]** 45/10
**night** **[1]** 30/22
**no** **[36]** 1/9 11/15 11/23 14/7 16/10 17/2 17/21 17/22 20/5 20/8 20/8 20/15 24/8 24/21 25/21 29/12 29/17 29/22 35/4

**N**

**no... [17]** 35/4 35/25 35/25 36/21 38/22 39/24 40/18 40/24 40/25 41/18 44/7 46/2 49/6 49/15 51/23 52/11 52/12
**No. [2]** 3/3 3/4
**No. 3 [1]** 3/3
**nondiscretionary [1]** 29/15
**nonhedging [1]** 16/8
**Northern [1]** 46/11
**not [84]**
**notes [2]** 6/15 8/16
**nothing [5]** 6/1 12/9 14/7 19/10 51/21
**notice [6]** 16/9 16/21 16/22 17/4 17/8 17/9
**November [8]** 12/23 26/14 29/2 30/14 42/21 43/3 44/8 54/9
**November 22 [1]** 44/8
**November 9th [1]** 29/2
**now [19]** 4/19 6/21 16/6 16/19 17/10 21/1 24/6 25/5 25/8 26/12 26/20 27/7 35/3 36/22 43/13 44/21 45/17 47/6 47/10
**number [6]** 5/22 5/24 44/5 44/7 44/11 46/1
**numbers [2]** 45/7 50/9

**O**

**o'clock [4]** 47/8 47/9 48/2 48/7
**o0o [1]** 3/2
**obligation [1]** 6/13
**obtain [1]** 10/14
**obviously [2]** 21/3 44/23
**OCTOBER [2]** 1/16 3/1
**OCTOBER 25 [2]** 1/16 3/1
**off [5]** 6/22 11/7 12/14 14/15 35/9
**OFFICIAL [2]** 1/21 54/12
**often [1]** 30/20
**Oh [3]** 20/15 20/17 26/1
**Okay [15]** 4/4 5/17 28/18 29/24 32/10 33/12 33/24 42/8 46/6 47/5 47/12 47/25 48/23 51/17 52/9
**omissions [4]** 18/18 19/16 23/15 37/23
**one [14]** 3/25 5/5 18/19 24/25 27/24 29/10 33/24 35/17 36/12 37/9 38/22 38/23 45/8 45/10
**only [10]** 11/25 17/23 19/19 27/10 27/11 28/12 36/3 49/23 50/3 50/6
**Onurcan [1]** 3/10
**oOo [1]** 53/2

**opening [1]** 34/1
**opportunity [1]** 48/19
**order [4]** 6/20 45/6 52/2 52/17
**organic [3]** 45/24 45/25 46/3
**other [10]** 11/16 16/10 19/16 27/20 28/6 28/21 41/21 43/19 46/17 46/19
**others [3]** 1/6 2/2 29/12
**our [17]** 7/20 9/8 9/9 9/14 10/22 15/6 15/10 17/3 17/4 17/17 21/1 21/13 23/1 24/16 31/2 35/13 41/21
**out [16]** 7/17 7/22 7/23 22/8 22/13 27/5 27/14 27/20 29/4 30/4 33/8 36/2 44/13 45/23 47/2 47/3
**over [2]** 12/24 37/24
**over-reliance [1]** 37/24
**overall [2]** 29/4 39/20
**Overtalking [1]** 17/6
**owed [1]** 28/6
**own [5]** 4/21 5/18 12/1 21/9 46/25

**P**

**PacWest [5]** 1/10 2/8 3/4 16/5 25/6
**page [3]** 34/6 34/10 54/6
**pages [5]** 39/5 39/5 40/5 43/9 44/14
**pages 177 [1]** 44/14
**papers [3]** 4/16 28/9 31/2
**paragraph [20]** 5/21 5/22 7/7 10/4 10/5 13/13 13/20 13/21 13/22 24/21 24/22 24/22 25/3 25/4 26/7 49/3 49/11 50/17 50/23 50/24
**paragraph 102 [1]** 10/5
**paragraph 118 [2]** 25/3 25/4
**paragraph 50 [1]** 24/22
**paragraph 60 [3]** 49/11 50/23 50/24
**paragraph 61 [1]** 13/13
**paragraph 65 [3]** 7/7 24/21 24/22
**Paragraph 75 [1]** 13/20
**paragraph 83 [3]** 13/22 49/3 50/17
**paragraphs [5]** 5/3 5/19 5/24 14/13 36/6
**paragraphs 74 [1]** 14/13
**paraphrasing [1]** 36/8
**parcel [1]** 18/22
**Paris [1]** 3/17
**parisa [1]** 2/16
**PARK [4]** 2/10 2/13 2/14 2/18
**PARKER [3]** 1/20

**54/12 54/12**
**part [9]** 9/17 11/19 12/15 12/25 14/16 15/19 18/22 22/19 24/1
**pass [1]** 15/15
**passed [2]** 22/10 25/6
**past [1]** 22/15
**patience [1]** 48/3
**Patrick's [1]** 9/3
**pause [6]** 5/7 6/18 24/24 31/12 37/3 51/18
**pay [2]** 29/16 29/22
**paying [1]** 27/6
**Pennsylvania [1]** 45/21
**per [1]** 47/22
**percent [10]** 6/2 6/6 6/7 9/12 13/12 13/13 17/24 26/15 27/6 27/7
**perhaps [3]** 12/13 13/7 26/23
**perilous [1]** 22/17
**period [9]** 6/25 8/8 13/8 13/18 15/14 29/4 29/5 29/5 35/17
**person [1]** 30/9
**place [2]** 22/14 34/13
**placed [1]** 43/19
**plain [1]** 49/2
**plaintiff [12]** 1/8 2/2 3/7 4/6 11/9 12/4 18/5 31/10 40/8 40/10 40/15 47/20
**plaintiffs [12]** 3/10 12/4 12/12 12/16 13/23 14/2 17/11 19/2 21/21 36/7 45/20 51/21
**plaintiffs' [13]** 6/21 8/22 9/2 10/12 10/13 12/3 14/16 21/24 41/20 42/8 42/22 47/21 48/20
**plausible [2]** 40/8 40/9
**pleading [2]** 19/17 19/18
**please [7]** 3/6 4/14 14/19 31/11 31/18 33/24 50/14
**pledged [1]** 28/5
**plummets [1]** 30/23
**podium [1]** 49/12
**point [16]** 5/25 11/5 21/21 23/16 26/8 26/13 26/17 27/11 32/12 33/5 42/9 42/11 42/22 49/8 50/22 51/11
**pointed [3]** 37/20 44/14 50/16
**points [4]** 33/16 47/19 47/20 50/16
**POMERANTZ [2]** 2/4 3/9
**pomlaw.com [1]** 2/6
**portfolio [35]** 6/7 6/8 8/23 9/11 11/4 15/11 15/16 15/18 15/21 15/23 16/11 17/13 17/20 18/13 19/12 19/14 22/23 23/10 23/13 23/23 23/23 24/16 33/19 38/2 38/5

**38/17 38/22 39/2 39/8 41/19 41/20 49/11 49/14 49/17 51/7**
**position [7]** 21/1 26/18 27/3 35/14 37/4 49/5 50/19
**possible [1]** 51/9
**post [1]** 44/21
**post-Silicon [1]** 44/21
**potential [2]** 7/6 43/21
**powerful [1]** 29/6
**practices [1]** 21/22
**precise [1]** 14/2
**predict [1]** 8/4
**predominately [1]** 9/16
**prefer [1]** 4/12
**prepared [8]** 7/8 8/7 11/23 15/1 15/2 23/17 23/21 23/24
**presented [2]** 7/14 51/15
**PRESIDING [1]** 1/4
**press [1]** 32/1
**press release [1]** 32/1
**presumption [1]** 41/3
**prevent [1]** 22/17
**previous [4]** 43/5 43/5 44/1 44/13
**previously [3]** 22/9 43/25 49/22
**price [4]** 30/7 30/15 31/7 41/10
**priced [1]** 41/6
**primary [11]** 17/23 27/24 28/4 28/7 28/9 32/16 34/8 42/16 42/19 43/14 45/9
**principal [1]** 45/19
**principle [1]** 31/2
**prior [5]** 13/4 29/5 30/4 51/2 51/7
**probably [5]** 4/2 13/16 19/20 46/18 47/21
**problem [3]** 8/3 24/8 24/10
**problematic [1]** 23/11
**proceed [1]** 52/19
**proceedings [3]** 1/14 53/1 54/5
**process [3]** 18/23 41/22 42/1
**professor [1]** 19/23
**profit [2]** 27/6 30/11
**profitable [2]** 15/7 17/17
**prominently [1]** 22/9
**pronouncing [1]** 31/15
**proper [1]** 11/21
**properly [1]** 31/16
**proportion [2]** 29/4 30/4
**provide [2]** 4/11 10/19
**provided [6]** 5/8 26/2 26/4 26/23 33/17 34/4
**providing [1]** 13/4
**proxy [8]** 7/5 16/14 24/17 49/13 50/23 50/25 51/1 51/5
**PSLRA [4]** 19/18 19/21

**19/24 20/23**
**public [1]** 49/10
**puffery [8]** 19/16 21/2 24/10 25/23 25/23 37/12 42/3 42/4
**pull [1]** 49/12
**pulled [2]** 28/24 28/25
**purchased [1]** 16/13
**purpose [3]** 35/10 35/11 35/12
**purposes [6]** 3/25 18/15 19/1 29/12 29/15 30/2
**pursuant [2]** 30/23 54/2
**put [5]** 16/9 18/24 22/14 27/5 32/7

**Q**

**Q1 [1]** 36/21
**Q2 [2]** 13/22 36/7
**Q3 [6]** 6/2 6/6 6/10 26/21 26/22 29/7
**Q4 [4]** 6/7 13/22 36/7 49/4
**Qs [2]** 7/11 14/5
**qualified [1]** 19/20
**quality [6]** 8/19 9/8 9/15 10/16 11/13 12/5
**quarter [12]** 5/25 33/18 33/18 38/1 40/4 40/4 42/18 42/18 42/18 45/9 45/10 45/10
**quarterly [3]** 12/22 43/8 51/7
**Questcor [2]** 30/23 31/1
**question [10]** 9/17 13/7 18/21 22/22 25/14 37/17 39/19 40/2 46/6 48/18
**questions [6]** 4/9 4/10 16/17 31/10 31/21 47/19
**quickly [3]** 14/22 14/23 19/8
**quote [2]** 8/19 50/25
**quoting [1]** 34/24

**R**

**raise [3]** 6/16 29/9 31/2
**raised [2]** 18/22 31/5
**rate [5]** 15/23 15/25 17/18 21/14 37/25
**rates [14]** 7/6 7/9 7/14 8/2 8/3 14/24 15/5 18/1 18/2 21/16 21/23 23/17 23/19 33/21
**rather [2]** 15/9 29/16
**ratio [31]** 21/25 22/3 22/10 25/7 26/13 26/17 26/20 26/21 26/24 27/3 27/12 27/16 27/23 28/24 42/10 42/11 42/15 42/23 43/3 43/25 44/13 44/17 45/1 45/12 46/5 49/20 49/22 49/24 51/11 51/12 51/13
**ratios [2]** 44/25 45/12
**read [4]** 18/12 38/14

**R**

**read... [2]** 41/16 41/17
**ready [1]** 7/9
**real [1]** 44/18
**realized [1]** 11/14
**really [7]** 8/4 19/5 22/11 37/19 37/23 41/11 41/25
**reason [10]** 13/4 27/10 27/11 29/17 29/22 31/1 31/7 48/1 49/16 50/7
**reasonable [37]** 11/6 18/10 18/10 18/16 18/24 18/25 19/2 19/6 37/14 38/13 38/14 38/21 39/3 39/8 39/11 39/12 39/16 39/21 39/25 40/3 40/9 40/13 40/16 40/18 40/19 40/20 40/22 40/24 41/12 41/19 41/23 41/24 44/18 45/11 49/9 49/13 51/12
**reasons [2]** 37/9 38/23
**reassurance [1]** 9/9
**reassurances [3]** 12/13 12/14 12/19
**received [2]** 10/9 32/4
**recess [1]** 52/25
**recklessness [1]** 22/16
**record [8]** 3/7 6/4 32/4 33/6 33/7 33/16 34/16 38/8
**recovery [2]** 36/18 37/1
**redemption [1]** 17/24
**reference [3]** 25/9 25/11 26/21
**referencing [1]** 24/2
**referred [1]** 16/19
**referring [4]** 17/1 25/9 27/8 33/25
**refers [1]** 50/17
**regard [3]** 6/16 49/4 49/19
**regarding [2]** 5/3 50/22
**regards [1]** 5/9
**regularly [1]** 33/17
**regulations [1]** 54/7
**Regulator [1]** 35/16
**reinserting [1]** 22/9
**reiterate [1]** 18/9
**relating [1]** 51/1
**release [4]** 10/6 26/25 27/9 32/1
**reliance [1]** 37/24
**relied [1]** 15/21
**relies [1]** 38/24
**rely [2]** 37/14 45/20
**remaining [1]** 6/12
**remains [4]** 8/19 10/16 11/13 12/6
**Remember [1]** 35/13
**remitted [1]** 29/17
**removed [1]** 26/21
**repeat [1]** 21/5
**repeated [1]** 5/24
**repeatedly [1]** 32/15
**reply [3]** 31/3 31/5 50/14

**report [2]** 17/6 42/23
**reported [1]** 54/4
**REPORTER [5]** 1/21 6/3 38/7 47/6 54/12
**REPORTER'S [1]** 1/14
**reporting [4]** 26/13 42/9 45/23 46/1
**reposition [1]** 35/8
**representations [1]** 15/20
**Republic [1]** 47/2
**request [2]** 16/20 17/4
**requests [2]** 6/3 38/7
**required [2]** 36/14 36/17
**Reserve [2]** 32/20 43/23
**respect [1]** 22/22
**respond [1]** 48/20
**responded [1]** 16/20
**response [2]** 41/20 47/21
**rest [1]** 52/21
**result [4]** 7/15 21/11 21/12 23/22
**resume [1]** 50/5
**resumed [3]** 25/6 27/14 50/4
**returns [1]** 29/21
**review [2]** 4/15 38/21
**reviewed [1]** 4/15
**right [25]** 3/22 4/3 4/15 5/11 5/17 13/21 18/25 20/8 21/10 30/24 31/9 31/20 41/3 42/5 42/7 43/17 44/18 45/3 45/13 47/5 47/12 51/19 51/24 52/9 52/21
**rise [4]** 7/14 21/16 23/18 52/25
**rises [1]** 17/25
**rising [9]** 7/6 7/8 8/2 8/11 8/11 8/12 14/24 21/23 23/19
**risk [29]** 5/4 7/16 10/23 11/25 14/22 14/23 15/3 15/9 15/10 15/13 15/13 15/13 17/16 19/14 21/2 21/13 21/22 24/2 24/3 24/7 24/9 24/11 24/15 25/15 25/15 25/20 38/25 41/22 42/1
**risks [3]** 7/2 7/14 7/18
**robust [2]** 24/3 25/15
**Ronconi [2]** 30/8 30/9
**room [1]** 8/10
**rub [1]** 16/7
**rule [5]** 18/5 18/15 19/17 40/7 52/5
**Rule 12 [3]** 18/5 18/15 40/7
**ruling [1]** 46/16
**run [3]** 15/6 25/5 44/22
**runs [1]** 35/20

**S**

**SACV [1]** 1/9
**said [23]** 7/8 8/2 9/14 10/2 12/22 13/17 14/6 14/6 15/2 15/12 16/2

17/9 18/20 24/17 24/18 25/19 25/24 36/17 42/12 45/1 49/4 49/6 52/3
**Saint [1]** 9/3
**sale [16]** 13/13 13/16 15/16 15/21 15/22 16/11 18/11 21/11 29/10 30/21 30/24 35/10 35/11 35/12 50/17 50/20
**sales [10]** 15/11 28/23 29/3 29/5 29/12 29/14 30/1 30/4 30/7 48/25
**same [20]** 5/23 13/2 14/11 14/12 22/22 23/12 29/5 30/3 30/18 30/25 30/25 31/21 43/16 44/11 44/12 49/6 50/8 50/20 51/6 51/6
**San [1]** 32/19
**San Francisco [1]** 32/19
**SANTA [4]** 1/3 1/15 1/23 2/23
**satisfy [2]** 19/17 50/20
**saw [3]** 46/16 49/6 50/7
**say [34]** 5/2 5/25 6/1 8/7 11/7 11/23 13/11 15/1 16/6 16/9 16/24 17/15 18/25 19/10 19/22 20/24 21/6 21/9 22/12 23/7 23/12 24/11 24/14 24/15 27/1 27/3 27/15 33/25 37/9 37/15 46/8 46/19 46/20 50/10
**saying [15]** 5/18 7/16 8/11 9/7 11/3 13/1 14/5 15/3 15/4 15/5 15/9 17/16 19/5 19/19 44/10
**says [2]** 37/2 42/22
**scheduling [5]** 4/1 4/2 52/3 52/5 52/19
**scheme [5]** 24/7 24/10 24/11 25/20 25/22
**school [1]** 7/21
**scienter [5]** 22/19 28/19 28/20 28/22 29/6
**second [7]** 5/5 5/25 6/8 29/2 33/24 49/8 50/22
**secondary [8]** 32/16 32/17 32/22 33/1 33/10 42/19 43/14 43/21
**section [2]** 20/13 54/2
**sections [1]** 20/16
**securities [68]**
**security [3]** 15/16 19/23 47/1
**see [13]** 7/16 10/22 14/7 15/17 16/12 19/10 19/11 21/19 24/16 26/24 34/4 38/22 45/6
**seeing [1]** 22/17
**seek [1]** 17/8
**seeking [2]** 12/7 16/22
**seemed [1]** 27/17
**sell [25]** 5/21 7/19 7/20 7/24 12/14 12/24 13/15 14/7 15/4 21/7 21/8

21/17 30/11 34/18 34/25 35/5 35/21 36/1 36/9 36/10 36/13 36/15 36/17 36/22 36/23
**selling [5]** 6/1 30/22 31/6 31/6 35/7
**sense [4]** 10/11 18/14 40/1 40/24
**sensitive [1]** 37/25
**sentences [3]** 47/24 48/15 50/11
**series [1]** 7/12
**set [4]** 5/19 16/4 16/5 49/17
**shape [1]** 9/7
**shares [3]** 29/2 29/17 30/9
**sheet [2]** 35/8 35/9
**shoes [1]** 18/24
**short [4]** 17/7 19/5 28/5 47/9
**short-term [1]** 28/5
**shortly [1]** 15/14
**shot [1]** 48/10
**should [6]** 16/9 19/24 29/18 31/3 31/4 31/5
**shouldn't [1]** 17/9
**show [1]** 27/19
**shows [1]** 22/16
**shrugged [1]** 15/12
**sic [1]** 30/24
**side [1]** 47/22
**Signature [3]** 9/19 16/3 47/3
**Signature Bank [1]** 9/19
**significantly [1]** 8/24
**Silicon [6]** 9/19 16/3 35/17 44/21 46/9 46/18
**Silicon Valley [2]** 9/19 46/9
**similar [2]** 46/8 46/19
**similarly [4]** 1/6 2/2 46/19 46/21
**since [4]** 20/5 27/16 31/4 51/9
**single [2]** 38/1 39/5
**sitting [1]** 8/10
**situated [4]** 1/7 2/2 46/19 46/21
**situation [3]** 18/21 22/18 45/22
**size [1]** 7/1
**Slow [2]** 36/19 38/9
**so [59]**
**sold [21]** 6/9 12/20 13/17 13/24 14/3 14/4 14/6 15/17 16/13 28/25 29/2 30/9 30/13 30/14 30/16 30/18 34/17 35/3 36/3 36/25 49/4
**sole [1]** 24/13
**some [16]** 4/9 4/9 13/16 26/13 28/19 29/10 29/13 31/21 32/12 35/8 36/3 42/9 42/22 43/13 47/14 47/21
**something [5]** 4/24

13/15 19/11 21/20 50/4
**sometimes [2]** 17/5 48/11
**somewhat [2]** 27/8 36/8
**soon [2]** 22/14 52/17
**sophisticated [3]** 40/25 41/8 41/8
**sorry [9]** 7/21 9/1 13/9 20/17 26/1 36/20 38/10 48/3 48/4
**sort [13]** 6/16 18/22 32/7 32/12 38/23 38/24 39/24 40/21 41/7 43/13 43/16 43/17 44/17
**sought [6]** 9/4 9/23 11/14 12/7 32/4 32/12
**sound [4]** 15/7 23/19 23/21 23/24
**sounds [1]** 10/8
**source [2]** 17/23 17/23
**sources [1]** 33/2
**SOUTHERN [1]** 1/3
**specific [10]** 6/10 10/1 13/6 21/17 23/14 26/7 28/21 34/22 34/22 37/18
**specifically [4]** 7/5 7/12 24/19 34/3
**specificity [1]** 19/22
**stage [2]** 11/20 27/21
**stand [1]** 52/22
**standard [8]** 19/17 19/19 39/10 39/12 40/14 40/19 40/20 41/12
**standing [1]** 11/5
**start [5]** 4/8 4/25 4/25 13/7 43/7
**started [4]** 4/6 14/15 14/18 45/25
**state [1]** 3/6
**statement [21]** 4/19 5/23 8/17 8/23 9/12 10/15 11/12 12/5 13/4 13/11 17/12 18/8 22/4 34/23 34/23 34/24 35/9 36/25 37/2 37/13 51/8
**statements [42]** 5/10 5/11 5/15 5/19 5/23 6/9 6/12 6/22 7/4 7/12 8/6 8/13 13/7 14/10 14/17 14/19 18/12 18/17 18/23 19/14 19/15 19/16 20/25 21/14 21/18 21/22 21/24 23/15 24/2 25/14 25/17 25/22 35/14 37/18 37/19 37/21 38/24 39/17 39/20 41/21 41/25 51/7
**STATES [4]** 1/1 1/21 54/3 54/7
**stating [1]** 40/14
**status [2]** 46/13 46/14
**statute [2]** 19/25 20/11
**statutory [1]** 20/20
**stay [1]** 10/7
**stenographically [1]**

## S

**stenographically... [1]** 54/4
**step [1]** 11/6
**steps [1]** 10/14
**still [6]** 9/7 9/23 26/23 30/3 50/8 50/10
**stock [6]** 28/23 30/7 30/10 30/14 30/18 31/7
**stop [1]** 22/1
**stopped [2]** 26/12 42/9
**straight [1]** 22/12
**strategic [2]** 45/24 45/24
**STREET [1]** 1/22
**strictly [1]** 35/1
**strip [1]** 8/9
**strong [1]** 9/15
**stupidly [1]** 11/13
**submission [2]** 46/15 52/1
**submit [3]** 19/4 38/14 40/6
**subsection [1]** 20/14
**sudden [1]** 35/19
**sufficient [3]** 16/15 19/22 39/7
**suggest [1]** 21/18
**SUITE [4]** 1/22 2/10 2/14 2/18
**sullcrom.com [3]** 2/12 2/16 2/20
**SULLIVAN [6]** 2/9 2/13 2/17 3/14 3/17 3/20
**summary [1]** 11/23
**sums [1]** 28/9
**supported [1]** 18/11
**supports [1]** 28/20
**sure [8]** 4/6 4/17 13/20 26/19 27/16 46/7 47/15 50/24
**survive [3]** 12/1 52/6 52/19
**suspicion [1]** 30/25
**suspicious [1]** 30/25

## T

**table [1]** 5/8
**take [14]** 4/12 7/22 7/23 16/25 21/2 40/8 40/10 41/5 41/9 41/25 47/13 49/10 52/1 52/17
**taken [3]** 22/13 27/4 46/15
**takes [1]** 27/24
**taking [6]** 11/6 27/6 27/7 36/2 48/4 48/4
**talk [1]** 17/5
**talked [2]** 28/18 32/15
**Tan [3]** 1/6 2/2 3/4
**tap [3]** 10/6 32/18 32/22
**tapped [2]** 33/1 33/9
**tauting [1]** 21/22
**tax [5]** 28/17 29/12 29/15 29/16 30/2
**taxes [1]** 29/22
**tell [4]** 23/7 23/8 36/5 41/13

**telling [2]** 37/6 37/10
**term [8]** 9/12 9/16 15/11 28/5 28/5 33/14 34/5 43/20
**terminology [1]** 43/14
**terms [8]** 5/14 5/17 11/17 29/18 31/24 40/15 40/22 43/15
**text [1]** 49/2
**than [9]** 12/11 15/9 21/18 22/7 29/16 35/7 37/6 47/25 48/4
**thank [9]** 17/10 31/9 34/15 48/3 48/22 50/13 50/15 51/25 52/23
**that [360]**
**that's [50]** 6/24 7/25 8/10 8/12 10/21 11/1 11/19 12/9 12/15 13/22 14/9 15/24 16/1 16/7 16/7 17/7 18/3 18/5 18/22 19/8 20/12 20/19 20/19 20/21 20/21 21/9 23/1 23/20 24/22 25/8 26/11 27/21 28/8 31/7 32/11 35/6 37/13 39/2 39/10 39/18 41/22 42/3 42/4 42/21 42/25 44/15 44/17 45/22 50/10 50/19
**their [23]** 6/6 6/8 6/11 7/5 7/10 7/25 9/11 11/4 11/12 13/4 13/13 15/3 15/17 22/16 27/4 27/6 27/11 36/2 36/18 37/1 37/21 38/4 48/25
**them [12]** 5/13 7/4 7/5 7/16 11/6 21/8 21/20 26/24 28/6 29/2 29/10 30/7
**themselves [1]** 5/15
**then [38]** 4/10 5/20 7/10 8/5 8/7 9/16 12/6 13/22 15/9 19/9 20/13 21/12 22/9 25/22 25/25 26/2 27/20 28/18 29/25 30/10 30/15 30/17 30/18 31/22 33/8 36/13 38/20 41/6 42/16 43/10 43/20 45/25 48/6 48/7 49/19 50/5 52/17 52/19
**theories [1]** 4/18
**theory [10]** 6/21 8/22 9/2 9/9 10/13 12/3 14/16 14/19 15/6 21/24
**there [39]** 4/19 5/7 6/13 7/2 11/4 11/16 11/23 12/9 16/9 19/4 19/11 19/16 20/16 22/1 24/9 27/2 28/13 32/12 33/12 34/3 35/19 35/20 39/4 39/7 42/17 44/20 44/24 45/3 45/13 45/22 45/23 46/17 47/3 49/15 49/20 50/10 51/1 51/8 52/17
**there's [34]** 8/3 8/9 11/15 11/25 21/18 21/19 27/6 29/17 29/21 33/3 35/4 35/25 35/25

**36/11 36/12 36/13 36/15 36/21 36/24 38/22 39/23 39/23 40/21 40/24 41/3 41/18 43/11 43/13 43/13 44/16 44/22 46/2 46/10 47/1
**thereafter [2]** 15/14 52/20
**these [22]** 8/6 10/8 15/19 15/19 17/25 18/12 18/17 18/23 19/3 21/7 21/7 21/19 29/11 29/14 38/13 38/15 38/15 39/16 41/21 46/2 47/4 49/4
**they [123]**
**they're [4]** 20/15 21/17 36/12 48/11
**they've [1]** 27/5
**thing [4]** 31/21 32/6 35/7 37/16
**things [5]** 6/20 8/14 8/15 43/15 43/16
**think [36]** 8/9 9/16 10/24 11/1 11/9 14/18 16/24 17/12 18/17 21/13 22/11 24/1 25/8 25/10 28/13 31/3 31/4 31/7 32/6 32/19 33/3 33/15 34/20 36/11 36/16 39/18 39/19 41/23 43/15 44/16 47/11 47/16 47/18 52/4 52/4 52/16
**thinking [1]** 6/20
**thinks [1]** 19/6
**third [2]** 2/4 23/20
**this [79]**
**thoroughly [2]** 4/7 4/16
**those [35]** 5/11 5/18 5/19 6/9 6/10 8/1 10/3 10/17 10/20 11/18 11/20 12/10 12/19 12/21 13/18 14/10 19/15 21/16 21/24 23/25 25/16 26/6 29/3 29/14 31/9 33/23 35/24 36/22 37/18 40/9 43/15 44/20 45/5 50/9 50/16
**though [5]** 9/15 9/22 15/16 19/11 23/19
**three [3]** 16/8 20/16 39/5
**thrilled [1]** 19/23
**through [4]** 5/18 14/18 14/19 24/12
**time [25]** 6/9 6/25 8/6 8/22 9/2 9/18 12/24 13/2 15/14 21/10 23/12 27/15 30/13 31/3 31/5 31/10 31/25 32/5 33/5 36/16 36/22 36/23 42/23 49/25 52/13
**times [4]** 13/19 16/1 18/20 24/12
**timing [13]** 6/16 6/16 8/16 9/25 10/1 10/13 10/14 10/15 12/5 12/18

**13/7 31/24 36/15
**Title [1]** 54/3
**today [1]** 52/10
**together [1]** 46/1
**told [3]** 10/25 34/18 50/1
**too [7]** 4/2 16/12 16/12 17/5 36/1 43/24 44/16
**took [3]** 10/14 14/15 28/8
**top [1]** 15/3
**torts [1]** 11/16
**total [1]** 27/25
**transactions [2]** 28/25 29/11
**transcript [4]** 1/5 1/14 54/4 54/6
**transcripts [1]** 1/24
**treated [1]** 29/18
**treatment [1]** 28/17
**tried [2]** 4/15 10/19
**trouble [1]** 10/7
**true [5]** 13/12 19/2 30/20 40/9 54/3
**truth [2]** 22/16 23/8
**try [1]** 9/20
**trying [6]** 8/7 10/11 22/6 29/6 30/11 35/8
**turn [2]** 31/11 48/17
**twice [2]** 12/24 13/17
**two [8]** 3/24 6/10 13/18 28/25 29/11 30/15 35/17 36/11
**types [3]** 4/5 33/20 38/18

## U

**U.S.C [1]** 20/9
**ultimately [2]** 9/22 45/1
**Unable [1]** 17/6
**unclear [2]** 29/13 51/3
**under [6]** 9/21 17/2 20/23 23/4 46/15 52/1
**understand [8]** 4/7 4/17 10/12 21/4 32/11 38/17 40/16 45/11
**understanding [1]** 46/16
**understood [3]** 25/21 36/5 39/13
**unfortunately [4]** 39/23 40/20 41/11 49/11
**unhedged [8]** 9/15 15/25 19/12 23/13 23/23 49/13 49/14 49/18
**uniquely [2]** 10/17 10/21
**UNITED [4]** 1/1 1/21 54/3 54/7
**United States [1]** 54/7
**unpledged [1]** 28/10
**unrealized [1]** 33/22
**until [2]** 8/13 52/5
**up [19]** 6/5 8/13 16/4 16/5 16/17 19/20 25/13 26/24 28/6 30/6 30/7 30/10 30/12 30/15 30/17 31/7 32/10 46/10

**48/1
**upon [1]** 48/17
**us [7]** 7/17 7/17 7/18 8/3 14/15 15/5 17/19
**use [5]** 27/2 29/22 29/23 39/11 41/12
**used [6]** 32/22 37/10 38/16 41/17 42/16 44/12
**uses [1]** 38/19
**using [3]** 43/20 44/12 50/8

## V

**vague [1]** 7/4
**Valley [6]** 9/19 16/3 35/17 44/21 46/9 46/18
**value [5]** 8/24 15/15 15/18 21/19 49/16
**values [1]** 11/4
**various [2]** 4/5 33/16
**version [1]** 17/7
**versus [5]** 3/4 9/11 10/15 43/14 45/20
**very [15]** 12/2 18/8 19/19 28/24 37/16 37/18 38/18 41/24 41/24 47/18 48/5 51/3 51/6 51/24 52/16
**view [3]** 5/8 21/24 40/15
**violation [1]** 11/16
**virtue [1]** 38/3
**vs [1]** 1/9

## W

**Wagner [2]** 30/6 30/13
**waiting [1]** 30/12
**walk [2]** 14/17 14/18
**walking [1]** 11/7
**want [8]** 4/6 32/10 37/13 43/24 45/12 47/5 47/9 47/20
**wanted [5]** 22/17 24/14 43/2 46/4 49/8
**was [98]**
**wasn't [10]** 11/6 15/23 16/14 16/16 23/9 23/24 24/18 32/9 39/7 51/9
**way [13]** 4/4 8/8 14/24 16/4 19/3 19/4 22/7 23/13 30/3 33/12 45/18 46/2 49/23
**we [99]**
**we'll [4]** 48/6 48/7 52/17 52/19
**we're [15]** 3/24 7/18 9/7 11/7 11/22 19/24 20/22 20/22 35/13 35/13 35/15 37/10 42/6 46/21 48/14
**we've [5]** 14/6 17/15 21/1 47/8 47/12
**wealth [1]** 30/3
**week [1]** 29/3
**weighted [2]** 9/16 15/11
**Welcome [1]** 3/23
**well [25]** 3/24 5/12 6/19 11/21 16/24 17/17

## W

**well... [19]**  17/18 18/8 20/7 20/19 21/15 22/20 24/8 25/11 25/13 26/22 26/22 28/12 28/13 37/8 38/23 41/21 48/10 48/16 52/23
**well-capitalized [1]**  17/17
**went [5]**  27/13 30/7 30/10 30/15 31/7
**were [57]**
**weren't [3]**  16/22 26/19 29/15
**WEST [1]**  1/22
**Westlaw [1]**  30/23
**what [81]**
**what's [4]**  22/15 28/5 46/8 46/13
**whatever [2]**  4/11 37/9
**when [31]**  6/2 6/24 8/5 9/6 10/7 10/14 12/19 13/23 16/13 20/24 22/10 24/11 26/9 26/14 27/13 30/6 30/13 33/25 34/17 35/3 36/24 37/7 37/19 37/22 39/11 40/4 41/16 42/21 48/24 49/12 50/3
**where [13]**  7/25 8/14 13/19 17/24 19/24 20/24 24/19 26/4 27/1 30/16 34/3 35/18 47/4
**whether [8]**  7/11 14/16 18/7 18/9 24/9 33/4 34/16 48/25
**which [20]**  5/25 7/19 9/11 9/21 16/2 16/19 18/20 20/23 21/3 27/4 30/23 37/1 37/25 38/2 43/8 43/8 43/9 44/23 45/20 49/11
**while [3]**  8/14 19/24 38/4
**who [2]**  20/23 45/2
**whole [8]**  6/22 14/17 14/20 15/6 37/22 41/4 41/5 41/16
**wholly [2]**  15/23 15/25
**why [13]**  13/4 14/19 16/1 16/12 20/24 20/25 24/16 30/11 31/1 31/7 35/13 49/16 50/5
**will [7]**  8/2 15/5 17/19 21/15 25/10 35/21 36/14
**wires [1]**  25/10
**wish [2]**  4/11 41/12
**withdrawing [1]**  35/18
**withdrew [1]**  7/25
**within [2]**  10/18 10/21
**without [4]**  13/2 13/3 31/8 43/20
**won't [3]**  13/1 15/4 21/5
**word [3]**  27/2 28/14 48/22
**words [5]**  12/13 26/6 32/22 37/10 38/4

**work [2]**  27/19 32/24
**worked [1]**  6/5
**worry [1]**  19/10
**worth [1]**  29/1
**would [89]**
**wouldn't [5]**  13/5 16/15 21/8 22/13 23/3
**written [1]**  52/2

## Y

**Yeah [1]**  43/1
**years [1]**  44/24
**yes [24]**  4/14 4/25 5/16 8/20 8/25 10/3 10/5 14/1 17/7 17/14 20/12 21/5 22/21 25/18 28/3 28/4 31/14 33/15 37/8 39/14 44/2 44/4 52/8 52/14
**yet [4]**  11/10 13/9 15/17 52/5
**YORK [2]**  2/5 2/5
**you [125]**
**you know [1]**  41/5
**you'd [1]**  3/6
**you're [15]**  4/20 5/18 10/8 14/5 17/1 18/3 18/6 26/9 30/22 33/25 34/24 37/6 37/7 40/20 44/10
**you've [3]**  18/21 44/14 51/15
**your [68]**
**your Honor [10]**  25/1 26/1 26/9 31/4 31/14 40/18 50/15 51/22 52/8 52/24
**your opening [1]**  34/1
**yours [1]**  12/13
**yourself [1]**  18/24

## Z

**zoomed [1]**  30/17